John H. Bae (JB-4792)
Ingrid Bagby (IB-3844)
CADWALADER, WICKERSHAM & TAFT LLP
100 Maiden Lane
New York, New York 10038
Telephone: (212) 504-6000

Attorneys for the Joint Administrators of
RSL Communications Plc, Plaintiff

Judge Berman

04 CV 5217

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RSL COMMUNICATIONS PLC, by
Michael John Andrew Jervis and Steven Anthony Pearson,
as the Joint Administrators,

Plaintiff,

-against-

Nesim Bildirici, Paul Domorski, Itzhak Fisher, Ronald S. Lauder, Steven Schiffman, Jacob Schuster and Eugene Sekulow,

Defendants.

Civil Action No.
04-

RECEIVED
JUL 02 2004
U.S.D.C. S.D. N.Y.
CASHIERS

**COMPLAINT**

RSL Communications Plc ("RSL Plc" or the "Plaintiff"), by Michael John Andrew Jervis and Steven Anthony Pearson as Joint Administrators (the "Joint Administrators"), through their undersigned attorneys, hereby allege as and for their Complaint in this action as follows:

**NATURE OF THE ACTION**

1. The Plaintiff, through the Joint Administrators, has commenced this action against the former members of the board of directors (the "Defendants") of RSL Plc for damages suffered by RSL Plc and, consequently, its creditors, resulting from the Defendants' breach of their fiduciary duties, including the duty of care, owed to RSL Plc and its creditors.

2. As alleged below, the Defendants permitted RSL Plc to borrow significant sums of money, yet never took any steps to protect or preserve the money they allowed the company to borrow. At a time when RSL Plc was in the zone of insolvency and when it should have been clear that its parent company, RSL Communications Limited ("RSL Ltd."), and the RSL operating companies (the "RSL affiliates", together, the "RSL Group") were losing significant sums of money in their operations without an end in sight, the Defendants, through their complete abdication of their duties and responsibilities, permitted RSL Ltd. and the RSL affiliates to use substantially all of RSL Plc's money to fund their losses.

3. The Defendants never took any action whatsoever to approve or disapprove of RSL Ltd. or the affiliates' continued use of RSL Plc's money. The Defendants never took any steps to assess the benefits or harm to RSL Plc in allowing RSL Ltd. or the RSL affiliates to use RSL Plc's money to fund their mounting losses. Indeed, the Defendants never held even a single meeting of the board of directors of RSL Plc to consider the interests of RSL Plc or its creditors. Once the money was borrowed, the Defendants allowed the money to be handed over to RSL Ltd. and the RSL affiliates for them to use for whatever purpose they deemed appropriate, without regard to how the money would be repaid to RSL Plc, or how RSL Plc would repay the persons from whom it borrowed the money. The Defendants permitted the RSL affiliates to use all of RSL Plc's money, even when outside financial advisors and RSL Ltd.'s own Chief Financial Officer expressed concern that the RSL Group did not have sufficient funds to continue to operate through the year 2000. The conduct of the Defendants clearly evidences their complete disregard of the interests of RSL Plc and its creditors. As Defendant Nesim Bildirici testified at his recent deposition, "Plc meant nothing to me . . . as a director or as an employee of RSL."

4. In February 2000, the board of directors of RSL Plc permitted RSL Plc to take on public bond debt of approximately $200 million on top of preexisting debt of approximately

$1.2 billion. Although the RSL Plc board saw fit to take on this significant debt, after the bond issuance, the board never held a single board meeting to monitor how the proceeds of the bond offerings were being used. Instead, through their inaction, the Defendants allowed individuals employed by RSL Ltd. to spend the entire amount of these proceeds by continuing to fund the operations of the RSL Group that were losing money in significant amounts without an end in sight.

5. In July 2000, having allowed RSL Ltd. and the RSL affiliates to spend all of the proceeds of both the February 2000 bond offering and prior borrowings, RSL Plc took on additional debt of $100 million from Defendant Ronald Lauder under terms very favorable to him. The RSL Plc board never held a board meeting to approve or authorize that loan. Like the $200 million raised by the February bond offering, the $100 million from the Ronald Lauder loan was spent in continuing to fund the operations of the RSL Group that were continuing to lose immense sums of money, without any participation or involvement by the RSL Plc board.

6. While RSL Plc's board continued its practice of abdicating its duties, significant events took place in the year 2000 that should have caused the RSL Plc board to take steps to protect the interests of RSL Plc and its creditors. As early as March 2000, with RSL Plc operating at a loss, it became clear that the RSL Group's attempts to raise money by divesting subsidiaries were unlikely to succeed at the high prices being sought by RSL Group. Indeed, by May 2000, RSL Ltd. had cancelled its efforts to raise money by selling its Australian subsidiary because it was unable to receive an attractive price. Meanwhile, in that same month, the RSL Group already had burned through over $100 million. Moreover, in June 2000, the board of directors of RSL Plc knew or should have known that the RSL Group's business plan, which projected the Group would raise $700 million to $1.1 billion over the next five years, was no longer viable as a consequence of RSL Group's complete and demonstrated inability at that point to raise additional cash through initial public offerings, equity infusions or other means. In fact, by June 8, 2000, RSL

Ltd.'s outside financial advisors warned RSL Ltd. that based on the company's then-current projections, the RSL Group would run out of cash by November 2000. At about the same time, RSL Ltd.'s then-Chief Financial Officer warned that the RSL Group would need to raise an additional $250 million to survive through the year 2000.

7. Against these facts and other facts alleged below, the Defendants allowed RSL Plc's assets to be wasted and breached their duties, including fiduciary duty of care, by permitting RSL Ltd. and the RSL affiliates to continue taking RSL Plc's money to fund their mounting losses throughout the year 2000. These facts, together with their knowledge of the dire financial condition of the RSL Group and the rate at which the operating subsidiaries were spending RSL Plc's money, demonstrate that the Defendants knew or should have known that the continued operation of the RSL Group in its then-current state would inevitably lead to the RSL Group's insolvency – an unfortunate fact that unsurprisingly came to fruition.

8. Notwithstanding the foregoing, the Defendants failed to take any action to preserve RSL Plc's funds, or have any participation in how the RSL Group would use RSL Plc's money. They failed to hold even a single board meeting or take any other action to consider alternative business plans that could have preserved some portion of RSL Plc's funds. They never challenged (or exercised a bare minimum of oversight that would support the challenge of) the RSL Group's attempts to sell assets only at above-market prices, in light of the declining telecom market and RSL Plc's own ever-dwindling cash resources and increasingly precarious financial situation. Although the telecom market was experiencing instability at this time, other telecom companies were consummating asset sales. But, despite this fact, the RSL Group did not take the action necessary to aggressively pursue its own asset sales, including reductions in price, so as to realize much-needed cash. Indeed, it is telling that certain individuals responsible for operating the RSL Group were contemplating and studying additional acquisitions of subsidiaries, even when,

simultaneously, others at RSL Group clearly recognized that the RSL Group did not have sufficient cash to survive through the year 2000. Yet, the RSL Plc board never intervened, or even met to consider whether the business strategy being pursued made any economic or business sense at that time.

9. Significantly, the members of the board of RSL Plc signed minutes of board meetings that never took place. Indeed, Mr. Bildirici testified at his recent deposition that he often signed board minutes without even reading the minutes, and at times, was merely given the signature page to sign, without the actual board minutes attached to the signature page.

10. These facts, as alleged more fully below, demonstrate that the Defendants violated their fiduciary duties under the laws of New York, including the duty of care. Although RSL Plc was organized under the laws of the United Kingdom, RSL Plc did not have any operations in the United Kingdom, and operated out of its offices in New York City. While the board of RSL Plc never met, the members of the board signed minutes of the fictional board meetings in New York. Moreover, the bonds were issued to creditors located in New York under indentures governed by New York law. Further, upon information and belief, with one exception, all of the directors of RSL Plc resided or conducted business in New York State during the relevant time period, and continue to do so today.

11. The Defendants' complete inattention to how and the circumstances under which RSL Plc's money was being spent and the resulting failure to protect RSL Plc's assets during the period from March 2000 through December 2000 constitute an abdication of their fiduciary duties as members of the board of directors under New York law. By this Complaint, RSL Plc, through its Joint Administrators, seeks an award of money damages in an amount not less than $400 million, the exact amount to be determined at trial, against the Defendants for the amount of RSL Plc's money that was spent during this period, as well as the lost proceeds that could have been

recovered from the sale of operating subsidiaries had the Defendants aggressively pursued such asset sales prior to the RSL Group's insolvency proceedings.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because this is a controversy between citizens of a foreign state and citizens of states of the United States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Venue in this District is proper under 28 U.S.C. § 1391(a) because the events and omissions giving rise to the claims at issue occurred in this District.

## PARTIES

14. Pursuant to an order of the High Court of Justice of England and Wales, dated March 19, 2001, Neville Barry Kahn ("Kahn"), Peter Norman Spratt ("Spratt") and Steven Anthony Pearson ("Pearson") were duly appointed joint administrators of the estate of RSL Plc, which is in administration under the United Kingdom Insolvency Act 1986. In 2002, Kahn resigned as a joint administrator. Subsequently, pursuant to an order of the High Court of Justice of England and Wales, dated June 24, 2003, Michael John Andrew Jervis replaced Spratt as a joint administrator. The Joint Administrators are residents of the United Kingdom and are agents of the estate of RSL Plc, and have authority to manage its affairs pursuant to their statutory duties under the United Kingdom Insolvency Act 1986.

15. In furtherance of their duties as joint administrators, on February 19, 2003, Spratt and Pearson commenced a case ancillary to a foreign proceeding by filing with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a petition pursuant to 11 U.S.C. § 304, seeking the authority to conduct discovery in the United States regarding assets and claims of the estate of RSL Plc. Pursuant to an Order of the Bankruptcy Court,

the Joint Administrators, conducted limited discovery, and took a deposition of Defendant Nesim Bildirici.

16. Defendant Nesim Bildirici ("Bildirici") is an individual who was, at all times relevant to this Complaint, a member of the board of directors of RSL Plc. Upon information and belief, Bildirici resides at 2264 Ocean Parkway, Brooklyn, New York 11223.

17. Defendant Paul Domorski ("Domorski") is an individual who became a member of the board of directors of RSL Plc starting on August 21, 2000 and was a director thereafter, for such period as is relevant to this Complaint. Upon information and belief, Domorski resides at 159 Blue Heron Court, Holmdel, New Jersey 07733.

18. Defendant Itzhak Fisher ("Fisher") is an individual who was a member of the board of directors of RSL Plc at all times relevant to this Complaint, until August 21, 2000, and simultaneously a member of the board of directors of RSL Ltd. during this period. Upon information and belief, Fisher resides at 155 West 70th Street, New York, New York 10023.

19. Defendant Ronald S. Lauder ("Lauder") is an individual who was, at all times relevant to this Complaint, a member of the board of directors of RSL Plc and simultaneously a member of the board of directors of RSL Plc's corporate parent, RSL Ltd. Upon information and belief, Lauder resides at 71 East 71st Street, New York, New York 10021.

20. Defendant Steven Schiffman ("Schiffman") is an individual who became a member of the board of directors of RSL Plc starting on August 21, 2000 and was a director thereafter, for such period as is relevant to this Complaint. Upon information and belief, Schiffman resides at 81 Sturges Road, Fairfield, Connecticut 06430.

21. Defendant Jacob Schuster ("Schuster") is an individual who was, at all times relevant to this Complaint, a member of the board of directors of RSL Plc, and simultaneously a

member of the board of directors of RSL Plc's corporate parent, RSL Ltd. Upon information and belief, Schuster resides at 12 Lyncrest Drive, Monsey, New York 10952.

22. Defendant Eugene Sekulow ("Sekulow") is an individual who was, at all times relevant to this Complaint, a member of the board of directors of RSL Plc, and simultaneously a member of the board of directors of RSL Ltd. Upon information and belief, Sekulow resides or conducts business at 7 Axtell Drive, Scarsdale, New York 10583.

## FACTUAL ALLEGATIONS

### The Role of RSL Plc within the RSL Group

23. In mid-1994, defendants Lauder and Fisher founded RSL Ltd., a multinational telecommunications company that sought to capitalize upon the deregulation of the international long distance telecommunications market. RSL Ltd. became the parent company for a group of direct and indirect subsidiaries operating in the telecom industry (collectively, the "RSL Group"). The RSL Group conducted business through operating subsidiaries located in various countries, with most of the subsidiaries having their own local management, including sales, engineering and customer service. At their peak, the RSL Group's subsidiaries provided a range of voice, mobile, data/internet and value-added services primarily to small and medium-sized businesses and residential customers in 22 countries.

24. RSL Plc was incorporated in the United Kingdom on July 25, 1996 as a company limited by shares under the English Companies Act 1985. At all times relevant to this Complaint, RSL Plc operated out of New York, issued bonds out of New York under indentures governed by New York law, and all minutes of meetings of the board of directors of RSL Plc were signed in New York, and allegedly took place in New York City. Moreover, decisions regarding the use of RSL Plc's funds, as well as all other strategic issues affecting RSL Plc and the RSL Group, were made by RSL Ltd. executives and directors headquartered in RSL Ltd.'s New York City

offices. Upon information and belief, RSL Plc maintained only limited contacts with the United Kingdom, such as maintaining statutory records and a registered office in England, as required under English law.

25. Although its parent was RSL Ltd., RSL Plc itself acted as a holding company for the RSL Group's European subsidiaries. RSL Plc also functioned as a financing vehicle for the operating subsidiaries of the RSL Group. Indeed, RSL Plc was formed for tax purposes in anticipation of bond financings intended to benefit the RSL Group. RSL Plc did not itself utilize the vast majority of the funds it raised, but instead funneled that money to the RSL Group's operating subsidiaries to fund their operations.

26. From its inception through February 2000, RSL Plc raised approximately $1.4 billion of public debt, which consisted of nine series of senior bond issues. The last of these bonds consisted of $100 million and €100 million in 12 7/8% Senior Notes due 2010 (the "2000 Plc Bonds"), which were issued on or about February 22, 2000. The 2000 Plc Bonds were guaranteed by RSL Ltd. and RSL COM U.S.A., Inc. ("RSL USA"), the United States operating subsidiary of the RSL Group and an indirect subsidiary of both RSL Plc and RSL Ltd. Presently, RSL USA is the subject of chapter 11 bankruptcy proceedings in the Bankruptcy Court, and its creditors are pursuing claims for breach of fiduciary duty against the former directors of RSL USA.

27. At the time the 2000 Plc Bonds were issued in February 2000, RSL Ltd. and RSL USA also retroactively guaranteed the other bonds that previously had been issued by RSL Plc. Each of the nine indentures governing the bonds issued by RSL Plc are governed by New York law. Upon information and belief, the vast majority of the holders of the RSL Plc bonds, who in turn are the vast majority of the creditors of RSL Plc, are located in the United States.

**The Events of Year 2000**

28. From its founding in 1994, the RSL Group was managed by the employees of RSL Ltd. and the board of directors of RSL Ltd. The RSL Group grew through an aggressive acquisition strategy, pursuant to which the RSL Group expanded by acquiring existing local telecom businesses. This aggressive growth strategy resulted in the RSL Group having distant operations in places as diverse as Japan, Hong Kong, Australia and Latin America, as well as operations in both North America and Europe. As a growing business, the RSL Group also pursued an aggressive fundraising program in order to provide the necessary cash flow support to the operating subsidiaries. As noted, approximately $1.4 billion of this fundraising came from RSL Plc's bond issues.

29. As the RSL Group entered the year 2000, the board of directors and the officers of RSL Ltd., who were in charge of managing the RSL Group's operations, were keenly aware of the RSL Group's continuing need for funding. In January 2000, the board of directors of RSL Ltd. reviewed a summary of the RSL Group's 1999 performance as compared to forecasts for the year 2000, and RSL Ltd.'s Chief Financial Officer noted at the time that the 2000 budget was "aggressive" and, therefore, depended upon the occurrence of specific critical events, including the completion of new financing and improvement in the RSL Group's cash management.

30. Subsequently, RSL Plc issued the 2000 Plc Bonds, raising approximately $200 million in cash that was to be utilized for funding the RSL Group's operating subsidiaries, interest payments and other expenditures. Notably, the $200 million RSL Plc raised by this bond offering fell approximately $100 million short of the total anticipated financing.

31. After the issuance of the 2000 Plc Bonds, in March 2000 at the latest, RSL Ltd.'s management concluded that certain portions of the RSL Group's operations were non-core assets and that such assets should be disposed of or monetized in order to streamline the business

and provide the funding needed for the year 2000 budget. RSL Ltd. hired an investment banking firm to assist in the pursuit of a private equity investment for RSL COM Latin America, as well as the pursuit of strategic alternatives for the RSL Group's Canadian operations. The board of directors of RSL Ltd. also considered closing RSL Group's Japan and Hong Kong operations as non-core businesses that were not profitable, but decided to delay the closing 90 days in order to attempt to locate a strategic investor.

32. In March of 2000, RSL Ltd. and the RSL Group produced a business plan for the period from 1999 through 2004 (the "RSL Business Plan"), which provided that on a going-forward basis, the RSL Group's focus would be solely on Europe and North America and that all other areas of the business were non-core and therefore, some or all of these non-core assets would be monetized. The RSL Business Plan provided that the RSL Group's strategy would be fully funded through various asset disposals, including obtaining approximately $200 million in financing from an initial public offering of the RSL Group's Australian operations during year 2000, as well as obtaining $100 million during the year 2000 from the sale of shares in a subsidiary known as "deltathree.com."

33. Despite the RSL Business Plan's focus on asset divestiture, and the fact that the Group's budget for year 2000 left very little cash cushion, at the end of March 2000, without the involvement of the RSL Plc board, the board of directors of RSL Ltd. approved the acquisition of two United Kingdom internet-related companies: REDNET Limited and Voyager Internet Limited/Voyager Networks Limited. Upon information and belief, these acquisitions ultimately resulted in the expenditure of approximately $42 million by the RSL Group. Upon further information and belief, the RSL Ltd. board approved these acquisitions without any contemplation or discussion of the impact of such spending on the RSL Business Plan, the Group's cash needs or increasingly suspect ability to meet the targets in the year 2000 budget.

34. Indeed, by the end of March 2000, RSL Plc's income statement already reflected a significant net loss of over $28 million for the three-month period ended March 31, 2000.

35. Subsequently, on or about April 14, 2000, the board of directors of RSL Ltd. issued a unanimous written consent approving the pursuit of an initial public offering for the RSL Group's Australian operations, as provided in the RSL Business Plan.

**Challenges to the RSL Business Strategy**

36. In early May 2000, RSL Ltd. released its financial results for the first quarter of 2000. A financial presentation to the board of directors of RSL Ltd. at this time stated that the company anticipated a "mixed" reaction to the results by the financial community, based in part upon concerns about "delivering on monetization promises." Upon information and belief, RSL Ltd. had cash on hand at the end of the first quarter of 2000 of approximately $310 million, a large portion of which represented proceeds from RSL Plc's bond offering.

37. Starting in the second quarter of 2000, the telecommunications industry began to show the effects of a dramatic decline as a result of oversupply, deregulation and intense competition. During this period, the capital markets became less enthusiastic about investments in emerging telecom companies such as the RSL Group, although sales of telecom assets still were being consummated. Nevertheless, as a result of this market instability, the RSL Group began to struggle in obtaining further investment or funding, and the share price of RSL Ltd. securities began to decline rapidly. Although the RSL Group was marketing for sale several of its operating subsidiaries and assets in 2000, it was now pursuing this strategy in a market with little interest in telecom acquisitions at the prices being demanded by RSL Ltd.'s management. Indeed, upon information and belief, no significant asset disposals occurred during this period and none of the RSL Group's efforts to obtain financing from third parties throughout the remainder of the year 2000

were successful. This negative turn of events, however, did not cause the directors of RSL Plc to meet or take any action to protect RSL Plc.

38. Further bad news for the RSL Group came at the end of May 2000 when, only three weeks after starting the sale process, RSL Ltd. was forced to cancel its initial public offering of the Australian subsidiary, as a result of market volatility. The failure to consummate the Australian initial public offering – a critical element of the RSL Business Plan – represented a reduction in available financing of approximately $200 million relative to the budget.

39. Notwithstanding this failure, which fundamentally altered a vital funding component contemplated by the RSL Business Plan, the RSL Ltd. board of directors never took any steps to modify the business plan, nor were the directors of RSL Plc roused from their slumber. The board of directors of RSL Plc failed to meet to evaluate the impact of this failure upon the viability of the RSL Group, or the interests of RSL Plc or its creditors.

40. Despite the RSL Group's inability to obtain additional financing, the RSL Group continued to burn through the substantial amounts of money RSL Plc had raised. In the month of May 2000 alone, the RSL Group used over $100 million. In a June 8, 2000 presentation made to RSL Ltd. by Goldman Sachs, RSL Ltd. was warned that based on the company's most recent projections, RSL Group would run out of cash by November 2000. Moreover, the Chief Financial Officer of RSL Ltd. candidly noted that the RSL Group needed to raise $250 million just to survive until the end of 2000.

41. From almost the beginning of year 2000, the stock price of RSL Ltd. performed worse than that of comparable telecom companies. However, in the period following the cancellation of the Australian IPO, the stock price of RSL Ltd. began to decline steeply in value and, by late June or early July, the stock traded independently of the relevant indices in the NASDAQ market. This continuing decrease in the RSL Ltd. stock price was an additional signal to the RSL

Group, not to mention the board of directors of RSL Plc, that serious questions surrounded the viability of the operating strategies being pursued by various RSL Group entities and funded substantially with RSL Plc cash. Until that time, the RSL Group had been pursuing a private equity investment along with its other fund-raising strategies. By July of 2000, however, no such private equity investment had been made, and the RSL Group's declining stock price made such an investment more unlikely. Similarly, the RSL Group had failed to raise the $100 million from the sale of the shares of deltathree.com as contemplated in the RSL Business Plan.

42. Upon information and belief, this was not the only indication of a lack of market confidence in the RSL Group, as a major investment bank advised the RSL Group during this period that a contemplated initial public offering of the RSL Group's Spanish subsidiary should be cancelled because of an absence of market support at the prices sought by the RSL Group. After the cancellation of the initial public offering, during the rest of 2000, the RSL Group marketed the Spanish subsidiary for sale and, upon information and belief, received offers to purchase the subsidiary in the range of $200 million. However, such offers were not accepted by the RSL Group and, in fact, by the time Kahn, Spratt and Pearson were appointed as joint administrators, the Spanish subsidiary had become virtually worthless.

43. Upon further information and belief, in June 2000, the chief financial officer of RSL Ltd. informed the board of directors of RSL Ltd. that more funding was required – possibly as much as $250 million – in order to survive through the end of the year. The RSL Group never raised the $250 million in financing during the remainder of 2000. Thus, it was abundantly clear that the additional funding contemplated by and integral to the RSL Business Plan and the RSL Group's budgets was not likely to be forthcoming.

44. The board of directors of RSL Ltd. then approved a stand-by, unsecured loan facility of up to $100 million to be provided by Defendant Lauder (the "Lauder Loan") to RSL Plc.

The terms of the loan involved a 1% arrangement fee payable immediately to Defendant Lauder, a draw-down fee of 1% each time amounts were drawn down under the loan, and a commitment fee of 1% per annum on the undrawn balance of the loan. Further, the loan carried interest at a rate of LIBOR plus 4½%. On or about July 6, 2000, RSL Plc, the borrower, entered into the loan agreement with Defendant Lauder. The Lauder Loan was guaranteed by RSL Ltd. and RSL USA.

45. Despite the company's existing debt of $1.4 billion, the board of directors of RSL Plc never formally met to approve the company's undertaking of this additional debt obligation, which was approved only by the board of RSL Ltd. Nevertheless, in August 2000, RSL Plc drew down $25 million from the Lauder Loan. Upon information and belief, the financing obtained by RSL Plc via the Lauder Loan was utilized to provide continuing funding to the operating subsidiaries of the RSL Group. Upon further information and belief, the directors of RSL Plc took no steps at this time to verify or evaluate the necessity, wisdom or propriety of continuing to provide cash to the RSL Group's operating subsidiaries.

46. During August 2000 -- the same month that RSL Plc drew down additional funds under the Lauder Loan -- the RSL Group's auditors, Deloitte & Touche, were at work preparing the financial statements for RSL Plc for the year 1999. As part of that process, Deloitte & Touche expressed concern regarding the ability of RSL Plc and/or RSL Group to sustain operations as a "going concern" through the end of the year 2000 and into 2001, in part as a result of the RSL Group's continued profligate rate of spending. Thus, in addition to the numerous warning signs casting doubt upon the viability of the RSL Business Plan, the RSL Group's prospects had deteriorated to the point that even professionals outside of the RSL Group recognized its increasingly precarious financial condition.

47. After the board of RSL Ltd. approved the Lauder Loan, during the summer and early fall of 2000, the directors of RSL Ltd. and RSL Plc did not hold any formal meetings, even

though the companies' financial condition continued to worsen. Although no full meetings of the board of directors of RSL Ltd. or RSL Plc were held in the period from August through October 2000, RSL Plc drew down an additional $30 million from the Lauder Loan in October 2000 in order to fund the voracious appetites of the RSL Group's operating subsidiaries for cash to fund their losses.

48. At the same time, possibly because the company recognized that it faced an imminent financial crisis and might not have sufficient funds to pay its employees, RSL Ltd. began providing assurances to its senior employees that their positions and bonus payments would be guaranteed during the company's "strategic repositioning."

49. On or about November 7, 2000, the board of directors of RSL Ltd. met to discuss the company's distressed financial condition and projected year-end cash balances. A presentation to the board at that meeting concluded that the company's business model, which had remained unchanged since the start of the year, was "a recipe to burn cash." As a result of this meeting, for the first time, the board of directors of RSL Ltd. determined to retain restructuring professionals for the RSL Group, and to implement stricter controls on cash spending. Even at this juncture, the board of RSL Plc failed to meet or take any other action to protect the interests of RSL Plc or its creditors despite the concern by management that the RSL Group might not survive until the end of the year.

50. In early November 2000, the RSL Group released its earnings for the third quarter of 2000, which indicated that the RSL Group had cash on hand of approximately of $72.6 million, less than one-third of the balance available as of the end of the first quarter of 2000. While the board of directors of RSL Plc remained asleep at the switch, the downward spiral of the RSL Group continued, and in December 2000, RSL Ltd. was de-listed from the NASDAQ stock exchange.

**RSL Plc and Other Members of the RSL Group Commence Insolvency Proceedings**

51. Upon information and belief, by the beginning of November 2000, RSL Plc had available cash of only a few million dollars, just months after having raised $200 million in bonds in February and having drawn down approximately $55 million under the Lauder Loan facility in the middle of the year. With no reasonable hope either for outside funding or the successful execution of any viable business strategy that would result in additional financing, in November 2000 RSL Plc drew down an additional $35 million under the Lauder Loan facility. Again, no meeting of the board of directors of RSL Plc was held to approve the incurrence of this debt or to consider alternative courses of action.

52. By early 2001 it became clear that certain members of the RSL Group would have to seek protection under the relevant local insolvency laws. On March 2, 2001, RSL Plc announced that it was suspending interest payments on certain of its bonds. During this period, RSL Plc also decided to defer repayment of the Lauder Loan.

53. On March 16, 2001, RSL USA and RSL COM Primecall, Inc., a wholly-owned subsidiary of RSL USA, filed with the Bankruptcy Court petitions for relief under chapter 11 of the United States Bankruptcy Code. On March 19, 2001, RSL Ltd. presented to the Supreme Court of Bermuda a petition seeking a winding-up order and the appointment of joint provisional liquidators for RSL Ltd. By order of the Bermuda Supreme Court, Spratt, Peter C. B. Mitchell and Randall S. Eisenberg were appointed the Joint Provisional Liquidators of RSL Ltd. (the "JPLs"). Also on March 19, 2001, the JPLs filed with the Bankruptcy Court a petition to commence a case ancillary to a foreign proceeding pursuant to 11 U.S.C. § 304, on behalf of RSL Ltd.

54. On March 19, 2001, an application was made to the High Court of Justice of England and Wales for the appointment of Administrators, under the provisions of the United Kingdom's Insolvency Act 1986, in respect of RSL Plc and its wholly-owned subsidiary, RSL COM

Europe Ltd. By order also dated March 19, 2001, the United Kingdom High Court appointed Kahn, Spratt and Pearson to act as the joint administrators of RSL Plc.

55. At the time of the High Court petition, RSL Plc's remaining undissipated assets fell far short of its liabilities, with its principal remaining assets consisting solely of cash, investments in subsidiaries and intercompany receivables of questionable value. Upon information and belief, by March of 2001, RSL Plc had little remaining cash.

**The RSL Plc Directors' Failure to Act Damaged the Company and its Creditors**

56. As early as early March 2000, the board of RSL Plc had specific indications that the RSL Group was spending money at extraordinary rates and that continuing to fund the RSL Group, in the absence of new financing, was unreasonable and imprudent. The Defendants knew or should have known that the RSL Group was operating at a loss and the RSL Group's ability to raise money by selling subsidiaries would be difficult as a consequence of the decline in the telecoms market. Further, this knowledge should have caused the Defendants to act to protect RSL Plc's interests during this period.

57. By June 2000, the Spanish and Australian initial public offerings had failed, the RSL Group had failed to obtain a private equity investment and several anticipated asset monetizations (such as the Telegate transaction and the sale of other non-core subsidiaries) had not yet occurred. By mid-June 2000, RSL Ltd.'s stock price had declined substantially, reflecting the significant uncertainty in the marketplace as to whether RSL Plc even would be able to make the interest payments on its bonds.

58. Meanwhile, the RSL Group was continuing to spend RSL Plc's money, using most or all of the funds remaining from the $200 million raised from the 2000 Plc Bonds. The Defendants permitted RSL Ltd. and the RSL affiliates to continue to use RSL Plc's money, notwithstanding the prediction from Goldman Sachs in June 2000 that the RSL Group would run out

of money by November 2000, and the concerns of RSL Ltd.'s own Chief Financial Officer that the company needed to raise another $250 million to survive through the year 2000.

59. Given all of these facts, by early to mid-2000 RSL Plc was either insolvent or in the "zone of insolvency" and the board of directors of RSL Plc had the duty to meet and substantively review the financial condition of RSL Plc, the costs of continuing to operate the RSL Group, the telecommunications industry in general and the amount of RSL Plc's remaining cash in order to determine what steps needed to be taken to preserve that cash for the benefit of RSL Plc and its creditors, including possibly ceasing to fund the operations of the RSL Group or certain parts thereof. RSL Plc's substantial debt burden of $1.4 billion in bonds plus the Lauder Loan mandated that directors actively monitor the events of year 2000 and their effects on the company.

60. However, notwithstanding their fiduciary duties as directors of RSL Plc, the Defendants never conducted a single board of directors meeting during this critical period to consider the interests of RSL Plc or its creditors holding $1.4 billion in claims. Indeed, as Defendant Bildirici testified "I must tell you, we never had a formal meeting where we discussed the Plc . . . We never – we never asked to participate in a Plc board meeting." Additionally, the Defendants never involved themselves in how the money that RSL Plc raised for the RSL Group was to be used.

61. While RSL Plc's records contain minutes of purported board meetings, Mr. Bildirici testified that the minutes actually recorded board meetings that never took place. He testified that he and other directors were asked to sign board minutes, even though no board meetings took place, and that they signed the board minutes without even reading the minutes. Specifically, RSL Plc's files contain minutes of a RSL Plc board of directors meeting of August 21, 2000 in New York City. The stated purpose of the only documented meeting of the board of directors of RSL Plc during the year 2000 was to accept the resignations of Defendant Fisher and Mr. Nir Tarlovsky as directors, and appoint Defendants Domorski and Schiffman as their successors.

However, Bildirici, the corporate secretary of RSL Plc who signed the minutes of this meeting, testified that no such meeting took place. Without even reading its contents, Defendant Bildirici simply signed the minutes that were presented to him by counsel for the RSL Group.

62. The only other meeting of the RSL Plc board after the February 2000 bonds were issued occurred on March 14, 2001, just days before RSL Plc filed for administration in the UK and long after RSL Plc's fate was sealed. This meeting occurred after professionals were retained to explore restructuring or bankruptcy options for the RSL Group. According to Defendant Bildirici, it was a "strange concept" that there was a difference between each of the entities in the RSL Group and this meeting represented the first time that the Defendants understood that there was a legal distinction between each of the RSL Group entities.

63. Despite the precipitous decline in the telecom market, during the entirety of the year 2000, the Defendants did not meet to discuss the deteriorating financial condition of either RSL Plc or the RSL Group, nor did the Defendants discuss or contemplate any actions that could or should be taken to preserve RSL Plc's cash and other assets for the benefit of its creditors. A reasonable and prudent board of directors exercising their fiduciary duties to RSL Plc and its creditors would have held regular and frequent meetings during the period from at least March 2000 onwards, and faced with a declining telecom market, would have taken steps to ensure the protection of the interests of RSL Plc and its creditors, to preserve the company's cash and to prevent any additional diminution in the value of RSL Plc's remaining assets. The RSL Plc directors took no such action, and virtually all of the company's assets were dissipated in funding the RSL Group's operations that, to any reasonable – or attentive – board, had little hope of surviving.

64. Indeed, despite warnings that additional funding was necessary for the survival of RSL Plc and the RSL Group, on or about February 5, 2001, RSL Plc made a payment in the amount of approximately $1 million, on account of past due invoices, to the law firm of

Debevoise & Plimpton LLP ("Debevoise"). Debevoise previously had acted as counsel to the RSL Group during the year 2000 and, upon information and belief, also acted and continues to act as counsel to Defendant Lauder. RSL Plc made this payment, just weeks prior to its insolvency filing, even though, upon information and belief, Defendant Lauder had previously paid approximately $800,000 to Debevoise in December 2000 for all outstanding amounts owed to the law firm. Upon further information and belief, when Debevoise received the $1 million payment from RSL Plc in February 2001, Debevoise subsequently repaid Defendant Lauder the $800,000 he had advanced in late 2000.

65. This payment by RSL Plc, virtually on the eve of the company's insolvency proceedings, was made even though it is questionable what legal services were provided to or for the benefit of RSL Plc in January/February 2001 as the RSL Group had, in November of 2000, retained a law firm other than Debevoise to assist the RSL Group with restructuring issues, based in part upon concerns of possible conflicts of interest with Debevoise. The failure by the board of directors of RSL Plc to adequately monitor the company's activities allowed this substantial payment to be made for the benefit of Defendant Lauder, an insider of the entire RSL Group, even though there was no discernible benefit provided by Debevoise to RSL Plc. This payment to Defendant Lauder's counsel had the effect of further depleting the assets of RSL Plc remaining for its creditors and, therefore, constitutes an additional breach of the RSL Plc board's fiduciary duties.

66. The critical need for oversight and involvement by the RSL Plc board of directors during year 2000 also is illustrated by the fact that, upon information and belief, several of the Defendants, including Defendant Lauder, were substantial shareholders in and directors of RSL Ltd. during year 2000. As alleged above, the share price of RSL Ltd. declined steadily throughout most of the year 2000. Upon information and belief, the declining telecommunications market and the concomitant decrease in the value of the shares in RSL Ltd. had a direct economic impact upon

the Defendants holding shares in RSL Ltd. Upon further information and belief, during year 2000 and early 2001, these Defendants had an economic incentive to attempt to preserve the value of their equity interests in RSL Ltd. by continuing to permit the operation and funding of the RSL Group, regardless of the harm that was being caused to the interests of RSL Plc and its creditors.

67. Upon information and belief, those Defendants that were both shareholders and directors of RSL Ltd. had an economic incentive to take risks by continuing to permit the funding of the RSL Group with RSL Plc's cash and by allowing RSL Plc to take on additional debt. With no effective oversight or involvement by the full board of directors of RSL Plc, RSL Plc and its creditors were left unprotected from the clear conflict of interests of those Defendants that were shareholders of RSL Ltd.

68. The lack of action by the RSL Plc board is further exacerbated by the fact that the RSL Plc directors could not have relied upon the board of RSL Plc's corporate parent, RSL Ltd., to ensure that the company's assets were being preserved and consideration was being given to the interests of creditors. Quite apart from the fact that the directors of RSL Ltd. owed fiduciary duties to RSL Ltd. and not to RSL Plc, during the most critical period from August until early November 2000, the full board of directors of RSL Ltd. also failed to hold any formal meetings, and the minutes from those board meetings that were held during the summer and fall of 2000 contain no statements suggesting that the board of directors of RSL Ltd. ever considered the interests of RSL Plc or its creditors. With no indication that any party was attempting to fulfill the fiduciary duties abdicated by RSL Plc's board, the Defendants' failure to meet and take action during the precipitous financial decline of the year 2000 was even more devastating to the company and its creditors.

69. Finally, the Defendants' abdication of their fiduciary duties caused damage to RSL Plc and its creditors in that certain of the operating subsidiaries of RSL Plc, or the assets thereof, could and/or should have been sold during the year 2000 for higher recoveries than were

ultimately obtained following the appointment of Kahn, Spratt and Pearson as joint administrators. Had the Defendants met during the year 2000 and resolved to aggressively pursue asset sales in order to preserve existing values for the benefit of RSL Plc and its creditors, certain assets or subsidiaries of RSL Plc could have been sold and, upon information and belief, funds could have been realized for the benefit of creditors. However, the Defendants' failure to meet as a board of directors and to consider the declining financial condition of RSL Plc and the market as a whole caused the corporation to lose the opportunity to sell assets at the then-prevailing market prices. Combined with their inattention to all of the other significant events of 2000 and early 2001, the Defendants' failure to meet as a board, consider and aggressively pursue a strategic sale of operating assets or a winding up of certain operations (including those being funded with cash funneled from RSL Plc), in consideration of the interests of RSL Plc and its creditors, resulted in a loss to the estate of several hundred million dollars.

**COUNT I**
**BREACH OF FIDUCIARY DUTIES TO RSL PLC**

70. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 69 as if fully set forth herein.

71. The Defendants, as members of the board of directors of RSL Plc, owed fiduciary duties, including a fiduciary duty of care, to the corporation and its constituents. In their capacity as fiduciaries, the Defendants had the obligation to supervise and monitor the affairs of the corporation, and to exercise independent judgment on behalf of the company and its constituents.

72. Beginning in March 2000 and thereafter, the Defendants' fiduciary duties encompassed the obligation to meet and consider the precarious economic condition of the RSL Group and the telecommunications market as a whole, the failure by the RSL Group to obtain the additional financing contemplated in the RSL Business Plan, the continuing rate at which RSL

Group was spending RSL Plc's cash and the resulting continued diminution of cash resources at RSL Plc.

73. As the board of directors of RSL Plc, during the year 2000 the Defendants owed fiduciary duties to RSL Plc to hold board meetings in order to evaluate the facts and circumstances, and to take any and all appropriate steps to preserve the assets of RSL Plc.

74. The RSL Plc board of directors, however, failed to conduct any such meetings and failed to take any such corrective or protective action even though the assets of RSL Plc continued to diminish in value. Indeed, the board failed to meet and evaluate whether it was appropriate, in light of the circumstances, for RSL Plc to incur additional debt by virtue of the Lauder Loan. The sustained pattern of inattention and inaction by the members of the board of directors of RSL Plc during the period from March 2000 onwards constituted a breach of the fiduciary duty owed to RSL Plc.

75. As a direct and proximate result of this breach, assets of RSL Plc were wasted, and the estate of RSL Plc was damaged in an amount to be determined at trial, but in excess of $400 million, plus interest and costs, which, upon information and belief, represents the value of the assets of RSL Plc that should have been preserved for the benefit of RSL Plc, but instead were either spent during the period from March 2000 through December 2000, or which were not sold or realized during the year 2000.

76. Accordingly, RSL Plc, through the Joint Administrators, is entitled to the entry of a judgment against each of the Defendants, jointly and severally, in an amount in excess of $400 million, the exact amount to be determined at trial, plus interest and costs, based upon the Defendants' breach of their fiduciary duties as members of the board of directors of RSL Plc.

**COUNT II**
**BREACH OF FIDUCIARY DUTIES TO THE CREDITORS OF RSL PLC**

77. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 76 as if fully set forth herein.

78. The Defendants, as members of the board of directors of RSL Plc, had fiduciary duties, including a fiduciary duty of care, to the corporation's creditors, since by March of 2000, RSL Plc was either insolvent or within the zone of insolvency. In their capacity as fiduciaries, the Defendants had the obligation to supervise and monitor the affairs of the corporation, and to exercise independent judgment on behalf of the company's creditors.

79. After the events of March 2000 and thereafter, the Defendants' fiduciary duties encompassed the obligation to meet and consider the precarious economic condition of the RSL Group and the telecommunications market as a whole, the failure by the RSL Group to obtain the additional financing contemplated in the RSL Business Plan, the continuing rate at which RSL Group was spending RSL Plc's cash and the continuing diminution of cash resources at RSL Plc.

80. As members of the board of directors of RSL Plc, a company that was insolvent or in the zone of insolvency, the Defendants owed fiduciary duties to RSL Plc's creditors to hold board meetings in order to evaluate the facts and circumstances, and to take any and all appropriate steps to preserve the assets of RSL Plc.

81. The RSL Plc board of directors, however, failed to conduct any such meetings and failed to take any such corrective or protective action even though the assets of RSL Plc continued to diminish in value. Indeed, the board failed to meet and evaluate whether it was appropriate, in light of the circumstances, for RSL Plc to incur additional debt by virtue of the Lauder Loan. The sustained pattern of inattention and inaction by the members of the board of

directors of RSL Plc during the latter half of the year 2000 constituted a breach of the fiduciary duties owed to RSL Plc's creditors.

82. As a direct and proximate result of this breach, the creditors of RSL Plc were damaged in an amount to be determined at trial, but in excess of $400 million, plus interest and costs, which represents the value of the assets of RSL Plc that should have been preserved for the benefit of creditors, but instead were either spent during the period from March 2000 through December 2000, or which were not sold or realized during year 2000.

83. Accordingly, RSL Plc, through the Joint Administrators, is entitled to the entry of a judgment against each of the Defendants, jointly and severally, in an amount in excess of $400 million, the exact amount to be determined at trial, plus interest and costs, based upon the Defendants' breach of their fiduciary duties as members of the board of directors of RSL Plc.

## DEMAND FOR JURY TRIAL

84. RSL Plc, by and through the Joint Administrators, demands a trial by jury.

WHEREFORE, RSL Communications Plc, through its Joint Administrators, requests that this Court enter a judgment (i) finding that each of the Defendants has breached his fiduciary duties as a member of the board of directors of RSL Communications Plc; and (ii) awarding money damages to RSL Communications Plc and against the Defendants jointly and severally, in an amount to be determined at trial, but in excess of $400 million, and that the Court grant such other and further relief as is just and proper.

Dated: New York, New York
July 1, 2004

CADWALADER, WICKERSHAM & TAFT LLP

By: ______________________
John H. Bae (JB 4792)
Ingrid Bagby (IB 3844)

100 Maiden Lane
New York, New York 10038
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Attorneys for Michael John Anthony Jervis and
Steven Anthony Pearson, as the Joint
Administrators of RSL Communications Plc