DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York  10022
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836
John S. Kiernan
Catherine M. Amirfar
Emily O'Neill Slater
Or Baron
Timothy T. Howard
Benjamin Sirota

Attorneys for Defendants Nesim Bildirici,
Paul Domorski, Itzhak Fisher, Ronald S. Lauder,
Steven Schiffman, Jacob Z. Schuster and Eugene Sekulow

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RSL COMMUNICATIONS PLC, by<br>Michael John Andrew Jervis and<br>Steven Anthony Pearson as the Joint Administrators,<br><br>         Plaintiff,<br>     -against-<br><br>NESIM BILDIRICI, PAUL DOMORSKI,<br>ITZHAK FISHER, RONALD S. LAUDER,<br>STEVEN SCHIFFMAN, JACOB SCHUSTER and<br>EUGENE SEKULOW,<br><br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 04-5217 (RJS)

**FILED UNDER SEAL**

## MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...................................................................................................................................2

I.    PLAINTIFF HAS MISCHARACTERIZED THE RECORD RESPECTING PLC'S
FINANCIAL CONDITION IN MID-2000 ..............................................................................2

II.   PLAINTIFF HAS MISCHARACTERIZED THE RECORD RESPECTING
DEFENDANTS' EFFORTS AS FIDUCIARIES ..................................................................6

III.  DEFENDANTS WERE NOT REQUIRED AS A MATTER OF LAW TO HOLD
SEPARATE MEETINGS OF THE PLC BOARD ................................................................8

      A.    The MTD Decision .....................................................................................9

      B.    The Applicable Law Did Not Require Defendants to Hold Separate
Formal Meetings of the Plc Board .......................................................12

      C.    Plaintiff Has Presented No Basis for Denying Defendants the Benefit of
the Business Judgment Rule ..................................................................15

IV.  PLAINTIFF'S SUBMISSION DOES NOT SUPPORT A FINDING OF
CAUSATION .......................................................................................................................17

CONCLUSION ..............................................................................................................................19

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*American Federal Group, Ltd. v. Rothenberg*, 136 F.3d 897 (2d Cir. 1998) ....................17

*Atias v. Sedrish*, 133 Fed. Appx. 759 (2d Cir. 2005) ..........................................................17

*Bavaria International Aircraft Leasing GmbH v. Clayton, Dubilier & Rice, Inc.*,
   03 Civ. 0377 (NRB), 2003 U.S. Dist. LEXIS 13197 (S.D.N.Y. July 30, 2003) ...........12

*Biaggi v. Commissioner*, 8 Fed. Appx. 66 (2d Cir. 2001) ....................................................5

*Hallinan v. Republic Bank & Trust Co.*, 06 Civ. 185 (HB), 2007 U.S. Dist. LEXIS
   65821 (S.D.N.Y. Sept. 7, 2007) ......................................................................................5

*Kostiuk v. Riverhead*, 570 F. Supp. 603 (E.D.N.Y. 1983) .................................................10

*LNC Investments. v. First Fidelity Bank, N.A. N.J.*, 173 F.3d 454 (2d Cir. 1999) ...........17

*Nobel Insurance Co. v. City of New York*, Case No. 00-CV-1328 (KMK), 2006 U.S.
   Dist. LEXIS 70816 (S.D.N.Y. Sept. 29, 2006) ..............................................................10

*Ochs v. Simon (In re First Central Financial Corp.)*, 269 B.R. 502 (Bankr. E.D.N.Y.
   2001).................................................................................................................................13

*Off. Comm. of Unsecured Creditors of RSL COM Primecall, Inc. v. Beckoff (In re RSL
   COM Primecall, Inc.)*, Case No. 01-11457 (ALG), 2003 Bankr. LEXIS 1635 (Bankr.
   S.D.N.Y. Dec. 11, 2003) .................................................................................................11

*RSL Communications Plc v. Bildirici*, 04-CV-5217 (KMK), 2006 U.S. Dist. LEXIS
   67548 (S.D.N.Y. Sept. 15, 2006) ..........................................................................9, 10, 11

*Rivervale Realty Co., Inc. v. Orangetown*, 816 F. Supp. 937 (S.D.N.Y. 1993) ...............10

*Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr.
   S.D.N.Y. 1999).................................................................................................................8

*Stephens v. National Distillers & Chemical Corp.*, 91 Civ. 2901 (JSM), 1996 U.S.
   Dist. LEXIS 6915 (S.D.N.Y. May 21, 1996) ..................................................................16

### STATE CASES

*Barnes v. All-American Investing Co.*, 206 A.D. 631, 198 N.Y.S. 900 (N.Y. App. Div. 2d
   Dep't 1923) ......................................................................................................................14

*Bayer v. Beran*, 49 N.Y.S.2d 2 (N.Y. Sup. Ct. N.Y. Co. 1944)...................................15, 16

*Goldston v. Bandwidth Technology Corp.*, 112098/04, 2007 N.Y. Misc. LEXIS 2360
(N.Y. Sup. Ct. N.Y. Co. March 6, 2007).........................................................................15

*People v. H & R Block, Inc.*, No. 401110/2006, 16 Misc. 3d 1124A, 2007 N.Y. Misc.
LEXIS 5831 (N.Y. Sup. Ct. N.Y. Co. July 9, 2007)......................................................18

*Lirosi v. Elkins*, 89 A.D.2d 903, 453 N.Y.S.2d 718 (N.Y. App. Div. 2d Dep't 1982)........8

*North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*,
930 A.2d 92 (Del. 2007)............................................................................................4, 5

*Northbay Construction Co., Inc. v. Bauco Construction Corp.*, 38 A.D.3d 737, 832
N.Y.S.2d 280 (N.Y. App. Div. 2d Dep't 2007) .............................................................18

*Tri-Bullion Smelting & Development Co. v. Corliss*, 186 A.D. 613, 174 N.Y.S. 830
(N.Y. App. Div. 1st Dep't 1919)....................................................................................13

## STATUTES

N.Y. Business Corporation Law § 708(b) .......................................................14

## MISCELLANEOUS

*1 New York Practice Guide: Business and Commercial* (Scott J. Giordano ed.
2005)....................................................................................................................14, 15

Isidore Kantrowitz & Sol Slutsky, 2 *White's New York Business Entities* (14th ed.
2004)........................................................................................................................14

Defendants submit this memorandum in opposition to plaintiff's motion for summary judgment.

## PRELIMINARY STATEMENT

Plaintiff's summary judgment motion, like its effort to strike portions of the report of defendants' governance expert as "irrelevant," rests on an unsustainable contention: that the Court should evaluate plaintiff's claim that defendants abdicated their responsibilities as fiduciaries for Plc by ignoring all of defendants' extensive efforts and business judgments for the benefit of the operating entities that Ltd. and Plc both owned, and for the noteholders that were creditors of Ltd. as well as Plc, because defendants did not pursue those efforts formally through separate Plc board meetings.

Plaintiff's submission misstates the financial condition of Ltd. and Plc in mid-2000, inaccurately describing the documentary evidence, disregarding undisputed facts that negate its contentions and superimposing on its claims a legally unsupportable concept of "zone of insolvency." Plaintiff's submission also mischaracterizes the scope of defendants' efforts, through repeated implications that the individual defendants took no actions in response to various developments because defendants did not take those actions formally "as a board of Plc." Neither common sense nor any principle of law supports plaintiff's urging that the Court disregard the record of defendants' written and oral briefings, meetings, evaluations, monetization efforts, solicitations of expert advice and decisions addressing Plc's condition during May-December 2000 simply because defendants undertook them outside of formal Plc board meetings.

Plaintiff's contention that its proposed approach follows as the "law of the case" from Judge Karas' 2006 MTD decision misapprehends the difference (recognized by Judge Karas) between a motion to dismiss and a motion for summary judgment. The observation that the Ltd.

board owed no duty as such to Plc misses the point that each individual defendant recognized his personal obligation as a fiduciary of Plc as well as a fiduciary of Ltd., and personally believed he was fulfilling both responsibilities through his work for the enterprise.  Citations to decades-old cases about what a board must do to bind a corporation disregard later legislation empowering boards to act without the rigid formalism plaintiff posits as a binding legal requirement, and provide no support for the unsustainable contention that exercises of fiduciary duty must be measured only by reference to formal board action.  Plaintiff's contention that defendants' actions as Ltd. fiduciaries should not count because Ltd. owned other assets in addition to the subsidiaries it owned in common with Plc is unsupported by any evidence that these additional assets tainted defendants' judgments for Plc, the operating subsidiaries of Plc (which were equally owned by Ltd.) or its noteholder creditors (which were also creditors of Ltd.).

Plaintiff's further notion that the absence of Plc board meetings caused the losses Plc and its creditors suffered in the telecommunications meltdown is a pure concoction, irreconcilable with the practical reality that if defendants had held separate formal Plc board meetings, they would have reaffirmed the judgments they had already made.  Plaintiff also has presented no evidence even purporting to identify any unreasonable decision by defendants or to link any conduct by defendants to the loss Plc and its creditors experienced when Ltd. and Plc failed (along with the rest of their business sector).

## ARGUMENT

## I.    PLAINTIFF HAS MISCHARACTERIZED THE RECORD RESPECTING PLC'S FINANCIAL CONDITION IN MID-2000

Plaintiff's attempt to present Ltd. and Plc as discernibly doomed as of "mid-2000," and to present defendants as indifferent or inactive in response to that condition, is based on a mischaracterization of facts that cannot genuinely be said to be in dispute.

2

While plaintiff suggests that Ltd.'s postponement of the Australian IPO in May 2000 foreordained Ltd.'s and Plc's inability to survive past November, that characterization disregards the successful sale of the company's interest in Telegate (a subsidiary of both Ltd. and Plc) in May 2000 for approximately $400-$500 million. Acknowledgement of this major transaction, at a price more than twelve times what RSL had paid for it two years before and with a closing postponed until 2001 only to reduce the taxes on the sale, is as conspicuously absent from plaintiff's motion as it was from the complaint. Plaintiff also can only assert an expectation in mid-2000 that Ltd. and Plc would run out of cash in November, a few weeks ahead of receiving the Telegate proceeds, by disregarding defendants' arrangements for the $100 million Lauder loan, agreed to in June and formalized in the first week of July 2000, which ensured the satisfaction of subsidiary funding needs until receipt of the Telegate proceeds. *See* Defs.' 56.1 Stmt. ¶¶ 29, 31, 43.

These facts alone indisputably negate plaintiff's ability to contend that it was apparent in mid-2000 that the company would not survive past November. Plaintiff's submission goes beyond disregarding these undisputed facts, to ignore the active ongoing efforts at the time to monetize other properties, the continuing expressions of interest by prospective purchasers of individual assets and of the entire enterprise, and the continued reporting of operating results that gave no indication of the downturn to come. In relying on a Goldman Sachs analysis from June 2000 for the contention that company would fail by November, plaintiff ignores that this analysis projected the company's ability to proceed without time pressures to sell its valuable assets on potentially unfavorable terms if it could obtain sufficient cash to fund itself from November until the receipt of Telegate sale proceeds in January. The analysis identified several different potential sources of this funding, and the Lauder loan (which Goldman Sachs did not

consider because Mr. Fisher approached Mr. Lauder about it only hours after the Goldman Sachs presentation) satisfied this need so effectively that the company ended up with enough cash to reach the Telegate proceeds even after results turned sharply downward later in 2000. *See id.* ¶¶ 39, 40-43, 75.

Defendants' efforts to sell assets and obtain a private equity investment to raise cash also had not proven to be a failure by mid-2000, as plaintiff contends without support. Pl.'s Br. Summ. J. 2.  Contract negotiations were ongoing for the sale of the Canadian subsidiary on what appeared to be agreed-upon terms; defendants were working vigorously to transform an apparent offer to buy the Spanish holdings for $350 million into a signed contract and were meeting with numerous potential buyers of that asset (such that even as late as January 22, 2001, PwC and all other financial advisors were agreeing that Ltd. continued to have substantial prospects for a sale of RSL Spain); discussions about potential sales of the Australia and Latin American holdings were ongoing; and defendants (including even non-employee directors) were meeting with potential private equity investors and potential purchasers of assets and of the entire company through the summer and fall of 2000.  Defs.' 56.1 Stmt. ¶¶ 41-42, 53, 75; Amirfar Decl. in Opp., Ex. G at 241:11-243:4; Amirfar Decl. in Support of Defs.' Mot. for Summ. J., Ex. 83 at LTD-ADD000468.

Plaintiff's contention that Plc was in the "zone of insolvency" during the mid-2000 period consequently is factually unsustainable, irrelevant and legally incorrect.  As explained in defendants' summary judgment brief (at 59-62), the Delaware state courts that originated the concept of duties to consider creditor interests in a "zone of insolvency" (and that New York's federal courts have consistently cited when recognizing this concept that no New York state court has adopted), expressly repudiated that concept in May 2007. *N. Am. Catholic Educ.*

*Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-02 (Del. 2007). Plaintiff's citation to a post-*Gheewalla* Southern District of New York decision that used the term "zone of insolvency" does not alter this change in the law, since the court, in rejecting an effort following a pre-*Gheewalla* trial to raise "zone of insolvency" arguments not made at trial, had no reason to consider or cite *Gheewalla* because it refused to permit a "zone of insolvency" argument in any event. *See Hallinan v. Republic Bank & Trust Co.*, 06 Civ. 185 (HB), 2007 U.S. Dist. LEXIS 65821, at * 20-21 & n.10 (S.D.N.Y. Sept. 7, 2007). Even if the concept applied, the definition of this unquestionably legal term would be a task for courts – which have never provided such a definition – not for an expert who merely asserts (as plaintiff's expert does) that he knows what it means and then lists "factors" about Plc that cause him to place Plc within that never-defined "zone." *See* Defs.' Br. to Excl. Pl.'s Proposed Expert Witnesses 18. Plaintiff has not cited a single decision supporting its "factors" or its proposed characterization of Plc's financial condition in "mid-2000" as in the "zone of insolvency," and defendants are aware of none.

Similarly, plaintiff's suggestion that Plc "should be considered insolvent" as of December 31, 1999, based on a 2001 Deloitte & Touche document using that term (*see* Pl.'s Br. Summ. J. 10), conceals that the document, in describing Plc as "technically insolvent," was expressly comparing only the book value of Plc's assets to its liabilities. Dembrow Decl. in Supp. of Pl.'s Mot. for Summ. J., Ex. LL at 2. Not even plaintiff, and no legal authority, has ever suggested that the application of duties triggered by insolvency would arise from an entity's mere "book" or "technical" insolvency. As the Second Circuit has recognized, "book value is not ordinarily an accurate reflection of the fair market value." *Biaggi v. Comm'r*, 8 Fed. Appx. 66, 69 (2d Cir. 2001) (citation omitted).[1]

---

[1]   As a simple illustration, if a company that borrows $1 million to buy an asset depreciates that asset on a conventional 20-year straight line basis on its books while paying only interest on its borrowing,

Despite full access to an enormous documentary record and extensive deposition discovery, plaintiff has identified no evidence that anyone at Ltd. or any of its advisors believed in mid-2000 that Ltd. and Plc were in the dire circumstances that plaintiff now seeks by hindsight to superimpose on that period.  Officers, including the out-going Chief Operating Officer, were continuing to express confidence that the combination of the Telegate closing and the Lauder loan had given the company time to execute its promising monetization efforts and to continue its development, subject to appropriate exercises of expenditure discipline, without the need to accept fire-sale offers for assets.  *See, e.g.*, Amirfar Decl. in Support of Defs.' Mot. for Summ. J., Ex. 43.  Financial officers were prudently discussing the importance of rigorously monitoring expenditures, but nobody was identifying a prospect of failure, and analysts were widely touting the stock as a "buy."  *See* Defs.' 56.1 Stmt. ¶¶ 33-38, 47.

When defendant Domorski reported to the Executive Committee in early October that the combination of delays in monetizations and deterioration in recently obtained and projected operating results raised concerns about whether the receipt of the Telegate proceeds in January 2001 would provide the company all the time it needed to achieve other monetizations and thereby fund its business plan, defendants moved promptly and decisively to retain and follow the advice of the best restructuring lawyers and financial advisors they could find. *See id.* ¶¶ 55-57.

## II.    PLAINTIFF HAS MISCHARACTERIZED THE RECORD RESPECTING DEFENDANTS' EFFORTS AS FIDUCIARIES

Plaintiff's submission does not even purport to contend – because it cannot – that defendants were personally passive about pursuing the financing efforts that brought them the

---

at the end of one year the books will show assets of $950,000 against liabilities of $1 million, or "book" or "technical" insolvency, even if the asset has doubled in market value and generated enough net income to pay all interest obligations.

cash they needed until the receipt of the Telegate sale proceeds, about monitoring expenditures

of funds to continue supporting subsidiaries' needs without running out of cash during that

period and about pursuing monetization efforts to fund the enterprise's development into the

future. Instead, plaintiff contends only that defendants did not pursue these efforts through

formal meetings of the Plc board. As set forth in defendants' submission in support of summary

judgment, defendants attended numerous formal and informal meetings among themselves and

with other members of management, met with potential investors and buyers of assets, received

regular reports on finances, consulted with financial advisors and approved efforts to sell

numerous assets.[2] Defs.' Br. Summ. J. 9-29.

      Plaintiff's effort to characterize defendants as indifferent to the interests of Plc in these

activities misapprehends the extent to which defendants' efforts were targeted at supporting the

operating subsidiaries Ltd. and Plc both owned, in ways intended to preserve asset values and

advance the interests of the noteholders to which Ltd. and Plc were both obligated. Defendants

were not indifferent to Plc's interests. They believed their efforts satisfied their fiduciary

obligations to Plc without regard to whether they pursued those efforts in formal Plc board

meetings. Mr. Lauder's testimony (quoted in plaintiff's summary judgment brief at 19) that he

viewed Ltd. and Plc as "mirror images of each other," and Mr. Sekulow's testimony that "those

of us who were Plc directors were also Limited directors, and in that capacity, we functioned

---

[2]    Plaintiff's sole specific criticism of defendants' asset sale efforts – that Ltd. never sought to market
one of the several assets Goldman Sachs mentioned as a possible candidate for sale in its June 2000
analysis (RSL Finland) – disregards that while defendant Bildirici did not remember efforts to sell
that property, defendants Fisher and Schiffman remembered instructing Goldman Sachs to try to sell
it (*see* Amirfar Decl. in Opp., Ex. H at 66:11-66:14, Ex. I at 48:22-49:5) and defendants Lauder and
Schuster remembered efforts to sell it generally (*see id.*, Ex. J at 69:13-25, Ex. K at 88:24-89:15).
Defendants also undisputedly sought during the summer and fall of 2000 to sell all of the other
entities Goldman Sachs identified as possible candidates, plus several additional entities. *See* Defs.'
56.1 Stmt. ¶ 42.

fully on behalf of the enterprise" does not demonstrate defendants' abdication of obligations as

Plc's fiduciaries or that defendants "completely disregarded RSL Plc's existence," as plaintiff

contends (*id.*), but rather defendants' belief that they were fulfilling their obligations to Plc by

acting as fiduciaries of Ltd. given the nature of the relationship between the entities. Similarly,

while plaintiff is fond of quoting Mr. Bildirici's statement that "[w]e never paid attention" to Plc

as a separate entity (*id.*), Mr. Bildirici made clear in his testimony that in making this statement

he meant that:

> PLC was just . . . an entity that was structured as part of a tax contemplation for the
> overall RSL parent. The interest of the PLC was the exact interest of the parent
> company, which was Limited. . . . So from our perspective, we were serving the interests
> of PLC by serving the interests of Limited . . . As we worked really diligently for
> Limited, we were also working very diligently for PLC. We never effectively saw any
> different interests between those two entities other than, effectively, it was serving for the
> same purpose.

Amirfar Decl. in Support of Defs.' Mot. for Summ. J., Ex. 121 at 11:8-12:20. Plaintiff's

reference to defendants' "candid admission that they took no action whatsoever to protect the

interests of Plc and its creditors" (Pl.'s Br. Summ. J. 21) is thus a fabrication. [3]

## III.   DEFENDANTS WERE NOT REQUIRED AS A MATTER OF LAW TO HOLD SEPARATE MEETINGS OF THE PLC BOARD

Plaintiff's attempt to justify disregarding the business judgments defendants actually

made is predicated on a misreading of Judge Karas's MTD decision, a misapplication of caselaw

respecting the circumstances when directors must act formally and an incorrect assertion that at

summary judgment the mere existence of additional assets at the Ltd. level made defendants'

---

[3]   Defendants have never disputed plaintiff's contention (Pl.'s Br. Summ. J. 13 n.2) that even directors
of a "dummy" corporation owe fiduciary duties to that corporation. In contrast to the directors in the
cases on which plaintiff relies, who permitted "dummy" corporations to be looted to the detriment of
separate creditors or shareholders, *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 330
(Bankr. S.D.N.Y. 1999); *Lirosi v. Elkins*, 89 A.D.2d 903, 905-06, 453 N.Y.S.2d 718, 721-22 (N.Y.
App. Div. 2d Dep't 1982), the defendants here were reasonable – given the relationship between Plc
and Ltd. and the Ltd. guarantee of Plc's debts – in concluding that their actions as fiduciaries of Ltd.
subsumed their obligations as fiduciaries of Plc.

good faith belief that their work as Ltd. fiduciaries satisfied their obligations as Plc fiduciaries

legally irrelevant.

### A.    The MTD Decision

Plaintiff's effort to characterize the MTD decision as determinative of the issues on

summary judgment is incongruous in light of plaintiff's substantial efforts at the motion to

dismiss stage to stress that the court must ignore extrinsic facts and defer entirely to the

pleadings. At oral argument, plaintiff urged to the court four times that the court's factual

concerns about plaintiff's position were premature on a motion to dismiss. *See* Amirfar Decl. in

Opp., Ex. F at 43:11-43:14, 47:16-48:18.

The MTD decision similarly made clear that its holding was limited to the motion to

dismiss context. Stressing that the court must deny the motion "unless no facts could be proved

by plaintiff which would entitle plaintiff to relief," must "accept as true Plaintiff's allegations in

the Complaint, and draw all inferences in favor of Plaintiff," and must "confine its consideration

to facts stated on the face of the complaint," *RSL Commc'ns Plc v. Bildirici*, 04-CV-5217

(KMK), 2006 U.S. Dist. LEXIS 67548, at *7-8 (S.D.N.Y. Sept. 15, 2006), the court repeatedly

indicated that it was basing its decision exclusively on the facts alleged in the Complaint. The

pleaded facts go far beyond alleging that defendants took no action in separate formal Plc board

meetings, to claim repeatedly that defendants were "asleep at the switch," were not "roused from

their slumber," "took no steps . . . to verify or evaluate the necessity, wisdom or propriety of

continuing to provide cash to the RSL Group's operating subsidiaries," and otherwise took no

actions at all. (Compl. ¶¶ 39, 45, 50.) Reflecting the required acceptance of those pleadings, the

court expressly predicated its denial of the protections of the business judgment rule at that stage

on plaintiff's allegation that decisions were made "without any deliberation" and that

"[d]efendants allegedly failed to consider any information they had regarding the company's

9

financial health," stressing that "Plaintiff does not concede that there were behind-the-scenes meetings where the business of RSL Plc was discussed by these members." *Bildirici*, 2006 U.S. Dist. LEXIS 67548, at *19-21.

Now that the record demonstrates extensive work by defendants directed to the interests of the operating subsidiaries of both Plc and Ltd. and noteholder creditors, the context for consideration of defendants' argument is entirely different. Judge Karas expressly recognized that summary judgment could provide this different context (without even triggering "law of the case" issues) in oral argument, acknowledging that "we are in 12(b) land here," and that his concerns were "maybe . . . more for summary judgment." Amirfar Decl. in Opp., Ex. F at 44:8-44:9, 44:23. Similarly, Judge Karas considered defendants' arguments anew on summary judgment despite another judge's earlier denial of defendants' motion to dismiss in *Nobel Ins. Co. v. City of New York*, Case No. 00-CV-1328 (KMK), 2006 U.S. Dist. LEXIS 70816, at *11-13 (S.D.N.Y. Sept. 29, 2006), citing numerous cases for the propositions that "as a ruling in favor of a plaintiff on a motion to dismiss does not address the merits of a case, such ruling will not preclude a subsequent ruling in favor of a defendant on the same issue on a motion for summary judgment," and that a "holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery." (Citations omitted.) *See also, e.g., Rivervale Realty Co., Inc. v. Orangetown*, 816 F. Supp. 937, 946 n.9 (S.D.N.Y. 1993) (granting summary judgment after having denied motion to dismiss); *Kostiuk v. Riverhead*, 570 F. Supp. 603, 607 (E.D.N.Y. 1983) (neither law of the case nor any other doctrine bars judge from granting summary judgment despite a prior judge's denial of a motion to dismiss, given the different legal contexts).

10

Judge Karas also repeatedly made clear in his decision that his central concern was the possibility of a need for separate Plc board meetings to prevent Ltd. from plundering Plc's assets after Plc became insolvent, to the possible benefit of insiders at the expense of Plc and its noteholder creditors, repeating twice that "'the directors of an insolvent subsidiary can [not], with impunity, permit it to be plundered for the benefit of its parent corporation.'" *Bildirici*, 2006 U.S. Dist. LEXIS 67548, at *23, 32 (quoting *Off. Comm. of Unsecured Creditors of RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.)*, Case No. 01-11457 (ALG), 2003 Bankr. LEXIS 1635, at *44 (Bankr. S.D.N.Y. Dec. 11, 2003). That concern expressly underlay his statement that "even the slightest variation in the interests between" Ltd. and Plc, arising from the existence of additional assets of Ltd. that were not also assets of Plc, "nullifies" defendants' entitlement to dismissal at that stage. Now, though, the facts establish that there was no "plundering" (or any other use) of Plc assets to fund Ltd.'s non-Plc holdings, that Plc had no interests of any kind (either assets or creditors) that were not equally interests of Ltd., and that defendants took no actions having the purpose or effect of benefiting any insider to the detriment of the noteholder creditors. In these circumstances, the mere existence of some additional Ltd. assets apart from the European and North American holdings that Ltd. and Plc equally owned – all of which assets were available to satisfy Plc's creditors under Ltd.'s guarantee – does not provide any basis for negating defendants' belief that they were fully attending to the interests of all Plc constituents without the need for separate Plc board meetings.

This Court now has a record of the nature of Plc and Ltd., the personal efforts by defendants, the company's actual financial position during 2000, the uses of Plc borrowings exclusively to support Plc's subsidiaries (rather than any separate Ltd. interests) and to pay interest to creditors, the defendants' belief that they were serving Plc's interests without the need

for separate meetings, the absence of any basis for claiming plundering of Plc assets or use of those assets to favor insiders to the detriment of separate Plc creditors, the retention of expert financial and legal advisors, the defendants' requests for these experts' advice about how to satisfy all legal obligations as directors (including as directors of subsidiaries), the absence of any advice to hold a Plc board meeting (apart from the meetings on written consent held at attorneys' instruction) and the expert advisors' confirmation that they still believe separate Plc board meetings were not necessary.  Those indisputable facts all support rejection of plaintiff's claims at summary judgment.

### B.     The Applicable Law Did Not Require Defendants to Hold Separate Formal Meetings of the Plc Board

Plaintiff's contention that the law imposed on defendants the technical obligation to meet is founded on a combination of misapplication of undisputed principles and mischaracterizations of the applicable legal rules.

Plaintiff's observation that the Ltd. board as such owed no fiduciary duty to Plc is correct but misses the point.  Defendants have never contended that the Ltd. board as an entity and its members who were not also directors of Plc owed obligations to Plc as such (although they owed the same obligation as Plc's fiduciaries to the noteholders, by virtue of Ltd.'s guarantees of the debt, and to the shareholders who were the enterprise's ultimate owners).  Similarly, defendants have never disputed that a fiduciary of both parent and subsidiary boards may take actions that bind one corporation but not another, depending on what "hat" the fiduciary is wearing.  For example, *Bavaria Int'l Aircraft Leasing GmbH v. Clayton, Dubilier & Rice, Inc.*, 03 Civ. 0377(NRB), 2003 U.S. Dist. LEXIS 13197, at *12-14 (S.D.N.Y. July 30, 2003), cited by plaintiff, merely supports (like the cases cited in the MTD decision) the unremarkable proposition that individuals holding dual directorships can wear the "hat" of only one for the

particular purpose of contractually binding the subsidiary but not the parent. But while dual fiduciaries can and often do act formally in ways that bind a parent or subsidiary (for example, in approving a transaction by one or the other), they wear the multiple "hats" all the time for the purpose of evaluating whether they satisfied their fiduciary obligations to the corporations. Thus, for example, *Ochs v. Simon (In re First Central Financial Corp.)*, 269 B.R. 502, 511-13 (Bankr. E.D.N.Y. 2001), also cited by plaintiff, determined that a defendant had breached his duty to a parent through wrongful conduct formally as a director of the subsidiary, contradicting rather than supporting plaintiff's contention that dual fiduciaries' actions in one capacity must be ignored when evaluating whether they discharged their duties in their other capacity.

The cases respecting directors' wearing of separate "hats" when binding subsidiaries provide no support for plaintiff's proposed conclusion that defendants individually could not reasonably believe they were satisfying their acknowledged fiduciary obligations to Plc and its creditors by their actions formally taken as Ltd. fiduciaries.

Plaintiff's contentions that New York law required defendants to meet formally and in person as a Plc board, that defendants' actions by written consent were invalid and that no action could be considered an action on behalf of the Plc board unless unanimously agreed to in a formal Plc board meeting misconstrue the decisions plaintiff cites. The 89-year old case on which plaintiff relies, *Tri-Bullion Smelting & Development Co. v. Corliss*, 186 A.D. 613, 174 N.Y.S. 830 (N.Y. App. Div. 1st Dep't 1919), did not hold that boards must always convene formal meetings, but only that directors had acted negligently when they countersigned fictitious checks, permitted "raids" on bank accounts, ignored accountants' reports of suspicious transactions and disregarded a specific by-law requirement of monthly board meetings to receive financial reports that would have confirmed these thefts. Here, of course, there was no

defalcation, no by-law provision requiring meetings, and no meeting requirement under either

New York law or the English law under which Plc's by-laws were issued and applied.  *See*

Defs.' 56.1 Stmt. ¶ 4.

Similarly, plaintiff's statement that some in-person formal board action was required to

make a written consent binding on a corporation erroneously conflates the determination of what

acts will bind a corporation with the very different determination of what acts can satisfy

fiduciary obligations to the corporation, and disregards that the 1923 decision on which plaintiff

relies, *Barnes v. All-American Investing Co.*, 206 A.D. 631, 198 N.Y.S. 900 (N.Y. App. Div. 2d

Dep't 1923), has been overtaken by modern practice as reflected in modern law.  New York's

Business Corporation Law section 708(b), enacted after that decision, expressly provides that

"[u]nless otherwise restricted by the certificate of incorporation or the by-laws, any action

required or permitted to be taken by the board or any committee thereof may be taken without a

meeting if all members of the board or the committee consent in writing to the adoption of a

resolution authorizing the action."  As explained in White's *New York Business Entities*:

> BCL 708(b) permits much of the management of a modern corporation to be conducted
> by consent, thus departing from the prior law. . . .  Management by consent reflects the
> modern practice in both public and close corporations.  It obviates scheduling conflicts
> and facilitates actions by the board of directors. . . .

Isidore Kantrowitz & Sol Slutsky, 2 *White's New York Business Entities* ¶ B708.02 & n.2 (14th

ed. 2004).

More generally, the formality of board activities that plaintiff seeks to impose is not

consistent with New York law respecting the differences between boards of public corporations

like Ltd. and boards of wholly-owned subsidiaries having only a single parent shareholder or

other close corporations, like Plc.  As explained in the New York Practice Guide, for example:

> In the case of large public corporations, meetings of the board are scheduled at regular
> intervals, often monthly or quarterly.  Special meetings, *i.e.,* meetings that have not

14

previously been fixed by the board or the by-laws, are convened only to address pressing issues.  By contrast, *for close corporations, special meetings, and not regular meetings, are the norm.  Directors of a small, private corporation rarely conduct formal meetings except when a particular transaction, such as a bank loan or underwriting, requires a meeting.*  Even in these instances, board approval by unanimous written consent under B.C. L. § 708(b), without any formal meeting, may be preferred by busy executives or entrepreneurs and their attorneys.

*1 New York Practice Guide: Business and Commercial* § 6.13(2)(a) (Scott J. Giordano ed. 2005)

(emphasis added).  *See also Goldston v. Bandwidth Techn. Corp.*, 112098/04, 2007 N.Y. Misc.

LEXIS 2360, at *19 (N.Y. Sup. Ct. N.Y. Co. March 6, 2007) ("A formal board meeting may not

be necessary for valid corporate action where informal action has been customary, particularly in

the case of a close corporation, and the directors of such corporation, when few in number and in

frequent contact with each other, may act effectively without going through the formality [of]

convening as a board").  Here, as described in defendants' summary judgment brief (at 56-59),

defendants' actions as a Plc board by written consent additionally were all accomplished at the

direction of counsel, whom defendants asked to advise them on all formal, procedural and

substantive actions they should take to satisfy their fiduciary obligations as directors generally

and as directors of Ltd. subsidiaries in particular.  Under N.Y. BCL § 717(a)(2), defendants were

legally entitled to rely on this guidance.

### C. Plaintiff Has Presented No Basis for Denying Defendants the Benefit of the Business Judgment Rule

Plaintiff's submission identifies no case holding that a fiduciary's exercises of business

judgment must be disregarded in assessing whether there has been a breach of duty unless the

judgments were made in a formal board meeting, and there is no such rule.  *See, e.g., Bayer v.

Beran*, 49 N.Y.S.2d 2, 9-11 (N.Y. Sup. Ct. N.Y. Co. 1944) (directors of public corporation not

liable for allegedly improper approval of a program of radio advertising benefiting a director's

wife when the approval issue "was not taken up at any formal meeting of the board of directors,

15

and no resolution approving it was adopted by the board or by the executive committee," because the directors customarily acted informally and the challenged transaction was "approved and authorized by the members individually"); *Stephens v. Nat'l Distillers & Chem. Corp.*, 91 Civ. 2901 (JSM), 1996 U.S. Dist. LEXIS 6915, at *23-24 (S.D.N.Y. May 21, 1996) ("[v]arious management defendants . . . made independent judgments that the [individuals] at issue were competent for their respective posts, [and] [t]he exercise of such independent judgment is sufficient to fulfill the duty of care"). For the defendants, all either Ltd. executives or non-employee directors who were far more involved in the company's affairs than ordinary outside directors (whose participation is largely limited to scheduled meetings), business judgments exercised at Ltd. board meetings were only a small fraction of the totality of their work for the enterprise. *See, e.g.*, Defs.' 56.1 Stmt. ¶¶ 41-42, 51-53, 59-62.

In the context of a claim that defendants are not entitled to the protections of the business judgment rule because they "abdicated" their responsibilities as directors, it makes no sense to evaluate the alleged abdication on summary judgment with blinders as to whether defendants truly were "asleep at the switch" and otherwise completely inactive as the complaint alleges. Plaintiff also cannot reasonably ask the Court to consider the knowledge defendants obtained as Ltd. fiduciaries in assessing defendants' liability for assertedly failing to act, but to disregard as legally irrelevant the actions defendants undertook in the same capacity upon obtaining that knowledge.

While plaintiff suggests that the mere existence of Ltd. holdings that were not also Plc holdings precludes defendants' work as fiduciaries of Ltd. from being treatable as work for the benefit of Plc and its subsidiaries, plaintiff has offered no evidentiary reason why that should be so. All Plc holdings were Ltd. holdings, and all Plc creditors were Ltd. creditors by virtue of its

guarantee. Plaintiff has acknowledged that defendants never caused any funds raised through Plc's debt offerings to be used for any purpose other than funding Plc subsidiaries and paying interest to creditors in 2000. Meanwhile, plaintiff has not generated any evidence of a decision about Plc assets influenced by consideration of benefiting Ltd.'s non-Plc assets, or explained how any such action would have been improper in any event given that all Ltd. assets were available to satisfy Plc's creditors under the guarantee (as is not otherwise the case for a parent's assets and a subsidiary's creditors). In the absence of any evidence of improper stripping of Plc assets when it was insolvent for the benefit of entities unreachable by Plc's creditors, plaintiff's contention should be rejected.

## IV.   PLAINTIFF'S SUBMISSION DOES NOT SUPPORT A FINDING OF CAUSATION

In continuing to claim no obligation to demonstrate proximate cause because the complaint asserts a breach of fiduciary duty, plaintiff simply disregards the settled law of the Second Circuit that plaintiff's proposed "substantial contributing factor" test applies only to actions seeking restitutionary relief from claimed breaches of fiduciary duty, while a plaintiff seeking *damages* for breach of fiduciary duty (as plaintiff does here) must demonstrate that the alleged breach proximately caused plaintiff's claimed injury. *See Am. Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897, 908 n.7 (2d Cir.1998); *LNC Invs. v. First Fidelity Bank, N.A. N.J.*, 173 F.3d 454, 465 (2d Cir. 1999); *Atias v. Sedrish*, 133 Fed. Appx. 759, 760 (2d Cir. 2005). Plaintiff cannot avoid this controlling authority by ignoring these decisions and instead citing only appellate opinions pre-dating them, a district court opinion that mistakenly does not address them and an unreported state trial court opinion that is consistent with their remedy-based

17

distinction.[4] If there were any remaining doubt on this issue – and there is not – the Appellate

Division has recently reaffirmed that New York's Pattern Jury Instructions (2002) properly

require proof of proximate cause. *See Northbay Constr. Co., Inc. v. Bauco Constr. Corp.,* 38

A.D.3d 737, 738, 832 N.Y.S.2d 280, 281 (N.Y. App. Div. 2d Dep't 2007) (quoting the Pattern

Jury Instructions and explaining that "[t]o prove a breach of fiduciary duty, the plaintiff must

establish that the alleged misrepresentations or other misconduct were the direct and proximate

cause of the losses claimed" (citation omitted)).

Apart from this error, plaintiff's contention that as a matter of law the absence of Plc

board meetings caused the enormous losses experienced when Plc failed is nonsensical. Plaintiff

has presented no evidence negating the obvious proposition and defendants' testimony that if the

Plc board had met formally in 2000, the same individuals who had already considered the same

issues would have reached the same judgments about how to proceed. The absence of such a

meeting was plainly not the proximate cause of the loss. As Judge Karas said at oral argument,

acknowledging that his concern was "maybe . . . more for summary judgment" than for the

"12(b) land" in which he was operating:

> I'm just not sure what they could have done, even if they met every day for breakfast,
> lunch and dinner, . . . that was going to fix the situation. . . . And as the parent goes
> down. . ., the sub does. . . . But my point is that they would have said what the board
> upstairs is doing is we agree with it because that's our decision and we think it is in the
> best interests of the company. And once they do that, once they utter those words, not
> only would you have serious business-judgment rule problems but, beyond that, I am just
> not sure what you say in terms of causation.

Amirfar Decl. in Opp., Ex. F at 44:9-45:12. In the context of the motion to dismiss, defendants

could not "utter those words" that the Court correctly anticipated, but defendants expressly

---

[4]   *See People v. H & R Block, Inc.,* No. 401110/2006, 16 Misc. 3d 1124A, 2007 N.Y. Misc. LEXIS
5831, at *21 (N.Y. Sup. Ct. N.Y. Co. July 9, 2007) (noting that "recovery of damages for aggrieved
consumers is but one aspect of the case. The Attorney General's focus is on obtaining wide-ranging
injunctive relief.").

uttered them in sworn deposition testimony, implicating entitlement to the protections of the business judgment rule on summary judgment and requiring plaintiffs now to present facts supporting causation that they were not required to present in responding to the motion to dismiss.

Even beyond these fundamental failures to demonstrate causation, plaintiff has presented no evidence of any improper decision or any action negligently not taken that, if reversed, would have prevented the losses that occurred. *See* Defs.' Br. to Excl. 21-23; Defs.' Br. Summ. J. 73-75. These losses were not caused by the absence of Plc board meetings, or by negligent conduct of any defendant, but by a marketplace meltdown.

## CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment should be denied.

Dated:  New York, New York
       January 9, 2008

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By:  _____
     John S. Kiernan

Of Counsel:

Catherine M. Amirfar
Emily O'Neill Slater
Or Baron
Timothy T. Howard
Benjamin Sirota

919 Third Avenue
New York, New York  10022
(212) 909-6000
Fax:  (212) 909-6836

**CERTIFICATE OF SERVICE**

I, Timothy T. Howard, associated with Debevoise & Plimpton LLP, attorneys for

Defendants herein, certify:

I am over eighteen (18) years of age.  On the 9th day of January 2008, I caused to

be served copies of the within Memorandum in Opposition to Plaintiff's Motion for

Summary Judgment, Defendants' Response to Plaintiff's Local Rule 56.1 Statement of

Uncontested Material Facts in Support of RSL Communications Plc's Motion for Partial

Summary Judgment, and the Declaration of Catherine M. Amirfar in Opposition to

Plaintiff's Motion for Partial Summary Judgment by hand delivery to counsel for the

other parties to this action at the following addresses:

> John H. Bae, Esq.
> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, New York  10281
>
> Keara A. Bergin, Esq.
> Dewey, Pegno & Kramarsky LLP
> The News Building
> 220 East 42nd Street, 33rd Floor
> New York, NY  10017

Pursuant to 28 U.S.C. § 1746, I certify under the penalty of perjury that the

foregoing is true and correct.

Executed on January 9, 2008.

_____
Timothy T. Howard