# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

———————————

№ 04 Civ. 5217 (RJS)

———————————

RSL COMMUNICATIONS PLC, by Michael John Andrew Jervis and Steven Anthony Pearson as the Joint Administrators,

Plaintiff,

VERSUS

NESIM BILDIRICI, PAUL DOMORSKI, ITZHAK FISHER, RONALD S. LAUDER, STEVEN SCHIFFMAN, JACOB SCHUSTER, and EUGENE SEKULOW,

Defendants.

———————————

OPINION AND ORDER
August 10, 2009

———————————

RICHARD J. SULLIVAN, District Judge:

The joint insolvency administrators of Plaintiff RSL Communications Plc ("RSL Plc") bring this diversity action on behalf of Plaintiff, alleging that seven former members of RSL Plc's Board of Directors breached fiduciary duties owed to RSL Plc and its creditors.[1] In its two causes of action, Plaintiff seeks to hold Defendants individually liable for approximately $1 billion in damages, a figure that represents Plaintiff's estimate of the decline in RSL Plc's value during the year 2000.

Before the Court are the parties' cross-motions for summary judgment, as well as Plaintiff's motion to re-open discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. For the reasons set forth below, Plaintiff's motions are denied, and Defendants' motion is granted.

———————————

[1] Defendants in this action are Nesim Bildirici, Paul Domorski, Itzhak Fisher, Ronald S. Lauder, Steven Schiffman, Jacob Schuster, and Eugene Sekulow (collectively, "Defendants").

I. BACKGROUND[2]

This case relates to the financial collapse of the RSL Group, an international telecommunications enterprise founded in 1994 by Defendant Ronald S. Lauder (the "RSL Group"). The primary parent entity of the RSL Group was RSL Communications Ltd. ("RSL Ltd."), a publicly traded company with numerous subsidiaries, including Plaintiff RSL Plc. Plaintiff's claims focus on Defendants' conduct in connection with RSL Plc and the RSL Group during the year 2000. (*See, e.g.*, Pl.'s Mem. at 1.)[3] Therefore, in describing the relevant background information, the Court's discussion focuses on that period of time.

A. Facts

1. The RSL Group

The RSL Group was created in order "to capitalize on the growth, deregulation and profitability of international long-distance telecommunications markets." (Defs.' 56.1 ¶ 1.) Its business strategy was two-fold. First, the RSL Group sought to provide "network and data solutions" to "small and medium business customers," including local, national, international, and mobile phone services, internet access, web hosting, data networking services, and "e-commerce solutions." (Dembrow Decl. Ex. R at RSL PLC 0003902; *see also* Amirfar Decl. Ex. 1 at PLF 66811.) Second, "once a sufficient critical mass of customers" was established, the RSL Group planned to make investments in the underlying network and infrastructure in order to achieve efficiencies that would provide it with a cost advantage. (*See* Dembrow Decl. Ex. R at RSL PLC 0003902.)

The RSL Group pursued these objectives through acquisitions in strategic regions spanning several continents and twenty-two countries. (*See* Defs.' 56.1 ¶ 2.) The enterprise was structured as a parent entity, RSL Ltd., with eighty-five direct and indirect subsidiaries. (Pl.'s 56.1 ¶¶ 3, 5; Defs.' 56.1 ¶ 2.)[4]

a. RSL Ltd.

RSL Ltd. was incorporated under Bermuda law in 1996, and its securities were

---

[2]   The facts described below are taken from the parties' Local Rule 56.1 Statements, the affidavits and declarations submitted in connection with the instant motions, and the exhibits attached thereto. Where only one party's Local Rule 56.1 Statement is cited, the facts are taken from that party's Local Rule 56.1 Statement, and the opposing party either does not dispute that fact or has not presented admissible evidence to controvert it.

[3]   The Court cites to the parties' memoranda of law in support of their respective motions as "Mem.," and their respective opposition briefs as "Opp'n." Thus, for example, Plaintiff's memorandum of law in support of its motion for partial summary judgment is cited as "Pl.'s Mem.," and its memorandum in opposition to Defendants' motion for summary judgment is cited as "Pl.'s Opp'n." There were also two sets of Local Rule 56.1 Statements submitted in connection with the parties' cross-motions for summary judgment. "Pl.'s 56.1" refers to the Local Rule 56.1 statement submitted by Plaintiff in support of its motion for partial summary judgment, and "Defs.' 56.1 Opp'n" refers to the Local Rule 56.1 counterstatement submitted by Defendants. Similarly, "Defs.' 56.1" refers to the Local Rule 56.1 Statement submitted by Defendants in support of their motion for summary judgment, and "Pl.'s 56.1 Opp'n" refers to the Local Rule 56.1 counterstatement submitted by Plaintiff in opposition to that motion.

[4]   The information provided herein regarding the structure of the RSL Group is derived, in part, from the organizational charts in the record. (*See* Bagby Decl. Ex. 20 at RSLLtd2007-048279-80; Mar. 27, 2009 Decl. of Michelle L. Angell in Supp. of Supplemental Mem. of Law of RSL Communications PLC on Causation ("Mar. 27, 2009 Angell Decl.") Ex. B.)

publicly traded on the NASDAQ Stock Market during 2000. (Defs.' 56.1 ¶ 1.) The RSL Group's acquisitions were funded through periodic public offerings of RSL Ltd. shares, as well as debt offerings issued through RSL Plc to "qualified institutional buyers." (*See id.* ¶ 3; Pl.'s 56.1 Opp'n ¶ 3.)[5] By the beginning of 2000, the RSL Group had $1.47 billion in revenues and over one million customers. (Defs.' 56.1 ¶ 2.)

However, during 2000, RSL Ltd.'s stock price decreased significantly, and it struggled to raise sufficient capital to fund its operations. (*See id.* ¶¶ 30, 39, 47.) On March 18, 2001, the Board of Directors of RSL Ltd. (the "RSL Ltd. Board") resolved to commence insolvency proceedings in Bermuda on behalf of the corporation. (*Id.* ¶ 82.)

### b. RSL Plc

Plaintiff RSL Plc was incorporated in the United Kingdom in 1996. (Pl.'s 56.1 ¶ 1.) It was created to serve as a "financing arm" of RSL Ltd., and functioned as an intermediate holding company for RSL Ltd.'s subsidiaries in North America and Europe. (Amirfar Decl. Ex. 123, Dep. of Paul Domorski at 21:22; *see also* Pl.'s 56.1 ¶¶ 4-5.) RSL Plc had no separate employees, and its only operations were conducted by its subsidiaries.

(Def.'s 56.1 ¶ 6; Pl.'s 56.1 Opp'n ¶ 6.)[6] Thus, immediately following the RSL Ltd. Board's March 18, 2001 decision to commence insolvency proceedings in Bermuda, the Board of Directors of RSL Plc (the "RSL Plc Board") formally convened and resolved to file for insolvency administration in the United Kingdom. (Defs.' 56.1 ¶ 82.)

Between 1996 and February 2000, RSL Plc issued approximately $1.4 billion in debt through a series of note offerings, all of which were unconditionally guaranteed by RSL Ltd. (Defs.' 56.1 ¶ 4.) Employees of RSL Ltd., acting from the New York offices of RSL Ltd., administered the funds raised by RSL Plc through these debt offerings. (Defs.' 56.1 ¶ 7; *see also* Amirfar Decl. Ex. 114, Aug. 31, 2007 Report on Flow of Funds, Valuation, and Solvency Considerations by Mark A. Hopkins (the "Hopkins Report") at 14-15; Amirfar Decl. Ex. 112, July 27, 2007 Expert Report by Seymour Preston Jr. (the "Preston Report") at 4.)[7] RSL Ltd. deposited the "vast

---

[5]   The phrase "qualified institutional buyer," or "QIB," is a term of art under the federal securities laws. *See* 17 C.F.R. § 230.144A(a)(1).   Pursuant to Regulation S and Rule 144A, issuers may offer securities to QIBs in private placements that are not subject to the registration requirements of the Securities Act of 1933, 15 U.S.C. § 77 *et seq. See generally In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 620 (S.D.N.Y. 2007) (discussing allegations relating to a debt offering to QIBs pursuant to Rule 144A).

[6]   Although Defendants assert that RSL Plc did not maintain separate offices apart from those of RSL Ltd. (*see* Defs.' 56.1 ¶ 6), one document in the record indicates that RSL Plc "maintain[ed] an office at Victoria House, London Square" in London, England. (Amirfar Decl. Ex. 1 at PLF 66813.)

[7]   During 2000, the RSL Group maintained "six principal bank accounts, two in RSL Ltd.'s name and four in RSL Plc's name . . . ." (Hopkins Report at 14.) The "vast majority" of the RSL Group's transactions were conducted through an RSL Ltd. account at Fleet Bank and an RSL Plc "investment account" at Morgan Stanley Dean Witter ("Morgan Stanley"). (*Id.*) The RSL Group also maintained two "ancillary investment accounts" under RSL Plc's name at Morgan Stanley, which were related to RSL Plc's Morgan Stanley investment account, and an additional "ancillary account" in RSL Plc's name at Fleet Bank that was related to RSL Ltd.'s Fleet account. (*Id.*) The sixth

majority" of the funds raised by RSL Plc, as well as the proceeds of an RSL Ltd. stock offering, into an account in RSL Plc's name at Morgan Stanley Dean Witter. (*See* Hopkins Report at 14.) According to one of Defendants' experts:

> Generally speaking, the determining factor in whether funds were held in . . . accounts in RSL Plc's name appeared to be not whether the funds were nominally raised at the RSL Plc or RSL Ltd. level, but whether the funds were to be expended in the short term or to be held for investment before they were expended.

(*Id.*)   When RSL Ltd. wished to provide operational funding and capital to one of the RSL Group's subsidiaries, it would transfer funds to the subsidiary from a bank account in RSL Ltd.'s name. (Defs.' 56.1 ¶ 7.) RSL Ltd. employees would then restore the balance of RSL Ltd.'s account by depositing funds from an account maintained in RSL Plc's name. (*Id.*; *see also* Hopkins Report at 14-15.)

### c. Defendants' Roles at the RSL Group

Each Defendant was a member of the RSL Plc Board at some point during the year 2000. (Defs.' 56.1 ¶ 11.) However, it is undisputed that "[n]o formal, noticed . . . meeting (either telephonic or in-person) of the full [RSL Plc Board] was held during the period from March 1 to December 31, 2000." (Pl.'s 56.1 ¶ 40.) Nevertheless, in addition to serving on the RSL Plc Board, each

_____

bank account maintained by the RSL Group was used in connection with the exercise of RSL Ltd. stock options. (*Id.*)

Defendant was also either an executive at RSL Ltd., or a member of its Board of Directors, or both. (Defs.' 56.1 ¶ 11.)

Specifically, Defendant Fisher was RSL Ltd.'s Chief Executive Officer ("CEO") from the beginning of 2000 until August 2000. (*Id.*)  In August 2000, Defendant Domorski replaced Fisher as RSL Ltd.'s CEO. (*Id.*) Defendant Schiffman acted as RSL Ltd.'s Chief Financial Officer ("CFO") from mid-April 2000 until March 2001. (*Id.*; *see also* Amirfar Decl. Ex. 131, Dep. of Steven Schiffman at 7:3-15.)  Defendant Bildirici was RSL Ltd.'s Executive Vice President of Mergers and Acquisitions for all of 2000. (*See* Defs.' 56.1 ¶ 11.)

Defendant Lauder — the founder of the RSL Group — held voting control of RSL Ltd. through his ownership of RSL Ltd. stock, and he acted as the chairman of the RSL Ltd. Board. (*Id.* ¶¶ 1, 11.) Defendants Lauder, Schuster, and Sekulow served as non-executive, *i.e.*, "outside," directors of the RSL Ltd. Board, and Defendants Fisher and Domorski were also RSL Ltd. directors during their respective tenures as CEO of RSL Ltd. (*See id.* ¶ 11.)  Additionally, Defendants Lauder, Schuster, Sekulow, and Fisher were members of the Executive Committee of the RSL Ltd. Board, and Defendants Schuster and Sekulow served on the Audit Committee. (*Id.* ¶¶ 14-15.)

### 2. The First Quarter of 2000

There is no dispute that, entering the year 2000, the financial forecasts for the RSL Group were positive.  In late 1999 and early 2000 — during the "golden age" of the European telecommunications industry — the shares of RSL Ltd. were rated as a "buy," and

analysts considered the total value of the RSL Group to be greater than the aggregate value of its outstanding shares at their current price. (*Id.* ¶ 19; *see also* Pl.'s 56.1 Opp'n ¶ 19.) During the last two quarters of 1999, RSL Ltd. reported positive earnings before interest, taxes, depreciation, and amortization ("EBITDA"). (Defs.' 56.1 ¶ 18.) In November 1999, RSL Ltd. also raised approximately $100 million through a public offering of securities of Deltathree, an RSL Ltd. subsidiary that provided voice-over-internet communications services. (*Id.*)

Optimism regarding the RSL Group was tempered by its short-term cash requirements. Slides from a January 6, 2000 presentation by RSL Ltd. Chief Operating Officer ("COO") Donald Shassian, titled "2000 Budget," estimated "Cash Needs" for the RSL Group of between $240 and $260 million, and identified "the Ability to Complete New Financing" as a "Critical Success Factor" for the year. (Amirfar Decl. Ex. 18 at LTD 003315-16.) Thus, in order to generate the needed funds in early 2000, the RSL Group issued additional shares of RSL Ltd. stock, sought private equity investments, and issued additional debt.

On February 18, 2000, RSL Ltd. hired Chase Securities to solicit investments from private equity firms in $150-million blocks. (Defs.' 56.1 ¶ 25; *see also* Amirfar Decl. Ex. 29.) However, although Chase received proposals from a number of interested parties by April 2000, including the Blackstone Group, the Carlyle Group, and Goldman Sachs, no such investments were consummated during the year 2000. (Defs.' 56.1 ¶ 25; Pl.'s 56.1 Opp'n ¶ 25; *see also* Amirfar Decl. Ex. 30 at RSL PLC/LTD 003931.) In mid-February 2000, RSL Ltd.

also issued convertible preferred shares of its stock, which raised approximately $110 million. (Defs.' 56.1 ¶ 21.)

Finally, in mid-February 2000, RSL Plc issued $100 million in United States Dollar-denominated notes, as well as an additional €100 million in Euro-denominated notes. (Defs.' 56.1 ¶ 21; *see also* Bagby Opp'n Decl. Ex. 23; Amirfar Decl. Ex. 1.) On February 10, 2000, the RSL Plc Board executed a Unanimous Written Consent approving the debt offering (Bagby Opp'n Decl. Ex. 23), and a "Special Committee" of the RSL Plc Board — comprised of Defendants Fisher and Schuster — set the pricing terms for the notes on February 14, 2000 (*see* Amirfar Decl. Ex. 87). Following the RSL Plc Board's approval, on February 14, 2000, RSL Plc issued an offering circular relating to the notes (the "February 2000 Offering Circular" or the "Circular"). (Amirfar Decl. Ex. 1.) The February 2000 Offering Circular indicated that the notes were being issued by RSL Plc, and were "unconditionally guaranteed . . . as to payment of principal, interest and any other amounts owed" by both RSL Ltd. and RSL COM U.S.A., Inc., a subsidiary of RSL Plc. (*Id.* at PLF 66813; *see also id.* at PLF 66804.)

The Circular used the term "we" to refer to the operations of RSL Ltd. on a "consolidated basis," including its subsidiaries. (*Id.* at PLF 66811.) The Circular also contained consolidated financial data for RSL Ltd. for the years 1996 through 1999, and stated that:

> RSL PLC had no independent operations other than serving solely as a foreign holding company for the Company's North American and

European operations. . . . [RSL Ltd.] has not presented separate financial statements and other related disclosures concerning RSL PLC because management has determined that such information is not material to shareholders or holders of the notes issued by RSL PLC. [RSL Ltd.'s] financial statements are, except for [RSL Ltd.'s] capitalization, deltathree.com operations, Asia/Pacific operations, Latin American operations, corporate overhead expenses and drawn credit facilities, identical to the financial statements of RSL PLC.

(*Id.* at PLF 66981.) The Circular identified the directors and senior executives of RSL Ltd., including the capacities in which Defendants served RSL Ltd. at that time, but it did not identify the directors of RSL Plc. (Defs.' 56.1 ¶ 8.) Finally, the February 2000 Offering Circular indicated that the funds raised through the offering would be administered by employees of RSL Ltd. (*Id.*)

### 3. The March 2000 Business Plan

In a March 3, 2000 discussion regarding "Strategic Alternatives," Goldman Sachs represented to RSL Ltd. that it was "trading at a 70% discount to its Sum of the Parts Valuation." (Amirfar Decl. Ex. 28 at GS/Bildirici 0025887.) Goldman Sachs also estimated that the fair value of RSL Ltd., net of its current debt, was approximately $4.7 billion. (*Id.*; *see also* Defs.' 56.1 ¶ 24.) On the basis of these projections, at some point in March 2000, RSL Ltd. created a business plan for the period between 1999 and 2004 (the "March 2000 Business Plan" or the "Plan"). (*See* Dembrow Decl. Ex. R.) The primary

feature of the Plan was RSL Ltd.'s decision to "focus on Europe and North America" because of "the slow pace of deregulation in the Far East and Latin America, combined with the explosive opportunity to exploit [the RSL Group's] positioning in Europe . . . ." (*Id.* at RSL PLC 0003902.) Based on that strategic emphasis, the Plan "only reflect[ed] the results of [the RSL Group's] operations in Europe and North America." (*See id.*)

The Plan deemed all other RSL Group subsidiaries to be "non-core." (Pl.'s 56.1 ¶ 17.) The operations specifically referenced as "non-core" in the March 2000 Business Plan were RSL Ltd. subsidiaries Deltathree, RSL Australia, and RSL Latin America, as well as "Telegate," a German telephone directory assistance subsidiary of both RSL Ltd. and RSL Plc. (*See* Dembrow Decl. Ex. R at RSL PLC 0003909-10.)

As part of the planned monetization of these "non-core" interests, the Plan contemplated: (1) a sale of at least part of RSL Ltd.'s remaining interest in Deltathree, which was worth approximately $800 million; (2) an initial public offering ("IPO") of RSL Australia, which RSL Ltd. estimated would generate between $200 and $250 million; and (3) a sale of Telegate that, at that time, was projected to generate net proceeds of approximately $400 million. (*See* Dembrow Decl. Ex. R at RSL PLC 0003910; *see also* Defs.' 56.1 ¶ 22.) RSL Ltd.'s Plan also indicated that it was "pursu[ing] strategic alternatives" and equity investment for RSL Latin America. (Dembrow Decl. Ex. R at RSL PLC 0003910.) Finally, the Plan stated that "[w]ith the monetization of non-core assets . . . (including [RSL Australia], [Deltathree] and [RSL Latin America], but excluding Telegate)," RSL Ltd. planned to

"fully fund" the "base case five-year plan" of the RSL Group.  (*Id.* at RSL PLC 0003902.)

### 4. May 2000:  Market Conditions Begin to Deteriorate

On May 2, 2000, RSL Ltd. announced that it would be conducting a public road show to promote the IPO of RSL Australia's stock.  (Defs.' 56.1 ¶ 27.)  Two days later, on May 4, RSL Ltd. announced its financial results for the first quarter of 2000, which indicated that it had achieved a third consecutive quarter of positive EBITDA.  (*Id.* ¶ 28.)

In the same press release in which RSL Ltd. announced its third-quarter earnings, it also announced that it had entered into an "alliance" with Italy's Seat Pagine Gialle Spa ("SEAT") that would provide it with an opportunity to sell Telegate in the future.  (*Id.* ¶ 29; *see also* Amirfar Decl. Ex. 32 at RSL PLC/LTD 006556.)  It was estimated that such a sale would ultimately generate proceeds of between $400 and $500 million.  (Defs.' 56.1 ¶ 29.)  However, in early May 2000, the RSL Ltd. Board decided to postpone the Telegate sale until early 2001.  (*Id.* ¶ 31.)  The schedule was adopted by RSL Ltd. with the hope of capitalizing on speculation that pending legislation in Germany, if enacted by the time of the sale, would reduce the tax on the transaction and increase the net proceeds by $150 million.  (*Id.*)

However, during the second quarter of 2000, "the overall capital markets . . . declined and investors became less receptive to investing in telecommunications companies."  (Pl.'s 56.1 ¶ 19.)  A "few weeks" after RSL Ltd. decided to postpone

the Telegate sale, the investment bankers working on the RSL Australia offering recommended that the IPO be "suspended" due to "soft capital market" conditions in Australia.  (Defs.' 56.1 ¶ 32.)  On May 24, 2000, RSL Ltd. publicly announced the postponement of the RSL Australia IPO. (Amirfar Decl. Ex. 38.)

On May 25, 2000, members of RSL Ltd.'s management — including Defendants Fisher and Schiffman — met with representatives of Goldman Sachs to discuss the financial condition of RSL Ltd. and its future financing needs.  (Pl.'s 56.1 ¶ 21; *see also* Dembrow Decl. Ex. T.)  A Goldman Sachs memorandum regarding the May 25 meeting indicated that RSL Ltd. was pursuing a number of funding sources, including "[s]ale[s] of non-core subsidiaries," other asset sales, a bridge loan, and a $300 million private placement that, "if successful," would be completed within three weeks of the date of the meeting.  (Dembrow Decl. Ex. T at GS/Bildirici 0019007.)  The memorandum referenced a "cash flow model" and indicated that RSL Ltd. had informed Goldman Sachs that, "[i]f the private placement" being pursued by Chase Securities was "not successful, RSL [was] scheduled to run out of cash in November of [2000] assuming reduced capital expenditures."  (*Id.*)

One day after the meeting, in an email dated May 26, 2000 with the word "Cash" in the subject line, Defendant Schiffman, RSL Ltd.'s CFO, instructed the heads of all of RSL Ltd.'s operating subsidiaries that, "[i]n light of our tight cash position," any capital expenditure would require the prior approval of both himself and RSL Ltd. COO Shassian. (Amirfar Decl. Ex. 41; *see also* Defs.' 56.1 ¶ 34.)  The email also "urgently" requested cash

forecasts for the second, third, and fourth quarters of 2000. (Amirfar Decl. Ex. 41.)

### 5. June 2000: RSL Ltd. Continues to Restrict Its Subsidiaries' Capital Expenditures

RSL Ltd.'s capital-raising difficulties were symptomatic of broader problems in the telecommunications industry. Although there are a number of potential explanations for the decline, including pricing pressure created by excess market entry (*see* Amirfar Decl. Ex. 133, Dep. of Eugene Sekulow at 93:20-25), it is undisputed that, by June 2000, investor optimism regarding the telecommunications sector had declined. (*See* Defs.' 56.1 ¶ 47; Pl.'s 56.1 Opp'n ¶ 47; Bagby Opp'n Decl. Ex. 19, Dep. of Mark Hopkins at 126:13-15.) In addition to this market-wide trend, securities analysts began to express concerns regarding RSL Ltd.'s liquidity in light of the postponement of the RSL Australia IPO. (*See* Amirfar Decl. Ex. 67.) By the summer of 2000, the prices of RSL Ltd.'s stock and RSL Plc's bonds both decreased "substantially." (Defs.' 56.1 ¶ 47.)

On June 8, 2000, Goldman Sachs provided a report to RSL Ltd. regarding "Funding Alternatives." (Amirfar Decl. Ex. 47 at RSL PLC 0004024; *see also* Pl.'s 56.1 ¶ 23.) The Executive Summary of the presentation reiterated RSL Ltd.'s prediction, which RSL Ltd. had provided to Goldman Sachs on May 25, 2000, that "[b]ased on RSL's most recent projections, the Company will run out of cash with its November 2000 interest payment" on the notes that were issued by RSL Plc. (Amirfar Decl. Ex. 47 at RSL PLC 0004027.) Goldman Sachs recommended that additional financing might be obtained through private equity investment, a sale or merger of the entire RSL Group to a "strategic buyer," a sale of one of the "crown jewel" RSL Group European subsidiaries such as RSL Spain or RSL Finland, or a transaction relating to RSL Australia. (*Id.*; *see also* Dembrow Decl. Ex. S at RSL PLC 0004037; Pl.'s 56.1 ¶ 23.) However, the slides from the presentation stated that "the immediacy of the cash need will mean dealing with financial buyers on potentially difficult and expensive terms," and indicated that private equity investment would be the "[m]ost feasible and immediate source" of funding. (Amirfar Decl. Ex. 47 at RSL PLC 0004027.)

Following the June 8 meeting with Goldman Sachs, the RSL Group conducted a "Global Finance Conference" on June 15 and 16, 2000. (*See id.* Ex. 42.) On the first day of the conference, Defendant Schiffman, RSL Ltd.'s CFO, gave a presentation titled "Cash is King" to the financial officers of RSL Ltd.'s operating subsidiaries. (*See id.* at RSL-PLC 005481; *see also* Defs.' 56.1 ¶ 34.) The slides from the presentation indicate that Schiffman reiterated the orders from his May 26, 2000 email, including the requirement that all capital expenditures had to be authorized by himself and RSL Ltd. COO Shassian. (Amirfar Decl. Ex. 42 at RSL-PLC 005497.)

### 6. July 2000: The $100 Million Bridge Loan from Defendant Lauder

In response to the increasingly troubling financial outlook for the RSL Group, the RSL Ltd. Board held a meeting on June 29, 2000, which was attended by Defendants Lauder, Fisher, Schuster, and Sekulow. (*See* Amirfar Opp'n Decl. Ex. B.) At the meeting, Defendant Fisher, RSL Ltd.'s CEO, "delivered a presentation to the Board on the current state of the Company's business,

including progress on the sale of the Company's non-core assets," "status on the Company's sources of financing," and "the remaining steps required to finalize the Telegate transaction." (*Id.* at RSL-GAC 0000146-47.)[8]  The RSL Ltd. Board also discussed a potential IPO of the RSL Spain subsidiary, and RSL Ltd. COO Shassian gave a presentation regarding RSL Ltd.'s operations and results since July 1999, as well as "the Company's strategies/objectives and challenges." (*Id.* at RSL-GAC C0000147.) "Finally, [Defendant Shiffman, RSL Ltd.'s CFO,] gave a financial overview of the Company's revenues, EBITDA, and cash forecast and described the actions being taken to improve the Company's cash position." (*Id.*)

At the conclusion of the meeting, the RSL Ltd. Board authorized its Executive Committee to "negotiate, review and, if appropriate, approve a standby loan agreement between [RSL Ltd.] and Ronald S. Lauder, upon fair and reasonable terms . . . ." (*Id.*)  On July 7, 2000, the Executive Committee conducted a conference call to discuss the terms of the loan from Lauder. (Defs.' 56.1 Opp'n ¶ 24; *see also* Amirfar Opp'n Decl. Ex. C.)  Defendants Fisher, Schuster, and Sekulow participated in the call, and the Executive Committee approved the principal terms of the loan from Lauder. (Amirfar Opp'n Decl. Ex. C at RSL/DS 00713-14; *see also id.* at RSL/DS 00716-17 ("Summary of Principal Terms of Senior Standby Loan Facility").)  Lauder subsequently undertook to provide a $100

million bridge loan to RSL Plc, the repayment of which was guaranteed by RSL Ltd. (Defs.' 56.1 ¶ 43.)  The RSL Plc Board did not hold a separate meeting to discuss the terms of the loan from Lauder.  (Pl.'s 56.1 ¶ 24.)

On July 28, 2000, RSL Ltd. COO Shassian sent a memorandum to RSL Ltd.'s subsidiaries regarding "Cash Forecasts." (Amirfar Decl. Ex. 43.)  The memorandum identified several initiatives that were "underway to raise cash," including acceleration of the Telegate sale, solicitation of private equity investments, and sales of RSL Australia, RSL Canada, and Deltathree, as well as "a $75M vendor finance facility" from Ericsson that would "be used to finance critical capital expenditures." (*Id.* at RSL PLC 0001298.)  Although Shassian indicated that he "fe[lt] very good" that the cash-raising initiatives would be successfully executed and that RSL Ltd.'s "ability to fund the business ha[d] a very high probability," he warned that "it is imperative that we tighten our belts HARD." (*Id.* at RSL PLC 0001299.)  The memorandum amplified the message that was "communicated . . . in May" and had been "repeatedly" offered by Defendant Shiffman: "[n]obody is authorized to spend or commit to any capital expenditures regardless of whether you have cash in the bank or not," "[w]e must stop our [capital expenditures] (both spending and future commitments) NOW!," and "[a]ll discretionary (not absolutely critical) expenditures must be curtailed . . . ." (*Id.* (emphasis in original).)  Finally, the memorandum directed the subsidiaries' management that "[t]he basic premise . . . to work under is that you will be receiving no cash from corporate until these asset monetizations are concluded." (*Id.* (emphasis in original).)

---

[8]   The minutes from the June 29, 2000 RSL Ltd. board meeting define the term "Company" as "RSL Communications, Ltd." (Amirfar Opp'n Decl. Ex. B at RSL-GAC 0000146.)

### 7.  The Fourth Quarter of 2000: The RSL Group Retains Insolvency Consultants

In early August 2000, Defendant Domorski replaced Defendant Fisher as the CEO of RSL Ltd. and as a member of the RSL Ltd. Board.  (Defs.' 56.1 ¶ 50.) Domorski and the RSL Ltd. Board agreed that he would evaluate the entire RSL Group before making recommendations regarding potential courses of action, and the RSL Ltd. Board did not meet while Domorski conducted the investigation.  (*Id.* ¶¶ 50-51.) Thus, with the exception of an August 1, 2000 Audit Committee meeting and an October 5, 2000 Executive Committee meeting, the RSL Ltd. Board did not formally meet between late-July and early-November of 2000.  (*Id.* ¶ 51.)

On September 28, 2000, the NASDAQ informed RSL Ltd. that its shares would be de-listed on December 29, 2000 if its common stock did not reach a minimum price of $5 per share for ten consecutive trading days between the date of the letter and December 27, 2000.  (Dembrow Decl. Ex. JJ.) On October 5, 2000, Defendant Domorski presented a report to the Executive Committee of the RSL Ltd. Board regarding his initial evaluation of the RSL Group. (Defs.' 56.1 ¶ 55.)  Following the presentation, certain members of the Executive Committee — including Defendants Lauder and Schuster — contacted the law firm of Weil Gotshal & Manges ("Weil Gotshal") regarding potential advice and representation in any future bankruptcy proceedings.  (*Id.* ¶ 56.)

Beginning in November 2000 and continuing through March 19, 2001, the RSL Ltd. Board met twice per month.  (*Id.* ¶ 58.)

On November 7, 2000, the RSL Ltd. Board held a meeting in which it considered "certain potential asset sales, including the early monetization of Telegate, and the status of discussions with potential merger candidates."  (Amirfar Decl. Ex. 78 at RSL/DS 00832.)  The RSL Ltd. Board also received presentations regarding insolvency issues under United States and Bermuda law from Jeffrey Weinberg of Weil Gotshal and Nicholas Trollope of the law firm Conyers Dill & Pearman.  (*See id.*; *see also* Defs.' 56.1 ¶¶ 66-67.)  After the presentation, the Board authorized RSL Ltd. to retain Weil Gotshal "as special counsel to the Company, to advise the Company on all legal matters relating to the Company's restructuring effort . . . ." (Amirfar Decl. Ex. 78 at RSL/DS 00832.) Additionally, based on Weil Gotshal's recommendation, RSL Ltd. retained Henry Miller, a financial restructuring expert, and his firm, Wasserstein Perella & Co., Inc. ("Wasserstein").  (*Id.*)

Miller and other employees of Wasserstein gave a presentation to the RSL Ltd. Board at its November 14, 2000 meeting. (Defs.' 56.1 ¶ 64.)  Under the heading "Key Liquidity Considerations," Wasserstein's presentation indicated that RSL Ltd. could "continue to operate in the short term and explore strategic alternatives, if asset sales close and are monetized on an aggressive schedule and there is no further deterioration in operations."  (Amirfar Decl. Ex. 79 at LTD-ADD005630.)  However, the presentation also stated that "[t]he Company will be unable to meet its obligations if asset sales do not proceed as planned."  (*Id.* at LTD-ADD005631.)  The minutes from the November 14, 2000 meeting state that Wasserstein "advised . . . that the Company must attempt to pursue all available options

simultaneously in order to maximize franchise value; with a focus on business stabilization." (*Id.* Ex. 80 at LTD-ADD003488.)

Subsequently, in December 2000, RSL Ltd. hired Keith Maib as its Chief Restructuring Officer, and retained Deloitte & Touche ("D&T") to analyze its cash forecasts and financial projections. (Defs.' 56.1 ¶ 65.) Between December 2000 and January 2001, RSL Ltd. also engaged the British and American offices of PricewaterhouseCoopers LLP ("PwC") to advise the RSL Group regarding whether and when it would need to initiate insolvency proceedings. (Defs.' 56.1 ¶ 65; *see also* Pl.'s 56.1 Opp'n ¶ 65; Amirfar Decl. Ex. 93 at RSLLtd2007-P005079; Bagby Opp'n Decl. Ex. 34.)

### 8. First Quarter 2001: The Commencement of Insolvency Proceedings

Between 2001 and 2003, "'[e]very independent, publicly traded carrier that depended on international [tele]communications for the bulk of its revenue,'" including RSL Ltd., "'filed for bankruptcy . . . .'" (Defs.' 56.1 ¶ 83 (quoting John B. Handley, *Telebomb: The Truth Behind the $500-Billion Telecom Bust and What the Industry Must Do to Recover* 163 (2005)); *see also* Pl.'s 56.1 Opp'n ¶ 83.) During that period, between $500 billion and $2 trillion of aggregate market value in the industry was lost. (Defs.' 56.1 ¶ 83; *see also* Pl.'s 56.1 Opp'n ¶ 83; Amirfar Decl. Ex. 123, Dep. of Paul Domorski at 229:15-230:8.)

Although RSL Ltd. completed its sale of Telegate in January 2001, the anticipated repeal of Germany's capital gains tax was not implemented prior to the sale, and a tax of approximately 42% was imposed on the

proceeds. (*See* Defs.' 56.1 ¶ 75; *see also* Amirfar Decl. Ex. 89.) In an attempt to address its ongoing lack of liquidity, RSL Ltd. initiated merger talks with several entities, including Primus Telecommunications and IDT Corp. (Defs.' 56.1 ¶ 75.)

On January 22, 2001, the RSL Ltd. Board conducted a meeting, which included presentations by Chief Restructuring Officer Maib and PwC. (*See* Defs.' 56.1 ¶ 78.) PwC advised RSL Ltd. that continuing to fund RSL Ltd.'s "core" subsidiaries and attempting to sell or shut down its "non-core" entities would provide "[p]otentially [the] highest return to creditors[]" but would also lead to "ongoing legal risks for directors." (Amirfar Decl. Ex. 93 at RSLLtd2007-P005085-86.)

By late February 2001, RSL Ltd.'s most viable remaining option for survival appeared to be a merger with IDT Corp. (*See* Defs.' 56.1 ¶ 79.) A meeting of RSL Ltd.'s Board was conducted on February 28, 2001. (*See* Amirfar Decl. Ex. 94.) The minutes of the meeting reflect that Maib represented to the Board that "absent very near term substantial progress with IDT [Corp.] on a global transaction, the Company should prepare for an [insolvency] proceeding . . . ." (*Id.* at RSL-FHL 0000051.) Following Maib's presentation, the RSL Ltd. Board resolved to: (1) suspend the March 1, 2001 interest payment that was due on the notes issued by RSL Plc, and (2) "pursue all strategic alternatives available, including a sale of the Company to IDT Corp. and/or the preparation for insolvency proceedings . . . ." (*Id.* at RSL-FHL 0000051-52.)

RSL Ltd. was unable to consummate the transaction with IDT Corp., and the minutes from the March 18, 2001 RSL Ltd. board

meeting indicate that Maib recommended to the Board that the RSL Group initiate insolvency proceedings. (Amirfar Decl. Ex. 96 at RSL PLC/LTD 006410.) Maib stated that the paperwork had been prepared to initiate insolvency proceedings in the United Kingdom related to RSL Plc and a subsidiary known as RSL COM Europe, Ltd. ("RSL Europe"). (*Id.*) Finally, Maib stated that he was also prepared to commence a provisional liquidation of RSL Ltd. in Bermuda, as well as "ancillary proceedings" in the United States relating to RSL Ltd., RSL Plc, and RSL Europe, Ltd. (*Id.*)

The minutes of the March 18, 2001 RSL Ltd. board meeting reflect that it ended at approximately 6:50 p.m. (*Id.* at RSL PLC/LTD 006411.) Following that meeting, the RSL Plc Board formally convened at approximately 7:00 p.m. in order to authorize the decision to file for insolvency administration in the United Kingdom. (Defs.' 56.1 ¶ 82.) On March 19, 2001, RSL Plc sought insolvency protection under the United Kingdom Insolvency Act. (*Id.*) RSL Plc's filing stated that it "[was] or [was] likely to become unable to pay its debts . . . ." (Amirfar Decl. Ex. 98 at RSL PLC 0001797.)

### B.  Procedural History

In 2003, the joint administrators of RSL Plc initiated a proceeding in the United States Bankruptcy Court for the Southern District of New York, which was ancillary to RSL Plc's insolvency administration in the United Kingdom. (Decl. of Michael John Andrew Jervis in Supp. of Pl.'s Mot. for Partial Summary Judgment ¶ 6.) On December 9, 2003, in connection with that ancillary proceeding, the joint administrators took the deposition of Defendant Bildirici. (*Id.*)

Based on that deposition and an independent investigation, the joint administrators commenced this action on behalf of RSL Plc on July 2, 2004. (*Id.* ¶ 7.) The case was initially assigned to the Honorable Richard M. Berman, District Judge, and on September 29, 2006, it was reassigned to the Honorable Kenneth M. Karas, District Judge. (Doc. No. 8.)

On November 1, 2004, Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. No. 12.) Judge Karas denied the motion on September 15, 2006 (the "MTD Decision"). *See RSL Commc'ns PLC v. Bildirici*, No. 04 Civ. 5217 (KMK), 2006 WL 2689869 (S.D.N.Y. Sept. 14, 2006). Following Judge Karas's ruling, Defendants filed an Answer on October 26, 2006. (Doc. No. 36.) On July 5, 2007, Defendant Fisher filed an Amended Answer, which added a counterclaim against RSL Plc alleging that it had breached his release agreement by naming him as a Defendant in this action. (Doc. No. 48.)

This matter was reassigned to the undersigned on September 4, 2007. (Doc. No. 52.) Discovery closed on October 23, 2007. (*See* Doc. No. 54.) On November 29, 2007, the parties filed cross-motions for summary judgment and motions *in limine* relating to the admissibility of certain evidence produced during expert discovery.[9] These motions were fully briefed as of January 30, 2008. (Doc. Nos. 76-80.)

---

[9]  On the same day that the parties' cross-motions for summary judgment were filed, Defendant Fisher filed a separate motion for summary judgment on his counterclaim and on Plaintiff's claims against him. (*See* Doc. No. 82.)

The Court conducted oral argument regarding the motions on February 20, 2009. Following the argument, by Order dated February 23, 2009, the Court directed the parties to submit additional briefing regarding the causation element of Plaintiff's claims. (Doc. No. 86.)   The parties filed their supplemental briefs on March 27, 2009. ("Pl.'s Supp. Mem." and "Defs.' Supp. Mem." (Doc. Nos. 88, 90).)

On May 29, 2009, Plaintiff filed a motion to re-open discovery pursuant to Rule 56(f). ("Pl.'s 56(f) Mem." (Doc. Nos. 97-98).) Defendant responded in opposition on June 12, 2009 ("Defs.' 56(f) Opp'n" (Doc. No. 101)), and Plaintiff filed its reply on June 19, 2009 (Doc. No. 103).

## II. LEGAL STANDARDS

### A. Governing Law

"[F]ederal courts sitting in diversity apply state substantive law . . . ." *Gasperini v. Ctr. for Humanities, Inc.*,   518 U.S. 415, 427 (1996).  The parties relied on New York law in their briefs and at oral argument, which is sufficient to establish the governing law in this action. *See, e.g.*, *Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08 Civ. 4341 (RJS), 2009 WL 1054830, at *2 (S.D.N.Y. Apr. 17, 2009); *see also Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law." (internal citations and quotations omitted)); *see also Bildirici*, 2006 WL 2689869, at *6. Therefore, the Court applies the substantive law of New York State in resolving the parties' cross-motions for summary judgment.

### B. Summary Judgment

In a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Pursuant to Rule 56(c), summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir. 2008).

"A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

## III. DISCUSSION

The central allegations in this case are that "Defendants never took any action whatsoever to approve or disapprove of RSL Ltd. or the [RSL Group] affiliates' continued use of RSL Plc's money" or "to consider the interests of RSL Plc or its creditors." (Compl. ¶ 3.)  Based principally on these allegations, Plaintiff brings two claims for breaches of fiduciary duty.  First, Plaintiff alleges that Defendants breached "fiduciary duties, including a fiduciary duty of care, to [RSL Plc] and its constituents." (*Id.* ¶ 71.)  Second, Plaintiff asserts that Defendants also breached an allegedly independent "fiduciary duty of care . . . to [RSL Plc's] creditors, since by

March of 2000, RSL Plc was either insolvent or within the zone of insolvency." (*Id.* ¶ 78.) In both of these claims, Plaintiff seeks to recover "the value of the assets of RSL Plc that should have been preserved for the benefit of creditors, but instead were either spent during the period from March 2000 through December 2000, or which were not sold or realized during year 2000." (*Id.* ¶ 82; *see also id.* ¶ 75.)

With respect to the cross-motions for summary judgment, the Court concludes that: (1) factual disputes regarding the nature and extent of Defendants' actions on behalf of the RSL Group and RSL Plc preclude the application of the business judgment rule; (2) Plaintiff has failed to provide sufficient authority under New York law to sustain a cause of action based on the existence of a duty of care owed by directors of a corporation to the corporation's creditors while the corporation allegedly operates in the so-called "zone of insolvency"; and (3) Plaintiff has failed to adduce a non-speculative evidentiary basis to support a conclusion that Defendants' conduct caused its losses.

As to Plaintiff's motion to conduct additional expert discovery pursuant to Rule 56(f), Plaintiff has not demonstrated that it is entitled to the relief it now seeks. Specifically, the request is untimely, Plaintiff has failed to adequately explain why it did not elicit the sought-after supplemental expert opinions during the time allotted to the parties to conduct discovery, and the proposed discovery would not address the principal defect in Plaintiff's causation theory. Accordingly, for the reasons set forth below, both of Plaintiff's motions are denied, and

Defendants' motion for summary judgment is granted.

## A. The Business Judgment Rule

Defendants argue that they are entitled to the protections of the business judgment rule with respect to any potential liability arising out of their actions as directors of RSL Plc. (Defs.' Mem. at 47-49; Defs.' Opp'n at 15-17.) Relying on the "law of the case" doctrine, Plaintiff argues that Defendants are precluded by the MTD Decision from invoking this defense to either of its causes of action. (Pl.'s Opp'n at 41-42; Pl.'s Mem. at 22.)

The Court is not persuaded by the arguments of either party. For the reasons stated below, because there are factual disputes regarding the actions taken by Defendants and the capacity in which those actions were taken, the application of the business judgment rule cannot be resolved at the summary judgment phase of this litigation.

### 1. Applicable Law

"Under New York law, the business judgment rule 'bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.'" *In re 1st Rochdale Co-op Group, Ltd.*, No. 07 Civ. 7852 (DC), 2008 WL 170410, at *1 (S.D.N.Y. Jan. 17, 2008) (quoting *Auerbach v. Bennett*, 419 N.Y.S.2d 920, 926 (N.Y. 1979)); *see also Stern v. Gen. Elec. Co.*, 924 F.2d 472, 476 (2d Cir. 1991) ("[U]nder the New York business judgment rule, the actions of corporate

directors are subject to judicial review only upon a showing of fraud or bad faith.").

"At the same time, to earn the protection of the business judgment rule, directors must do more than merely avoid fraud, bad faith, and self-dealing." *In re 1st Rochdale Co-op Group, Ltd.*, 2008 WL 170410, at *1 (citing *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 274 (2d Cir. 1986)). "It is not enough that directors merely be disinterested and thus not disposed to self-dealing or other indicia of a breach of the duty of loyalty. Directors are also held to a standard of due care. They must meet this standard with 'conscientious fairness.'" *Hanson Trust*, 781 F.2d at 274 (quoting *Alpert v. 28 Williams St. Corp.*, 483 N.Y.S.2d 667, 674 (N.Y. 1984)).

Thus, a director "does not exempt himself from liability by failing to do more than passively rubber-stamp the decisions of the active managers." *Barr v. Wackman*, 36 N.Y.2d 371, 381 (N.Y. 1975). Nor does the business judgment rule "protect directors in 'omission' cases where an injury results from the inaction of a director." *Frater v. Tigerpack Capital, Ltd.*, No. 98 Civ. 3306 (SAS), 1999 WL 4892, at *4 (S.D.N.Y. Jan. 5, 1999).

### 2. Analysis

Plaintiff argues that the MTD Decision precludes the subsequent application of the business judgment rule in this matter. (Pl.'s Opp'n at 42.) In support of this assertion, Plaintiff relies on Judge Karas's comment that, "if the facts are as described by Plaintiff, it cannot be said, and Defendants have cited no authority to say, that as a matter of law Defendants should be immunized by the business judgment rule." *Bildirici*, 2006 WL 2689869, at *6. However, Plaintiff's argument misconstrues the MTD Decision.

First, Plaintiff seeks to imply a ruling on the merits in its favor from language that merely denied a portion of Defendants' motion to dismiss. The MTD Decision reasoned that Defendants were *not* entitled to judgment as a matter of law — *i.e.*, dismissal of Plaintiff's claims pursuant to Rule 12(b)(6) — because they had not cited a case where the business judgment rule had been applied to insulate a defendant from allegations that he or she had failed to act on behalf of a corporation. In resolving that issue *against Defendants*, Judge Karas did not grant "judgment as a matter of law" in *Plaintiff's favor* or rule that the business judgment rule is inapplicable in this litigation. Thus, Plaintiff's argument on this point is neither logically nor legally sound.

Second, one of the primary assumptions underlying Judge Karas's ruling on this issue is no longer supported by the evidentiary record. Specifically, in resolving Defendants' motion, Judge Karas properly assumed the truth of Plaintiff's allegations. The language of his holding — "*if* the facts are as described by Plaintiff," *id.* (emphasis added) — indicates that the ruling was contingent upon that assumption. Now, following discovery, it is clear that the Complaint contains several colorfully worded allegations that are inconsistent with the evidence in this case. For example, Plaintiff alleged that Defendants engaged in a "continu[ing] . . . practice of abdicating [their] duties," and "*never took any action whatsoever* to approve or disapprove of RSL Ltd. or the affiliates' continued use of RSL Plc's money." (Compl. ¶¶ 3, 6 (emphasis added).) Notwithstanding

these allegations, the record before the Court indicates that Defendants played active roles within the RSL Group.

During the time that they were affiliated with the RSL Group, Defendants Fisher, Domorski, Shiffman, and Bildirici were executives of RSL Ltd. (Defs.' 56.1 ¶ 11.) Defendants Lauder, Schuster, Sekulow, Fisher, and Domorski also served as directors of RSL Ltd. (*Id.*) Moreover, the RSL Ltd. Board met eight times during 2000: January 12, March 28, June 29, July 27, November 7, November 14, December 7, and December 18. (Defs.' 56.1 ¶ 13.) Defendants Fisher, Domorski, and Schiffman attended each RSL Ltd. board meeting in 2000 while they were employed at the RSL Group. (*Id.*) Defendant Sekulow missed one meeting, and Defendant Bildirici missed three. (*Id.*) In addition to the board meetings, these Defendants participated in sixteen actions of the RSL Ltd. Board through unanimous consent during 2000. (*See* Pl.'s 56.1 Opp'n ¶ 16.)

Some Defendants also served on committees of the RSL Ltd. Board. Defendants Schuster and Sekulow served on the Audit Committee, and Defendants Lauder, Schuster, Sekulow, and Fisher were members of the Executive Committee. (Defs.' 56.1 ¶¶ 14-15.) Defendants Schuster and Sekulow attended each of the Audit Committee's meetings during 2000, which were held on March 1, May 8, August 1, and November 7. (*Id.* ¶ 15.) The Executive Committee met on January 6, March 1, March 17, July 7, and October 5, 2000. (*Id.* ¶ 14.) Defendants Lauder and Sekulow attended each of these meetings, Defendant Fisher attended the meetings that occurred while he was the CEO of RSL Ltd., and Defendant Schuster missed only one meeting. (*Id.*)

Finally, although no RSL Ltd. board meetings were held between August and October 2000, Plaintiff concedes that the purpose of the break was to permit the new CEO of RSL Ltd., Defendant Domorski, to "undertake a *thorough evaluation* of [RSL Ltd.] — including traveling to multiple subsidiaries, *all also subsidiaries of* [*RSL*] *Plc* — before making recommendations on how to proceed." (*Id.* ¶ 50 (emphasis added).)

Thus, the record evidence of Defendants' activities and roles within the RSL Group is sufficient to call into question Plaintiff's allegations that Defendants acted with "complete inattention to how and the circumstances under which RSL Plc's money was being spent," and "failed to take any action to preserve RSL Plc's funds, or have any participation in how the RSL Group would use RSL Plc's money." (Compl. ¶¶ 8, 11.) Therefore, because the MTD Decision's discussion of the business judgment rule assumed the truth of Plaintiff's allegations, and because there are now, at minimum, factual disputes as to the truth of those allegations, the prior ruling has no binding effect on the Court in resolving the parties' summary judgment motions.

However, Defendants' arguments regarding the business judgment rule are similarly unavailing. Defendants are named in this litigation as directors of RSL Plc, and the applicability of the business judgment rule cannot be resolved through summary judgment based on the actions that they took in their other capacities within the RSL Group. These functional distinctions are relevant to the availability of this legal defense. *See, e.g.*, *Hanson Trust*, 781 F.2d at 274. Specifically, while Defendants cannot be said to have *failed* to act, the parties

dispute the extent to which Defendants considered the interests of RSL Plc and its constituents in isolation when they attended RSL Ltd. board meetings and executed the voluntary consents issued by the RSL Ltd. Board. (*See, e.g.*, Pl.'s 56.1 Opp'n ¶¶ 13, 16.) Likewise, although several Defendants have produced calendars indicating that they scheduled numerous meetings with RSL Ltd. management and outside investment advisors to discuss strategic planning for the RSL Group (*see* Defs.' 56.1 ¶¶ 41, 51, 52, 53), Plaintiff disputes the occurrence of these meetings and whether, if the meetings occurred, the interests of RSL Plc were separately considered (*see* Pl.'s 56.1 Opp'n ¶¶ 41, 51, 52, 53).

Consequently, there are factual disputes regarding the extent to which Defendants, acting in their capacity as directors of RSL Plc, exercised their business judgment specifically on behalf of Plaintiff. Although the evidence of the actions taken by Defendants in their other roles at the RSL Group is relevant to the analysis of the causation element of Plaintiff's claims, *see infra* Part III.C.2.b, the factual disputes regarding the capacity in which Defendants acted preclude them from successfully relying on a blanket application of the business judgment rule. Accordingly, Defendants' motion for summary judgment is denied insofar as it is predicated on invoking the business judgment rule as a defense to either of Plaintiff's claims.

## B. The "Zone of Insolvency"

Plaintiff concedes that there are disputed issues of fact regarding the date on which RSL Plc became insolvent. (*See* Tr. of Oral Argument, Feb. 20, 2009 ("Tr.") at 30:16-

31:1.) However, it seeks summary judgment on the issue of whether Defendants owed a duty of care to the creditors of RSL Plc while it was operating in the "zone of insolvency." (*See* Pl.'s Mem. at 15-17.) Defendants cross-move for summary judgment, arguing, *inter alia*, that they owed no such duty prior to RSL Plc's insolvency. (Defs.' Mem. at 35-41.)

For the reasons set forth below, the Court concludes that there is no support under New York law for Plaintiff's "zone of insolvency" theory of liability. Accordingly, Plaintiff's motion for summary judgment on this issue is denied, and Defendants' motion is granted to the extent that Plaintiff's claims are based on allegations that Defendants breached fiduciary duties owed to RSL Plc's creditors prior to RSL Plc's insolvency.

### 1. Applicable Law

In New York, a director is required to "perform his [or her] duties . . . , in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." N.Y. Bus. Corp. Law § 717(a); *see also Hanson Trust*, 781 F.2d at 273; *Alpert*, 63 N.Y.2d at 561 (noting that directors "have an obligation to all shareholders to adhere to fiduciary standards of conduct and to exercise their responsibilities in good faith when undertaking any corporate action"); *Schwartz v. Marien*, 37 N.Y.2d 487, 491 (N.Y. 1975) ("[M]embers of a corporate board of directors . . . owe a fiduciary responsibility to the shareholders in general . . . ."). Thus, directors' duties to act as "guardians of the corporate welfare," *Alpert*, 63 N.Y.2d at 561 — including fiduciary duties of care and loyalty — operate to the benefit of the corporation's owners, who stand to gain from

the firm's success and also bear the risk of its potential financial failure. *Cf. Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 787 (Del. Ch. 2004) (recognizing that the "corporate law . . . of most of our nation . . . expects that the directors of a solvent firm will cause the firm to undertake economic activities that maximize the value of the firm's cash flows primarily for the benefit of the residual risk-bearers, the owners of the firm's equity capital"). In the context of a wholly-owned subsidiary, such as RSL Plc, the relevant "owner" is the firm's parent — here, RSL Ltd.

Such an owner "is an adventurer in the corporate business; he [or she] takes the risk, and profits from success." *Comm'r of Internal Revenue v. O.P.P. Holding Corp.*, 76 F.2d 11, 12 (2d Cir. 1935). By contrast, "[t]he creditor, in compensation for not sharing the profits, is to be paid independently of the risk of success, and gets a right to dip into the capital when the payment date arrives." *Id.* In light of this "vital difference" between a corporation's owners and creditors, *id.*, directors' fiduciary duties extend to creditors only in somewhat limited circumstances. Indeed, "[u]nder New York law, creditors are owed a fiduciary duty by officers and directors of a corporation *only* when the corporation is insolvent." *Cooper v. Parsky*, No. 95 Civ. 10543 (JGK) (NRB), 1997 WL 242534, at *22 (S.D.N.Y. Mar. 27, 1997) (emphasis added), *rev'd on other grounds*, 140 F.3d 433 (2d Cir. 1998); *see also Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.*, No. 06 Civ. 5383 (JGK), 2007 WL 2077153, at *5 & n.3 (S.D.N.Y. July 20, 2007) (noting that "[i]t is well established that corporations do not have a fiduciary relationship with their unsecured creditors" because "[t]he relationship is

contractual rather than fiduciary," but that "[a]n exception to this rule arises in the case of an insolvent corporation"); *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, No. 98 Civ. 6907 (MBM), 2000 WL 335557, at *11 & n.8 (S.D.N.Y. Mar. 30, 2000) ("[U]nder New York law issuers of non-convertible bonds generally do not owe a fiduciary duty to their bondholders. . . . The one substantial exception to this rule is that an insolvent firm may owe fiduciary duties to its bondholders."); *cf. In re Cent. Ice Cream Co.*, 836 F.2d 1068, 1073 (7th Cir. 1987) (Easterbrook, J.) ("Creditors outside of bankruptcy may not challenge the firm's decisions; in bankruptcy they may do so, because they are (presumed to be) the principally affected persons, the new residual claimants.").

Moreover, the duty that directors owe to the creditors of an insolvent corporation under New York law is defined primarily by the "trust fund doctrine." *See Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 549 (N.Y. 2000). Specifically, "officers and directors of an insolvent corporation are said to hold the remaining corporate assets in trust for the benefit of its general creditors." *Id.*; *see also Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506, 512 (2d Cir. 1981); *Chambers v. Blickle Ford Sales, Inc.*, 313 F.2d 252, 257-58 (2d Cir. 1963); *Troll v. Chase Nat'l Bank of City of New York*, 257 F.2d 825, 828 (2d Cir. 1958); *New York Credit Men's Adjustment Bureau v. Weiss*, 305 N.Y. 1, 7 (N.Y. 1953). As such, "directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of creditors." *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 308 (S.D.N.Y. 2006) (citing

*Clarkson*, 660 F.2d at 512 and *Weiss*, 305 N.Y. at 7).

### 2. Analysis

According to Plaintiff, RSL Plc was in the "zone of insolvency" for a period of between thirty and sixty days during May and June 2000, and Defendants owed RSL Plc's creditors a fiduciary duty of care during that period. (*See* Pl.'s Mem. at 15; Nov. 28, 2007 Aff. of Steven G. Panagos In Support of Pl.'s Mot. for Partial Summary Judgment ("Panagos Aff.") Ex. A, July 27, 2007 Export Report of Steven G. Panagos ("Panagos Expert Report") at 17-20, 29.) However, in the portion of his Expert Report relating to this subject, Plaintiff's expert, Steven G. Panagos, did not define the term "zone of insolvency," and instead cited a series of events that he believed indicated that RSL Plc was operating in this "zone" by May 2000. (Panagos Expert Report at 17-18.) In an affidavit submitted in support of Plaintiff's motion for partial summary judgment, Panagos pointed more specifically to four events that led him to this conclusion: (1) in mid-2000, RSL Ltd. and RSL Plc were "having difficulties raising financing to address their liquidity needs" (Panagos Aff. ¶ 5); (2) during May and June 2000, RSL Plc's public notes were "trading well below par value" (*id.*); (3) RSL Ltd. delayed the IPO of RSL Australia in late-May of 2000 "because of market conditions" (*id.* ¶ 6); and (4) on June 8, 2000, Goldman Sachs warned the RSL Ltd. Board that it "was projected to run out of cash by November 2000" (*id.*). On the basis of this *ex-post* analysis from its expert, Plaintiff urges the Court to conclude that RSL Plc was in the "zone of insolvency" "[b]y May of 2000," and that, after that date,

Defendants owed fiduciary duties of care to RSL Plc's creditors. (*See* Pl.'s Mem. at 15.)[10]

In connection with this amorphous definition of the "zone of insolvency," Plaintiff has suggested two alternative bases for its claim that Defendants owed fiduciary duties to RSL Plc's creditors during this period. In its first cause of action, Plaintiff alleges that Defendants owed fiduciary duties to RSL Plc and "its constituents." (Compl. ¶ 71.) Under this theory, according to Plaintiff, upon RSL Plc's entry into the "zone of insolvency" the constituency of stakeholders in the enterprise broadened to include RSL Plc's creditors: "[O]nce [RSL] Plc entered the zone of insolvency, [RSL] Plc's directors owed its creditors the same duty of care the directors previously owed only to [RSL] Plc and its shareholders, without any limitations." (Pl.'s Opp'n at 35.) In its second cause of action, Plaintiff alleges that Defendants breached "fiduciary dut[ies] of care" to "exercise independent judgment on behalf of [RSL Plc's] creditors," suggesting that these duties were separate from Defendants'

---

[10]   In response to Plaintiff's contention that Defendants owed a fiduciary duty of care to RSL Plc's creditors "without any limitations" (Pl.'s Opp'n at 35), Defendants argue that the duties they owed to RSL Plc's creditors were "narrow," as opposed to non-existent (*see* Defs.' Mem. at 35-39). Defendants' argument is consistent with New York's trust fund doctrine. *See Credit Agricole Indosuez*, 94 N.Y.2d at 549 (citing *Weiss*, 305 N.Y. at 7). However, Plaintiff has disavowed reliance on the trust fund doctrine as a basis for Defendants' liability. (*See* Pl.'s Opp'n at 36; *see also* Tr. at 80:12-13 ("This is not a trust fund case.").) Therefore, the Court need not, and does not, address the issues of when and whether the trust fund doctrine may be invoked in regard to a corporation allegedly operating in the "zone of insolvency."

fiduciary duties to RSL Plc and its other constituents. (*See* Compl. ¶ 78.)[11]

Both of Plaintiff's theories must fail because neither is supported by New York law. Specifically, New York State's corporate directors do not owe a duty of care to a corporation's creditors when the corporation is arguably operating within the "zone of insolvency," as that term has been defined by Plaintiff in this litigation. In light of the other legal protections afforded to creditors, the Court rejects Plaintiff's attempt to extend directors' fiduciary duties in this fashion.

Recognizing the dearth of support for its position, Plaintiff contends that the primary legal authority for its "zone of insolvency" theory is the MTD Decision, and it again relies heavily on the "law of the case" doctrine. (*See* Tr. at 7:8-9:3; Pl.'s Mem. at 15; Pl.'s Opp'n at 14-19.) This argument is unavailing. "'The law of the case doctrine . . . does not preclude this Court from reconsidering issues on summary judgment that have initially been raised in the context of a motion to dismiss.'" *RSL Commc'ns, PLC*

*v. Bildirci*, No. 04 Civ. 5217 (RJS), 2009 WL 454136, at *2 (S.D.N.Y. Feb. 23, 2009) (quoting *Nobel Ins. Co. v. City of New York*, No. 00 Civ. 1328 (KMK), 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006)); *see also Arizona v. California*, 460 U.S. 605, 618 (1983); *LNC Invs., Inc. v. First Fidelity Bank*, 173 F.3d 454, 467 n.12 (2d Cir. 1999); *Sagendorf-Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996); *DiLaura v. Power Auth.*, 982 F.2d 73, 76 (2d Cir. 1992); *Golden Pac. Bancorp v. F.D.I.C.*, No. 95 Civ. 9281 (NRB), 2003 WL 21496842, at *5 n.14 (S.D.N.Y. June 27, 2003) ("[W]hen the mandate of a higher court is not involved, the law of the case doctrine is a discretionary one."). The Court is not persuaded that New York law supports Plaintiff's "zone of insolvency" theory, and therefore declines to afford preclusive effect to the remarks in the MTD Decision regarding this issue.

The paragraph in the MTD Decision discussing the "zone of insolvency" cited only one case, using a "cf." signal, that applied New York law: *Clarkson Co. v. Sheehan*, 660 F.2d 506, 512 (2d Cir. 1981). *See Bildirci*, 2006 WL 2689869, at *8 & n.2. *Clarkson*, however, simply quotes a statement from the New York Court of Appeals that "[i]f the corporation *was insolvent* at [the] time" that the defendants liquidated the corporation, then "it is clear that defendants, as officers and directors thereof, were to be considered as though trustees of the property for the corporate-beneficiaries." *Clarkson*, 660 F.2d at 512 (emphasis added) (quoting *Weiss*, 305 N.Y. at 7). Thus, neither *Clarkson*, nor the case upon which it relied — *Weiss* — supports Plaintiff's "zone of insolvency" theory.

---

[11]    Based on the record before the Court, the joint administrators appear to lack standing to advance this theory based on damages to "the creditors of RSL Plc" (Compl. ¶ 82), as opposed to RSL Plc itself. *Cf. Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec.*, 351 F. Supp. 2d 79, 90 (S.D.N.Y. 2004) (holding that "[i]nsofar as [the plaintiff corporation] seeks to recover money owed to creditors, it lacks standing," but that the plaintiff "may . . . bring claims to recover for injuries *it* allegedly incurred" (emphasis in original) (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995))). However, in light of the Court's conclusion that New York law does not impose on corporate directors a fiduciary duty of care to creditors when a corporation is in the "zone of insolvency," the Court does not resolve the merits of this issue.

*In re Adelphia Communications Corp.*, 323 B.R. 345 (Bankr. S.D.N.Y. 2005), which was the primary authority cited in the MTD Decision for the "zone of insolvency" proposition, also merits discussion.  Notably, in the portion of the opinion cited in the MTD Decision, the *Adelphia* court was not applying New York law.  *See id.* (discussing the "entire fairness" doctrine under Delaware law).  Moreover, the *Adelphia* court made clear that the corporate entities at issue in the case were "not in the 'zone of insolvency,' or a little bit insolvent.  They [we]re hopelessly insolvent." *Id.* at 386.  Based on that finding, the court noted that, "once [the corporate entities] became insolvent, the Rigases [the managers of the corporate entities], in order to meet their continuing fiduciary duties . . . , had to remember that the stakeholders of the [corporate entities] . . . included the creditors . . . ." *Id.*  No party to this litigation appears to dispute that principle as it relates to an insolvent corporation.

Only after making those observations did the *Adelphia* court use — in a footnote — the language relied on in the MTD Decision:

> Many courts, including the Second Circuit, this one, and the state courts from which the applicable principles have their origin, have said that when a corporation becomes insolvent or enters into the zone of insolvency, the fiduciary duties of a corporation expand from its stockholders to its creditors.

*Id.*  However, the authority cited by the *Adelphia* court does not compel the conclusion sought here by Plaintiff.  The only Second Circuit case it cited, *In re STN Enterprises*, 779 F.2d 901 (2d Cir. 1985),

applied the law of Vermont.  *See id.* at 905.  Moreover, the *STN Enterprises* decision merely states that "although in most states directors of a *solvent* corporation do not owe a fiduciary duty to creditors, quite the reverse is true when the corporation *becomes insolvent*." *Id.* at 904 (second emphasis added).

In the same footnote, the *Adelphia* court characterized the above-quoted "zone of insolvency" proposition as "useful shorthand" for a "more precise formulation" proffered by Vice Chancellor Leo E. Strine of the Delaware Court of Chancery:  "'[T]he directors' obligations are '*to the firm itself*.'" *In re Adelphia Commc'ns Corp.*, 323 B.R. at 386 n.140 (emphasis added) (quoting *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 791 (Del. Ch.  2004)).[12]  The *Adelphia* court elaborated as follows:

> While directors continue to have the task of attempting to maximize the economic value of the firm, the *fact of insolvency* "affect[s] the constituency on whose behalf the directors are pursuing that end," and "places the creditors in the shoes normally occupied by the shareholders — that of residual risk-bearers."  Where the

---

[12]  Vice Chancellor Strine has subsequently discussed, at length, courts' use of this "useful shorthand."  *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 195 n.75 (Del. Ch. 2006) (noting that use of the phrase "directors ow[e] duties to the insolvent corporation itself" "might be short-hand that elides the rich academic debates about what corporations are," but that it serves as "a judicial method of attempting to reinforce the idea that the business judgment rule protects the directors of solvent, barely solvent, and insolvent corporations, and that the creditors of an insolvent firm have no greater right to challenge a disinterested, good faith business decision than the stockholders of a solvent firm . . .").

remaining equity is under water, whatever remains of the company's assets will be used to pay creditors, usually either by seniority of debt or on a *pro rata* basis among debtors of equal priority.

*Id.* (emphasis added) (quoting *Prod. Res. Group*, 863 A.2d at 791) (alteration in original). Thus, the *Adelphia* court reasoned that a corporate director's fiduciary obligations extend to creditors upon "the fact of insolvency," and not, as Plaintiff argues, during a period of approximately thirty to sixty day days in which a corporation *might* be considered to be in the "zone of insolvency." The comment from *Adelphia* relied on in the MTD Decision was, at most, *dictum*, and the court's discussion does not support Plaintiff's theory of the "zone of insolvency."[13] Therefore, the Court declines to follow the language and authority from the MTD Decision cited by Plaintiff. Because Plaintiff has relied on the MTD Decision as the "best support" for its position (Tr. at 7:15), its motion for summary judgment on this issue is denied.

Nevertheless, perhaps because — in Plaintiff's words — "there is not a case under New York law that has fully analyzed [these]

issues" (Tr. at 8:12-13), much ink has been spilled in the parties' submissions regarding the pronouncements of the Delaware courts. It goes without saying that, while the Court is not obligated to follow Delaware law in this matter, many courts — including this one — appropriately look to the views of Delaware's learned jurists when analyzing issues of corporate law. Although the Delaware cases cited by Defendants, which involved direct claims by creditors, are distinguishable from the case at hand (in which the claims are, at least nominally, brought on behalf of RSL Plc), it is true that Delaware courts have opined on the appropriate extent of directors' fiduciary duties to creditors when a corporation enters the "zone of insolvency." *See, e.g., N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007); *Prod. Res. Group*, 863 A.2d at 787-88. Having closely examined these authorities, the Court concludes that adopting Plaintiff's "zone of insolvency" theory would provide redundant legal protections to creditors, while impeding corporations' ability to recruit qualified directors, generate capital, and serve their general wealth-maximizing function.

First, in response to the vague definition of the "zone of insolvency" proffered by Plaintiff, the Court agrees with the Delaware Supreme Court's position in *Gheewalla*, 930 A.2d at 101, that the need to provide clear legal guidance to corporate directors and managers counsels against defining fiduciary duties in connection with such amorphous and unpredictable boundaries. Indeed, it is difficult to imagine a coherent limiting principle in the current economic climate that would preclude a facially plausible allegation, *see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009), that a corporation is in the "zone of

---

[13]   The portion of the *Adelphia* opinion cited in the MTD Decision contains only two other non-Delaware cases that refer to the "zone of insolvency": *In re Global Crossing Ltd.*, 295 B.R. 726, 745 & n.61 (Bankr. S.D.N.Y. 2003) and *In re Adelphia Communications Corp.*, No. 02-41729 (REG), 2003 WL 22316543, at *32 (Bankr. S.D.N.Y. Mar. 4, 2003). These citations are no more instructive than the above-discussed *Adelphia* opinion with respect to the issue before the Court, as they both contain an identical quote, without analysis, and cite the Second Circuit's decisions in *Clarkson* and *STN Enterprises*.

insolvency," as that term has been defined by Plaintiff in this matter.

Second, the existence of such a duty could permit direct claims by the creditors of a solvent corporation, which would hinder the efforts of officers and directors to fulfill their obligations to all of the stakeholders in the enterprise. Hypothetically, a group of creditors could commence litigation against the directors of a corporation that is arguably in the "zone of insolvency," despite the fact that the corporation in question is solvent and may never actually become insolvent. Such pre-insolvency litigation with creditors would risk, if not require, instances in which corporate officers and directors must divert their collective focus from the corporation's shareholders and their reasonable efforts to repay the debts at issue. Indeed, the expenditure of resources on creditor-initiated litigation could prevent the debtor-corporation from escaping this treacherous "zone" by avoiding insolvency altogether. *See generally Prod. Res. Group*, 863 A.2d at 789 n.56 (explaining that recognizing a direct cause of action based on a fiduciary duty to creditors where the firm is in the "zone of insolvency" would "mean[] that creditors will be able to get discovery in situations when it is ultimately determined that the relevant company was not only solvent, but never even within the so-called zone of insolvency"). Thus, creating a pre-insolvency duty of care to creditors would distort — and potentially conflict with — the incentive structure for corporate managers that the law of fiduciary duties has been erected to create. Such a construction would work to the detriment of the corporate stakeholders that this body of law was designed to protect.

Finally, recognizing a fiduciary duty of care to creditors when a corporation enters the "zone of insolvency" would "involve[] using the law of fiduciary duty to fill gaps that do not exist." *Prod. Res. Group*, 863 A.2d at 789-90. Indeed, "[c]reditors are better placed than equityholders and other corporate constituencies (think employees) to protect themselves against the risk of firm failure." *Trenwick Am. Litig. Trust*, 906 A.2d at 174; *see also id.* at 198-200 (discussing the "law of fraudulent transfer"). This is because New York law already provides ample legal protection to creditors' interests.

Prior to the time at which creditors enter into a formal relationship with a corporation, they may bargain for contractual protections such as liens on corporate assets. *See, e.g., Lorenz v. CSX Corp.*, 1 F.3d 1406, 1417 (3d Cir. 1993) ("It is well-established that a corporation does not have a fiduciary relationship with its debt security holders, as with its shareholders. The relationship between a corporation and its debentureholders is contractual in nature." (applying New York law)). These creditors' contractual rights are further protected by the implied covenant of good faith and fair dealing. *See, e.g., Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 731 (S.D.N.Y. 1993) ("Every contract governed by New York law, including the indenture at issue here, contains an implied covenant of good faith and fair dealing."). New York's legislature has also provided statutory protections to creditors against fraudulent conveyances of assets by insolvent entities, which may be invoked prior to the time of a corporation's actual insolvency. *See* N.Y. Debt. & Cred. Law § 273 ("Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as

to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."). And, as discussed above, New York courts continue to apply the trust fund doctrine. *See, e.g.*, *Credit Agricole Indosuez*, 94 N.Y.2d at 549-50.[14]

Therefore, in sum, Plaintiff has adduced no support under New York law for its argument that Defendants owed a fiduciary duty of care, "without any limitations" (Pl.'s Opp'n at 35), to RSL Plc's creditors during the thirty- to sixty-day period in which Plaintiff argues that RSL Plc was in the "zone of insolvency." The Court has analyzed the merits of this position, and concludes that Plaintiff's "zone of insolvency" theory does not stand to reason. "The incantation of the . . . words zone of insolvency should not declare open season on corporate fiduciaries." *Trenwick Am. Litig. Trust*, 906 A.2d at 174. Accordingly, to the extent that either of Plaintiff's claims is based on the existence of such a duty, Defendants' motion for summary judgment is granted and those components of Plaintiff's claims are dismissed.

## C.  Causation

Plaintiff also moves for summary judgment as to the causation elements of its

claims, arguing that Defendants were "the only persons" who "could have acted to preserve the value of RSL Plc's assets," and therefore Defendants' "inaction *necessarily* was the cause of damages suffered by RSL Plc and its creditors." (Pl.'s Mem. at 29 (emphasis added).) Defendants cross-move for summary judgment on the causation element of both of Plaintiff's claims, arguing that the cause of Plaintiff's losses "was not the absence of formal [RSL] Plc board meetings, but an industry meltdown that bankrupted literally every company in [the RSL Group's] sector." (*See* Defs.' Mem. at 75.)

For the reasons stated below, the Court concludes that Plaintiff has failed to adduce sufficient evidence that Defendants' alleged breaches of fiduciary duty were a factual, "but for" cause of the losses for which Plaintiff seeks damages. Accordingly, for the reasons set forth below, Plaintiff's motion for partial summary judgment is denied, Defendants' motion for summary judgment is granted, and the remainder of Plaintiff's claims are dismissed.

### 1.  Applicable Law

In a breach of fiduciary duty claim "[w]here . . . the remedy sought is damages to compensate for a claimant's loss, the usual damages-causation rule for tort and contract breach cases is appropriate . . . ." *Am. Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897, 907 n.7 (2d Cir. 1998); *see also LNC Invs.*, 173 F.3d at 465; *BNY Capital Mkts, Inc. v. Moltech Corp.*, No. 99 Civ. 11754 (GEL), 2001 WL 262675, at *10 (S.D.N.Y. Mar. 14, 2001) ("Under New York law, a party claiming that it has been damaged by actions of its fiduciary must prove not only that the

---

[14]   Although inapplicable in the context of RSL Plc's United Kingdom-based insolvency proceedings, it is also relevant to note that Congress has created an additional layer of creditor protections through the bankruptcy code. *See In re Worldcom, Inc.*, 401 B.R. 637, 645 (Bankr. S.D.N.Y. 2009) ("[T]he filing of a [bankruptcy] petition . . . creates several statutory causes of action that belong to the estate, such as the avoidance of preferential transfers, fraudulent conveyances, and certain postpetition transaction[s] . . . ." (citing 11 U.S.C. §§ 547, 548, 549, 551)).

breach was the 'but for' cause of the damage, but also that it constituted proximate causation."); *de Kwiatkowski v. Bear, Stearns & Co., Inc.*, No. 96 Civ. 4798 (JGK), 1999 WL 1277245, at *14 (S.D.N.Y. Nov. 29, 1999). This "usual . . . causation rule" requires proof of two sub-elements: "but for" and proximate causation. *See Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 482 (S.D.N.Y. 2005), *aff'd*, *In re Bankers Trust Co.*, 450 F.3d 121 (2d Cir. 2006); *cf. Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("[A] plaintiff must prove that a defendant's breach *directly* and *proximately* caused his or her damages." (emphasis in original)).

These are not novel concepts. "[C]ausation has been 'a well-recognized and essential element of the [tort] plaintiff's case in chief' since at least the early 17th century, and probably much, much before." *Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 426 (2d Cir. 2004) (Calabresi, J., concurring) (quoting *Zuchowicz v. United States*, 140 F.3d 381, 384 n.2 (2d Cir. 1998)). Nor, contrary to Plaintiff's argument, is the application of these causation principles limited to instances in which the plaintiff "is . . . seeking damages to compensate it for lost profits or lost earnings." (Pl.'s Opp'n at 68.) The only distinction drawn in the Second Circuit authority on this issue focuses on the difference between restitutionary remedies and compensatory damages. *See Am. Fed. Group*, 136 F.3d at 907 n.7. Lost profits, as relevant in *American Federal Group*, are simply a subset of compensatory damages. *See* 1 Dan B. Dobbs, *Handbook on the Law of Remedies* § 3.3(4), at 302. Plaintiff does not seek restitution in this matter, and it has not argued that Defendants retained ill-gotten gains as a result of their alleged breaches of fiduciary duty. (*See* Tr. at 34:12-21.) Rather, Plaintiff concedes that it is seeking compensatory damages. (*Id.*) Therefore, to prevail on its claims, Plaintiff must establish both "but for" and proximate causation.

"But for" causation, which the Court refers to as "factual causation," presents a "threshold question" of whether the alleged breach of fiduciary duty was a "cause in fact" of the loss complained of by the plaintiff. *Semi-Tech Litig.*, 353 F. Supp. 2d at 484; *see also Petitt v. Celebrity Cruises, Inc.*, 153 F. Supp. 2d 240, 252 & n.10 (S.D.N.Y. 2001); *Barnes v. Andrews*, 298 F. 614, 616 (S.D.N.Y. 1924) (Hand, J.) ("The plaintiff must accept the burden of showing that the performance of the defendant's duties would have avoided loss, and what loss it would have avoided."). As the Supreme Court has explained:

> But-for causation is a hypothetical construct. In determining whether a particular factor was a but-for cause of a given event, we begin by assuming that that factor was present at the time of the event, and then ask whether, even if that factor had been absent, the event nevertheless would have transpired in the same way.

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989). Thus, a plaintiff establishes factual causation by demonstrating that, "but for" the allegedly unlawful act, it is more likely than not that the injury for which redress is sought would not have occurred.

However, courts have developed a test — dubbed, somewhat misleadingly, the "substantial factor" test — that may be applied where there are multiple potential

causes of a single harm. *See, e.g.*, *Rodriguez v. Budget Rent-A-Car Sys., Inc.*, 841 N.Y.S.2d 486, 490 (N.Y. 2007) ("'Where the independent and negligent acts or omissions of two or more parties cause injury to another, each of those negligent acts or omissions is regarded as a cause [of] that injury provided it was a substantial factor in bringing about that injury.'" (quoting New York Pattern Jury Instructions)); *see also Atl. Mut. Ins. Co. v. Alitalia Airlines*, No. 02 Civ. 5758 (GBD), 2005 WL 427573, at *3 (S.D.N.Y. Feb. 22, 2005); *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336, 342 (S.D.N.Y. 2002). Nevertheless, each of the potential causes must be independently sufficient to have caused the plaintiff's injury. *See Point Prods. A.G.*, 215 F. Supp. 2d at 342 ("Under tort law, where there is an issue of multiple potential causes of [the] plaintiff's harm, the court can use a substantial factor test in place of but for causation in order to determine the cause in fact of the injury. Thus, applying this test requires that each individual action was sufficient standing alone to cause the same harm."); *see also* Restatement (Third) of Torts § 26 cmt. j (Proposed Final Draft 2005) (noting that the "primary function" of the substantial factor test is "to permit the factfinder to decide that factual cause existed when there were . . . two separate causal chains sufficient to bring about the plaintiff's harm, thereby rendering neither a but-for cause." (internal quotation omitted)). Accordingly, the "substantial factor" test does not obviate the requirement of demonstrating factual causation, it simply provides an alternative means by which a plaintiff may meet his or her burden.[15]

_____

[15]   The "substantial factor" test of factual causation, *see, e.g.*, *Point Prods. A.G.*, 215 F. Supp. 2d at 342, is analytically distinct from the issue of whether, in

The second aspect of the causation inquiry — "proximate cause, or more appropriately legal cause" — "has proven to be . . . incapable of being precisely defined to cover all situations." *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 314 (N.Y. 1980). However, "[w]here damages are sought in a breach of fiduciary duty claim, 'the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability.'" *Pension Comm. v. Bank of Am. Sec., LLC*, No. 05 Civ. 9016 (SAS), 2008 WL 4755734, at *3 (S.D.N.Y. Oct. 29, 2008) (quoting *LNC Invs.*, 173 F.3d at 465). "The . . . question is how far down the causal chain to go before cutting off liability," *Semi-Tech Litig.*, 353 F. Supp. 2d at 482-83, which is an inquiry that is usually left to the factfinder.

### 2. Analysis

"One of the primary and completely legitimate purposes of incorporating is to limit or eliminate the personal liability of corporate

_____

general, a "*less stringent* 'substantial factor' causation requirement" applies in a breach of fiduciary duty case such as this one, *Am. Fed. Group*, 136 F.3d at 907 n.7 (emphasis added). Under the latter, "less stringent" causation standard referenced by Plaintiff (*see, e.g.*, Pl.'s Mem. at 30-33; Pl.'s Opp'n at 67-71; Pl.'s Supp. Mem. at 1-2), the plaintiff does "not have to show either 'but for' or proximate causation, but only that the [defendant's] breach was a 'substantial factor' contributing to her injury." *LNC Invs.*, 173 F.3d at 465; *see also ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 995-96 (2d Cir. 1983). *But cf. Evvtex Co., Inc. v. Hartley Cooper Assocs. Ltd.*, 102 F.3d 1327, 1334 (2d Cir. 1996) (reasoning that, in *ABKCO Music*, "the district court's finding of proximate cause was implicit"). As stated above, this "less stringent" causation standard is inapplicable in this case because Plaintiff seeks compensatory damages rather than restitution. *See RSL Commc'ns*, 2009 WL 454136, at *2; *see also LNC Invs.*, 173 F.3d at 465.

principals." *Goldman v. Chapman*, 844 N.Y.S.2d 126, 127 (2nd Dep't 2007) (citing *Bartle v. Home Owners Coop.*, 309 N.Y. 103, 106 (N.Y. 1955)). Thus, the law holds corporate officers and directors individually liable for breaches of fiduciary duty only to the extent of the damages caused by the breach. *See LNC Invs., Inc. v. First Fidelity Bank*, 126 F. Supp. 2d 778, 801 (S.D.N.Y. 2001) ("[A]n actor's conduct, even if wrongful, is not actionable if it causes no harm to another; conversely, the harm one suffers is not actionable unless caused by the wrongful conduct of another."); *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 684 F. Supp. 27, 35 (S.D.N.Y. 1988) ("[F]ault unrelated by casual connection to injury is without legal significance."); *cf. Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 763 (7th Cir. 1998) (noting that holding a defendant liable for losses he did not cause "would produce overdeterrence by making him an insurer against conditions outside his control," and that "it is bad policy to encourage people harmed in some natural or financial disaster to cast about for someone on whom to lay off the consequences who had, however, committed only a technical breach of duty"). Consequently, in order to prevail on its causes of action, Plaintiff must establish that Defendants' alleged breaches of fiduciary duty were factual causes of its injuries.

"[I]n the usual case, it is undisputed that the complained-of loss would not have occurred had the defendant not committed the relevant breach." *Semi-Tech Litig.*, 353 F. Supp. 2d at 482. This is not a "usual case" in that regard. Thus, the Court must examine whether Plaintiff has "'present[ed] persuasive evidence that its claim of causation [is] not implausible.'" *Id.* at 484 (quoting *LNC Invs.,*

*Inc. v. First Fidelity Bank*, No. 92 Civ. 7584 (MBM), 1997 WL 528283, at *28 (S.D.N.Y. Aug. 27, 1997)); *see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 865 F.2d 492, 493 (2d Cir. 1989); *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).

Plaintiff's theory of causation proceeds as follows:

> Defendants, as directors of RSL Plc, were the only persons who could have acted on RSL Plc's behalf . . . . Moreover, . . . the collective market value of RSL Plc's operating subsidiaries in March 2001 was less than their value in June 2000. Thus, the failure of the Defendants to take any action to protect RSL Plc in the year 2000 must have been, as a matter of law, a substantial factor in causing the admitted decline in value of RSL Plc's assets, and the resulting damages suffered by RSL Plc and its creditors.

(Pl.'s Mem. at 31-32 (internal citations omitted); *see also* Tr. at 33:20-24 (Plaintiff's counsel summarizing this theory and characterizing it as "pretty simple"); Pl.'s Supp. Mem. at 5-6 (arguing that the evidence of causation is sufficient to satisfy its burden of demonstrating both factual and legal causation).)

In support of its causation argument, Plaintiff places significant emphasis on the opinion expressed in the Panagos Expert Report. Providing evidence through expert opinions is, of course, an entirely permissible manner of proceeding, both in a motion for summary judgment and at trial. *See, e.g.,*

*LNC Invs., Inc. v. First Fidelity Bank*, No. 92 Civ. 7584 (CSH), 2000 WL 1024717, at *3 (S.D.N.Y. July 25, 2000) ("It is hardly surprising that trials of professional malpractice cases invariably feature the opinion testimony of expert witnesses."). Indeed, where, as here, an understanding of the responsibilities and actions of Defendants, as directors of a wholly owned subsidiary, falls outside the province of a layman's experiences, expert testimony is usually required to assist the factfinder.   *See id.* However, regardless of the form that the proffered evidence takes, the burden of proof remains with Plaintiff to demonstrate that Defendants' alleged breaches of fiduciary duty caused the diminution in value of RSL Plc for which it seeks recovery.

Turning to this evidence, Panagos's expert opinion as to causation proceeds on the basis of two premises.  First, in his view, "a board of directors exercising its fiduciary duties would have had frequent meetings" in order to "deliberate[] on the courses of action [RSL Plc] should take to improve its financial condition . . . ."  (Panagos Expert Report at 26.)  Second, at such meetings, reasonable "directors exercising [their] fiduciary duties would . . . consider" issues relating to the financial health and strategic plans of RSL Plc.  (*Id.*)  Based on these premises, Panagos offered the conclusion that, if Defendants had held meetings of the RSL Plc Board, then those deliberations "*could* have enabled the board of directors to take" actions that "would have preserved significant value for RSL Plc's creditors . . . ."  (*Id.* at 27 (emphasis added).)

Plaintiff summarizes this opinion as follows:  (1) Defendants "should have held frequent meetings" on behalf of RSL Plc; (2)

there were a number of issues that Defendants "should have" considered at such meetings; and (3) if Defendants had considered those issues, then they "*might have* '[s]old the [RSL Plc] Operating Subsidiaries to preserve value for [RSL] Plc and its creditors and shareholders,' and '[s]ignificantly reduced cash outflows of [RSL] Plc as soon as possible.'"   (Pl.'s Opp'n at 72 (emphasis added) (quoting Panagos Expert Report at 27).)

The Court discusses each of these three assertions in turn below.  The legal merit of Plaintiff's first premise, which posits that Defendants breached their fiduciary duties by failing to hold "frequent" meetings of the RSL Plc Board, is somewhat dubious. Nevertheless, the Court assumes, *arguendo*, that Plaintiff is correct.  The second premise, which relates to a series of issues that reasonable directors would have considered, fails to account for the record evidence that Defendants *did* consider these issues as they related to the RSL Group as a whole.  Finally, the Court finds that the conclusion that Plaintiff draws from these premises — that Defendants "might have" caused RSL Plc to sell its subsidiaries or implement additional restrictions on subsidiary funding — is fatally speculative in terms of establishing factual causation.

a. Premise 1:  Defendants Should Have Held Frequent Meetings of the RSL Plc Board

The first premise upon which Plaintiff rests its causation theory is the opinion of its expert that "a board of directors exercising its fiduciary duties would have held frequent meetings . . . [to] deliberate[] on the courses of action the company should take to improve its financial condition . . . ."  (Panagos Expert

Report at 26; *see also* Pl.'s Opp'n at 72.) This component of the Panagos Expert Report is relevant to when and whether Defendants breached fiduciary duties to Plaintiff and its creditors in the year 2000. (*See, e.g.*, Tr. at 26:4-6 (Plaintiff's counsel noting that the "[f]ailure to have meetings, whether formal or informal, to specifically consider the interests of [RSL] Plc, that failure is a breach").) However, here again, Plaintiff's assertions as to the scope of Defendants' fiduciary duties are overly broad.

First, the Court rejects any suggestion that the RSL Plc Board was required by law to hold "frequent" meetings. Plaintiffs have not identified any decision for which the approval of the RSL Plc Board was legally required but not given. Moreover, in recognition of the fact that sound corporate governance may not require formal meetings each time an action of a corporate board is necessary, section 708(b) of New York's Business Corporation Law expressly permits "action[s] required or permitted to be taken by the board or any committee thereof" to be consummated by written consent. N.Y. Gen. Bus. Law § 708(b). For example, the RSL Plc Board approved the February 2000 debt offering in this fashion. (*See* Bagby Opp'n Decl. Ex. 23.) This practice "permits much of the management of a modern corporation to be conducted by consent," which "reflects the modern practice in both public and close corporations. It obviates scheduling conflicts and facilitates actions by the board of directors . . . ." Isidore Kantrowitz & Sol Slutsky, 2 *White: New York Business Entities* ¶ B708.02 at 7-75 & n.2 (14th ed. 2004).

"Courts are not to shut their eyes to the realities of business life." *Leslie, Semple & Garrison, Inc. v. Gavit & Co., Inc.*, 439 N.Y.S.2d 707 (3d Dep't 1981). RSL Plc was a wholly owned intermediate subsidiary, which functioned as a "holding company" for the RSL Group's "core" subsidiaries (Pl.'s 56.1 ¶ 5), lacked its own operations or employees (*id.* ¶ 4), and had a board primarily comprised of individuals who were also either officers or directors of RSL Plc's sole shareholder, RSL Ltd. Departures from procedural formalism are eminently reasonable in this context. Therefore, the absence of more frequent meetings of the RSL Plc Board did not, in and of itself, constitute a breach of Defendants' fiduciary duties.

Second, while RSL Plc was solvent, Defendants' fiduciary duties required that RSL Plc be managed for the benefit of RSL Ltd. *Cf. Trenwick Am. Litig. Trust*, 906 A.2d at 200 ("'[I]n a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.'" (quoting *Anadarko Petro. Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988))); *In re RSL COM PRIMECALL, Inc.*, Nos. 01-11457 (ALG) *et al.*, 2003 WL 22989669, at *12 (Bankr. S.D.N.Y. 2003) (applying Delaware law). Plaintiff points to no evidence suggesting that Defendants breached their duties of loyalty. In any event, it appears that Defendants had every incentive to maintain the commercial viability of the RSL Group, including RSL Plc, and that they undertook reasonable efforts to do so. Under these circumstances, Defendants — as directors of a solvent, wholly owned subsidiary — "had no duty to replicate the deliberative process of [RSL Ltd.'s] board of directors." *Trenwick Am. Litig. Trust*, 906 A.2d at 201; *cf. id.* ("There is no sound basis to hold that the boards of

wholly-owned subsidiaries must engage in their own parallel . . . consideration processes, thereby setting in motion an inefficient intergenerational . . . procedural mandate . . . to every level of the corporate family." (internal citation omitted)). Indeed, even if Defendants had chosen to hold additional RSL Plc board meetings, it is difficult to conceive of a situation in which their duties of care would have required them to revolt against the business strategy that they had chosen as directors and executives of RSL Plc's parent and sole shareholder, RSL Ltd.

Finally, although the parties disagree as to the timing of RSL Plc's insolvency, there is no dispute that Defendants' fiduciary obligations changed when RSL Plc became insolvent and that the interests of RSL Plc's creditors became relevant at that time. Nevertheless, it cannot be said, as Plaintiff has suggested, that Defendants' duties of care required them to sell RSL Plc's subsidiaries. To the contrary, "there is no absolute duty under American law to shut down and liquidate an insolvent corporation." *In re Global Serv. Group, LLC*, 316 B.R. 451, 460 (Bankr. S.D.N.Y. 2004); *cf. Trenwick Am. Litig. Trust*, 906 A.2d at 195 n.75 ("[I]nsolvency does not suddenly turn directors into mere collection agents. . . . [Rather,] [t]he fiduciary duty tool is transferred to the creditors when the firm is insolvent in aid of the creditor's contract rights."); *In re RSL COM PRIMECALL, Inc.*, 2003 WL 22989669, at *7-8 (applying Delaware law). Therefore, neither Defendants' duty of care to RSL Plc, nor their obligations to consider the interests of RSL Plc's creditors, *required* them to sell RSL Plc's subsidiaries.

Nevertheless, in order to isolate the causation analysis, the Court assumes, without deciding, that Defendants breached their duties of care by failing to engage in additional deliberations — formal or otherwise — regarding the specific interests of RSL Plc during the year 2000. (*See* Pl.'s 56.1 ¶ 40; *see also* Pl.'s Supp. Mem. at 6.) The Court further assumes the truth of Plaintiff's contention that RSL Plc was insolvent as of June 30, 2000, and that Defendants subsequently breached their duty to consider the interests of RSL Plc's creditors after that date. (*See* Panagos Expert Report at 4, 14.) However, "[i]t is easy to say that [Defendants] should have done something. But that will not serve to harness upon [them] the whole loss, nor is it the equivalent of saying that, had [they] acted, the company would now flourish." *Barnes*, 298 F. at 618. Therefore, the Court's treatment of Plaintiff's initial premise marks the beginning, rather than the conclusion, of the causation inquiry.

b. Premise 2:  Issues That Defendants Should
    Have Considered

The second premise underlying Plaintiff's causation theory is that reasonable directors of RSL Plc "exercising [their] fiduciary duties would [have] . . . consider[ed], among other things": an operating budget for 2000, a long-term business plan, internal controls, "asset divestiture options such as sales and IPOs," "whether the incurrence of additional debt was necessary and feasible," "the ability to repay creditor obligations considering asset values and operating trends," and "[d]ecisions to fund RSL Ltd. subsidiaries that were not part of RSL Plc . . . ." (Panagos Expert Report at 26; *see also* Pl.'s Opp'n at 72.)

However, as discussed above, *see supra* Part III.A.2, the record suggests that Defendants played active roles within the RSL Group. Moreover, there is also evidence that Defendants took into consideration the very issues identified by Plaintiff's expert. Indeed, Plaintiff's expert acknowledged at his deposition that, based on his review of the record, "in general, it looked like" Defendants, acting as fiduciaries of RSL Ltd., "addressed these issues and had some level of deliberation on many of these issues." (Bagby Decl. Ex. 17, Dep. of Steven Panagos at 236:12-15.) Thus, although the Panagos Expert Report does not account for this evidence — apparently because Panagos "was not asked to specifically review the actions taken by the [RSL] Ltd. Board" (Panagos Aff. Ex. B. at 25) — the Court declines to simply ignore it when assessing Plaintiff's causation argument.

For example, Panagos asserted that Defendants should have considered a "2000 operating budget and a long-term business plan" for RSL Plc. (Panagos Expert Report at 26.) However, RSL Ltd.'s March 2000 Business Plan set forth a comprehensive five-year business strategy for the RSL Group, including a commitment to focusing on RSL Plc's subsidiaries — the "core" RSL Group subsidiaries in North America and Europe. (*See* Dembrow Decl. Ex. R at RSL PLC 0003902.) As part of that Plan, RSL Ltd. compiled and presented consolidated financials for these "core" entities. (*See id.* ("[T]he accompanying five-year plan only reflects the results of [the RSL Group's] operations in Europe and North America."); *see also id.* at RSL PLC 0003925-3928 (financials for RSL North America); *id.* at 0003943-3947 (financials for RSL Europe).) The remaining RSL Group subsidiaries,

which were not subsidiaries of RSL Plc, were characterized as "non-core." (*Id.* at RSL PLC 0003902.) The Plan did not include financials for those entities, and it indicated that the RSL Group was "looking to monetize some or all" of them. (*Id.*)

Panagos also opined that RSL Plc should have "[a]nalyze[d] asset divestiture options," the "overall state of the company's financial condition," and the "company's business strategy . . . in light of the issues facing the company . . . ." (Panagos Expert Report at 26.) However, on May 25, 2000, Defendants Fisher and Schiffman, as well as other employees of RSL Ltd., attended a meeting with representatives from Goldman Sachs regarding the same sort of issues that Plaintiff's expert suggests should have been discussed by the RSL Plc Board. (*See* Dembrow Decl. Ex. T.) There is evidence that the topics at this meeting included RSL Ltd.'s planned expenditures for the remainder of 2000, the status of its pending efforts to raise capital and increase liquidity, and its future plans for funding sources. (*See id.* at GS/Bildirici 0019006-19007.) Additionally, at the meeting, "RSL conveyed that [it] would like Goldman Sachs to do a formal analysis of their financial alternatives in light of this information and be able to discuss this the week of June 5th." (*Id.* at GS/Bildirici 0019007.)

The slides from the subsequent Goldman Sachs presentation to RSL Ltd., which are dated June 8, 2000, reflect that RSL Ltd.'s management and board — including Defendants — were made aware of the changing market conditions in the telecommunications industry and considered the potential impact of the changes on the March 2000 Business Plan. (*See* Amirfar

Decl. Ex. 47.) The slides indicate that RSL Ltd. had updated its cash projections, reevaluated its financing sources, and was aware that "[b]*ased on RSL's most recent projections*, the Company will run out of cash with its November 2000 interest payment." (*Id.* at RSL PLC 0004027 (emphasis added).)

With respect to the "recoverability of future advances to RSL Plc subsidiaries" (Panagos Expert Report at 26), the record likewise indicates that this issue was considered by RSL Ltd.'s management. On May 26, 2000, Defendant Schiffman communicated to the heads of all of RSL Ltd.'s operating subsidiaries — including the subsidiaries of RSL Plc — that "we need to implement certain cash controls, effective immediately." (Amirfar Decl. Ex. 41; *see also* Defs.' 56.1 ¶ 34.) The email also stated that "[i]f any of you are unable to collect on any of your inter-company receivables please let me know immediately," and "urgently" requested updated quarterly cash forecasts for the remainder of 2000. (Amirfar Decl. Ex. 41.)

On June 15, 2000, Schiffman reiterated this strategy in a presentation titled "Cash is King," which was given at the "Global Finance Conference" of the RSL Group. (*See id.* Ex. 42; Defs.' 56.1 ¶ 34.) RSL Ltd.'s COO, Donald Shassian, provided an additional reminder of the need to preserve funds to the RSL Group's operating subsidiaries through a July 28, 2000 memorandum. (*See* Defs.' 56.1 ¶ 35.) The import of these actions is clear — neither the RSL Group nor Defendants ignored RSL Plc and its subsidiaries as the conditions in the telecommunications market changed for the worse.

Plaintiff argues that the evidence of Defendants' consideration of the issues outlined by Panagos on behalf of RSL Ltd. is irrelevant. In support of this argument, Plaintiff asserts that RSL Plc board meetings would not have been duplicative of the efforts of RSL Ltd.'s management because: (1) RSL Ltd. had additional subsidiaries that were not subsidiaries of RSL Plc, and (2) RSL Ltd. and RSL Plc had different sets of creditors. (Pl.'s Opp'n at 46-50.) Neither of these contentions is persuasive with respect to the issue of whether Defendants' failure to convene the RSL Plc Board caused Plaintiff's losses.

First, Plaintiff argues that RSL Ltd. had subsidiaries that it was required to take into consideration that were not affiliated with RSL Plc. Relatedly, Panagos suggested that Defendants, as RSL Plc directors, should have deliberated regarding whether it was appropriate "to fund RSL Ltd. subsidiaries that were not part of RSL Plc." (Panagos Expert Report at 26.) It is conceivable that the interests of RSL Plc and RSL Ltd. might have diverged with respect to the question of whether RSL Plc funds should have been provided to RSL Ltd. subsidiaries that were not affiliated with RSL Plc, *i.e.*, the "non-core" subsidiaries identified in the March 2000 Business Plan. However, although there is evidence that, generally speaking, funds raised in the RSL Plc debt offerings were administered by RSL Ltd. and used to fund the subsidiaries of the RSL Group (*see* Defs.' 56.1 ¶ 7; *see also* Hopkins Report at 14-15), Plaintiff points to no evidence that funds raised by RSL Plc were provided to non-RSL Plc subsidiaries between March and December 2000 (*see* Defs.' 56.1 ¶ 88; Pl.'s 56.1 Opp'n ¶ 88). This is not surprising in light of RSL Ltd.'s commitment in the March 2000 Business Plan to focus on "core" entities

that were subsidiaries of RSL Plc. (*See* Dembrow Decl. Ex. R at 0003902.) Therefore, Plaintiff's assertion that funds raised in RSL Plc's debt offerings might have been provided to non-RSL-Plc subsidiaries is unavailing.

Additionally, in response to Plaintiff's arguments regarding RSL Ltd.'s additional subsidiaries, Defendants have provided evidence that RSL Ltd. possessed sufficient resources to operate its "non-core" subsidiaries without resorting to the funds of RSL Plc. (*See generally* Hopkins Report at 27 ("Our analysis of expenditures shows that on a net basis, total disbursements to entities that were not subsidiaries of RSL Plc were less than the proceeds of RSL Ltd.'s [February 2000] Preferred Equity Offering . . . .").) In February 2000, RSL Ltd. raised approximately $110 million through an offering of its securities. (*See* Defs.' 56.1 ¶ 21.) The proceeds from that offering were sufficient to cover the approximately $98 million that Plaintiff's expert estimated RSL Ltd. disbursed to its "non-core" subsidiaries in 2000. (*See* Amirfar Decl. Ex. 117.) Therefore, there is no evidence in the record that a conflict between the interests of RSL Ltd. and RSL Plc as to subsidiary funding came to fruition. As such, the Court finds unpersuasive Plaintiff's speculation that, because RSL Plc directors did not have to consider the interests of the RSL Ltd.'s "non-core" subsidiaries, separate RSL Plc board meetings might have led reasonable directors to arrive at different conclusions than those that were reached at the RSL Ltd. level.

Next, Plaintiff argues that RSL Plc and RSL Ltd. had different creditors. (*See, e.g.*, Pl.'s Opp'n at 46-50.) This appears to be true in a formal sense. However, the record

indicates that RSL Ltd. was either a guarantor or an obligor on almost all of RSL Plc's debts. Whatever legal differences may have existed between the obligations of RSL Plc to its creditors, and RSL Ltd.'s obligations to RSL Plc's creditors as a guarantor, there is no evidence that this distinction had an effect on the functional relationship between these creditors and the RSL Group in 2000.

As of January 2000, RSL Plc had approximately $1.2 billion in outstanding debt. (Pl.'s 56.1 ¶ 12.) The notes underlying this debt were unconditionally guaranteed by RSL Ltd. (*See* Pl.'s 56.1 Opp'n ¶ 4; *see also* Panagos Expert Report at 6.) In February 2000, RSL Plc issued additional debt in the amount of $100 million and €100. (*See generally* Amirfar Decl. Ex. 1.) This debt issuance was also unconditionally guaranteed by RSL Ltd. (*See id.* at PLF 66804, 66813.)[16] In July 2000 — when, according to Plaintiff, RSL Plc was insolvent and Defendants were ignoring their fiduciary duties — *Defendant Lauder* willingly became one of Plaintiff's creditors by providing a $100 million bridge

---

[16]   On February 22, 2000, RSL Plc and RSL Ltd. entered into a contract by which the Chase Manhattan Bank agreed to act as the book-entry depositary in connection with RSL Plc's February 2000 note offering. (Decl. of Emily O'Neill Slater in Further Support of Defendants' Mot. for Summary Judgment ("Slater Reply Decl.") Ex. 1.) RSL Ltd. and RSL Plc "jointly and severally agree[d]" to provide compensation for those services. (*Id.* at PLF 67416.) Defendants represent, and Plaintiff presents no evidence to the contrary, that the agreement resulted in a $1.4 million debt to Chase Manhattan Bank (now JP Morgan Chase), for which both RSL Ltd. and RSL Plc were responsible as co-obligors. (*See* Mar. 27, 2009 Angell Decl. Ex. B; *cf.* Bagby Opp'n Decl. Ex. 21 at RSLPLC 031404 (July 2004 "Summary of unsecured creditors' claims" indicating a $1.4 million debt owed by RSL Plc to JP Morgan Chase).)

loan to RSL Plc in order to provide funding for the RSL Group's operations. (*See* Panagos Expert Report at 8.) The terms of the loan were negotiated by the Executive Committee of the RSL Ltd. Board, and, once again, RSL Ltd. guaranteed repayment of the loan. (Amirfar Opp'n Decl. Exs. B, C.)[17]

The *only* instance cited by the parties of a debt owed by RSL Plc for which RSL Ltd. did not serve as either a guarantor or a co-obligor was approximately $170,000 owed by RSL Plc to D&T. (*See* Bagby Opp'n Decl. Ex. 21 at RSLPLC 031404.) However, RSL Ltd. was also a debtor to D&T. Defendants have provided invoices that were issued to RSL Ltd. in 2000, which indicate that RSL Ltd. owed D&T money for services rendered, and that the size of the debt far exceeded that owed to D&T by RSL Plc. (*See* Slater Reply Decl. Ex. 2.) For example, a September 19, 2000 invoice issued to RSL Ltd., which was addressed to Defendant Schiffman, listed a $260,467 bill for "professional services rendered" relating to tax forms completed in 1999 for RSL Ltd. "and its subsidiaries . . . ." (*Id.* at RSLLtd2007-105443.) Thus, there is evidence of only one RSL Plc debt not guaranteed by RSL Ltd. However, even in that instance, D&T was a creditor of both entities.

In addition to the fact that RSL Ltd. acted as a guarantor or co-obligor on nearly all of RSL Plc's debts, there is also evidence that RSL Plc's status as the direct debtor was a matter of formality rather than substance. In the February 2000 Offering Circular, the RSL

Group indicated that it had "not presented separate financial statements and other related disclosures concerning RSL PLC because management ha[d] determined that such information [was] *not material to shareholders or holders of the notes issued by RSL PLC.*" (Amirfar Decl. Ex. 1 at PLF 66981 (emphasis added).) The RSL Group subsequently used funds from an RSL Ltd. bank account at Fleet Bank to make two interest payments to RSL Plc's creditors. (*See* Hopkins Report at 15; *see also* Preston Report at 15.) Moreover, when the RSL Group suspended interest payments on the notes, it did so through a resolution adopted at an RSL Ltd. board meeting on February 28, 2001. (Amirfar Decl. Ex. 94 at RSL-FHL 0000051.) Finally, there is evidence that, when RSL Plc's creditors wished to communicate with the RSL Group, they contacted representatives of RSL Ltd. For example, on January 19, 2001, counsel for "substantial beneficial holders of various bonds issued by [RSL Plc], a subsidiary of [RSL Ltd.]," sent a letter to RSL Ltd.'s insolvency counsel at Weil Gotshal. (Amirfar Decl. Ex. 6.) The "Re" line of the letter indicates that the correspondence pertained to RSL Ltd. "and its various subsidiaries and affiliates," which the creditors' counsel defined collectively as "the Company." (*Id.*)[18]   All of this evidence

---

[17]   Although Plaintiff initially alleged that the loan was made "under terms very favorable to [Lauder]" (Compl. ¶ 5), that contention appears to have been abandoned following discovery.

[18]   One of the law firms that represented the creditors represents RSL Plc and the joint administrators in this action. Ironically, whereas Plaintiff's expert opined that Defendants, as directors of RSL Plc, might have been able to direct RSL Plc to liquidate some, or all, of its subsidiaries in order to preserve value for these creditors, the January 19, 2001 letter does not suggest that the creditors pressed that course of action at that time. Rather, the letter states that the creditors were "prepared to continue in . . . discussions with the Company" relating to, among other things, "the option of conversion of all or part of their debt claims into some substantial equity interest in the Company or an

suggests that, to the extent there are formal legal differences between the respective obligations of RSL Plc, as debtor, and RSL Ltd., as guarantor or co-obligor, to the creditors of RSL Plc, those distinctions were not considered material by either the RSL Ltd. Board or RSL Plc's creditors.

Therefore, the undisputed evidence demonstrates that the issues that Plaintiff's expert believes "could" have been considered at RSL Plc board meetings, were, in fact, considered by Defendants in connection with their roles at RSL Ltd. Moreover, Plaintiff has failed to provide any explanation with a basis in the record suggesting how, if at all, separate consideration of these issues at an RSL Plc board meeting would have led these same Defendants to reach different conclusions than those that were actually reached by the officers and directors of RSL Ltd. Thus, the Court concludes that, whereas Plaintiff's initial premise regarding the scope of Defendants' fiduciary duties is overbroad as a legal matter, Plaintiff's second premise is factually suspect because it ignores the evidence of Defendants' actions on behalf of the RSL Group as a whole.

c. Conclusion: Actions That Defendants "Might" Have Taken on Behalf of RSL Plc

Proceeding from these two premises, Plaintiff argues that, despite the above-described evidence, isolated consideration of RSL Plc's specific interests "might have" caused Defendants to sell RSL Plc's subsidiaries and "significantly reduce" cash outflows. (Pl.'s Opp'n at 72-73.) In support of this theory, Plaintiff's expert posited that

appropriate affiliate or related entity." (Amirfar Decl. Ex. 6 at LTD-ADD000482.)

holding separate meetings of the RSL Plc Board, with directors acting reasonably under the circumstances faced by the RSL Group, "could have enabled the board of directors to take, among other things . . . actions, which would have preserved significant value for RSL Plc's creditors . . . ." (Panagos Expert Report at 27.) Panagos provided two primary categories of potential actions that Defendants, acting on behalf of RSL Plc, "could have" taken: (1) reducing "the cash outflows of RSL Plc as soon as possible . . ."; and (2) selling the RSL Group's "Operating Subsidiaries to preserve value for RSL Plc and its creditors and shareholders." (*Id.*)

However, in the conclusion of his July 27, 2007 Expert Report, when enumerating actions that "a reasonable board of directors of a company exercising its fiduciary duties when facing similar circumstances to those faced by the board of directors of RSL Plc in 2000 . . . *would* typically have" taken, Panagos did not opine that reasonable directors would have sold RSL Plc's subsidiaries or imposed additional restrictions on expenditures by RSL Plc's subsidiaries on top of those that had already been implemented by RSL Ltd. (*Id.* at 29 (emphasis added).) Rather, he asserted that reasonable directors would have "held regular board meetings" during 2000 and "considered the overall state of their company's financial condition . . . ." (*Id.*) These conclusions are relevant to the first premise underlying Plaintiff's causation theory — whether Defendants' breached fiduciary duties, *see supra* Part III.C.2.a — but they do not suggest that reasonable directors acting in a manner consistent with their fiduciary obligations should have or would have been able to stem RSL Plc's losses.

This is a critical flaw in Plaintiff's causation argument. Providing a list of actions that reasonable directors "could have" or "might have" taken (Pl.'s Opp'n at 72), without more, simply restates the central question with respect to causation. *See LNC Invs.*, 2000 WL 1024717, at \*4. At oral argument, Plaintiff's counsel appeared to do just that, asking the Court:

> But what if, what if the directors of [RSL] Plc had met and said, you know what, let's think about this from the creditors' standpoint. . . . Maybe the thing to do is to consider preserving the assets that we have and maximizing the value of those assets for the benefit of creditors. And [Defendants] decide to go back and have a conversation with the parent company [RSL Ltd.]. Isn't that a reasonable thing that a board of directors should be doing?

(Tr. at 84:14-24.) Simply put, neither the Court nor a factfinder may reply to Plaintiff's query through speculation regarding a central element of its claims. This question is for Plaintiff, and, at the summary judgment phase, the answer must have some basis in the record.

Moreover, the lack of evidence suggesting that reasonable directors acting on behalf of RSL Plc would have, or should have, taken the actions identified by Plaintiff's expert stands in stark contrast to the evidence that Defendants and others at the RSL Ltd. level *did* attempt to do so. With respect to cash expenditures, Plaintiff's expert suggested that Defendants could have, *inter alia*, "[s]topped funding RSL Plc subsidiaries who had an inability to pay the amounts back," "reduced

selling, general and administrative expenses for RSL Plc subsidiaries," and "[s]topped all non-critical capital expenditures for which financing was not obtained." (Panagos Expert Opinion at 27.) However, Plaintiff has not identified specific expenditures by RSL Plc or RSL Ltd. that were, in its view, imprudent or should have been prevented by Defendants. On the other hand, the record is clear that RSL Ltd. attempted to limit the spending of all of its subsidiaries. The message from RSL Ltd. was straightforward and emphatic: "[I]t is imperative that we tighten our belts HARD." (Amirfar Decl. Ex. 43 at RSL PLC 0001299; *see also id.* Exs. 41-42; Defs.' 56.1 ¶¶ 34-35.) Defendant Schiffman's approval was required prior to any capital expenditure by an RSL Group subsidiary as of May 26, 2000, and each subsidiary was directed that "all inter-company accounts MUST BE SETTLED once a month." (*See* Amirfar Decl. Ex. 41.)

Plaintiff points to no evidence that RSL Ltd. subsidiaries circumvented this approval process to improvidently spend funds that should have been preserved by Defendants as directors of RSL Plc. Indeed, when Panagos was asked at his deposition to identify expenditures by RSL Plc between May and November 2000 that went "beyond the reasonable scope of what the [RSL Plc] board should have permitted, or a fiduciary should have permitted," he responded that "[n]othing comes to mind right now." (Amirfar Decl. Ex. 128, Dep. of Steven Panagos at 254:12-21.) Moreover, one of the former joint administrators of RSL Plc testified that the RSL Group spent less on its subsidiaries in the third and fourth quarters of 2000 — which is the time period most relevant to Plaintiff's claims — than in the first quarter of 2001, a period that included Plaintiff's

commencement of insolvency proceedings and the onset of supervision by the joint administrators that have brought this action. (Amirfar Decl. Ex. 135, Dep. of Peter Spratt at 197:17-22, 198:16-24.) Thus, there is no basis in the record to conclude that, with respect to the RSL Group's expenditures on subsidiaries during 2000, Defendants' failure to hold meetings of the RSL Plc Board caused losses to Plaintiff or its creditors.

The same is true of Plaintiff's arguments regarding potential sales of RSL Plc's subsidiaries in 2000. Although Plaintiff's expert opined that such sales "could have" happened if Defendants had met as directors of RSL Plc, there is evidence in the record explaining why such sales did not occur. The answer is not the lack of RSL Plc board meetings. Rather, RSL Ltd.'s directors and managers tried to monetize certain RSL Group subsidiaries, but failed to consummate the transactions due to the inability to arrive at reasonable terms in a declining market.

Specifically, between May and July 2000, Defendants sought to raise funds through transactions relating to RSL Australia, Telegate, RSL Spain, and RSL Canada. (*See* Panagos Expert Report at 7-8.) The latter three of these entities were also subsidiaries of RSL Plc. (*See* Bagby Decl. Ex. 20 at RSLLtd2007-048279.) Referring to these attempts to monetize assets, one of RSL Ltd.'s bankruptcy advisors indicated that RSL Ltd. "couldn't get a willing buyer to either purchase the assets at an acceptable price or at any price, or the terms and conditions of any such sale were just not executable. . . . It was at a time when there was just a collapse in the telecom industry . . . ." (Amirfar Decl. Ex. 126, Dep. of Richard P. Krasnow at 55:2-8; *see also id.* Ex. 136, Dep. of Jeffrey Weinberg

at 58:23-59:16 (indicating that RSL Ltd. was "[v]ery much" trying to make sales, that there "was no lack of effort on" RSL Ltd.'s part to do so, and that the failure to consummate transactions was due to problems at the "purchaser level").)

Thus, the evidence demonstrates that the declining conditions in the telecommunications market were the principal — even if not the only — factual cause of Plaintiff's financial losses. (*See* Defs.' 56.1 ¶ 83; Pl.'s 56.1 Opp'n ¶ 83; *cf.* Pl.'s Opp'n at 74.) This fact neither precludes Plaintiff from proving that Defendants' alleged breaches of fiduciary duty were another factual cause of its losses, nor "absolves" Defendants of liability (Pl.'s Opp'n at 74). Nevertheless, the market conditions do not relieve Plaintiff of its burden of demonstrating that it is more likely than not that Defendants' alleged breaches of fiduciary duty actually caused its losses. *See Point Prods. A.G.*, 215 F. Supp. 2d at 342 (noting that "applying [the substantial factor] test requires that each individual action was sufficient standing alone to cause the same harm" (internal quotation omitted)). Simply put, there is no basis in the record for a factfinder to conclude that reasonable directors, acting solely on behalf of RSL Plc in circumstances similar to those faced by Defendants, would have chosen to pursue the monetization of the RSL Group's "core" subsidiaries differently, much less that such directors would have been successful in doing so. Consequently, irrespective of the flaws in Plaintiff's initial premises, no factfinder could conclude based on the undisputed evidence in the record that Defendants' failure to hold meetings of the RSL Plc Board caused the losses for which Plaintiff now seeks compensation.

***

In sum, the essential question with respect to the factual causation inquiry is whether, but for Defendants' failure to consider the interests of RSL Plc in isolation by holding meetings of this wholly owned subsidiary's board, the value of RSL Plc would have declined by $1 billion between June 2000 and March 2001. In light of the uncontested evidence that the deterioration in the telecommunications industry during 2000 served as an intervening cause of Plaintiff's losses, Plaintiff "must advance more than mere speculation in order to overcome the showing that their loss was attributable" to Defendants' alleged breaches of fiduciary duty. *Shanahan v. Vallat*, No. 03 Civ. 3496 (PAC), 2008 WL 4525452, at *5 (S.D.N.Y. Oct. 3, 2008); *see also In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 513 (S.D.N.Y. 2009) ("Where there is a market-wide downturn in a particular industry, however, [the plaintiffs] must show that their loss was caused by the [d]efendants' fraud, rather than the intervening events . . . ."). Plaintiff has not done so.

Although the Court has analyzed the premises underlying Plaintiff's causation theory at length above, the essence of Plaintiff's argument is that, because Defendants "were the only persons who could have taken action on behalf of RSL Plc," "their inaction necessarily must have been a substantial factor in causing the damages suffered by RSL Plc and its creditors." (Pl.'s Mem. at 28.) The latter contention — that Defendants' "inaction" must "necessarily" have caused Plaintiff's losses — is entirely conclusory, lacking in evidentiary support, and merely suggests a correlation between Defendants' alleged breaches and RSL Plc's

financial losses. Crediting these assertions as legally sufficient to defeat a motion for summary judgment would stretch the law of causation and corporate liability beyond its logical breaking point. Not every instance of financial loss gives rise to legally actionable damages.

In contrast to Plaintiff's speculation regarding causation, there is undisputed evidence that: (1) Defendants played active roles within the RSL Group; (2) nearly all of the issues identified by Plaintiff's expert were deliberated upon by Defendants in their roles at RSL Ltd.; and (3) RSL Ltd. sought to restrict its subsidiaries' expenditures and attempted, unsuccessfully, to engage in several projects to preserve value and generate additional liquidity for the RSL Group. "[A] convincing presentation [of evidence] by the moving party cannot be overcome by 'the mere possibility that a factual dispute *may* exist.'" *Fragrance Express Dot Com, Inc. v. Standard & Poor's Corp.*, 314 F. Supp. 2d 189, 194 (S.D.N.Y. 2003) (emphasis in original) (quoting *Ansam Assoc., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 447 (2d Cir. 1985)). In light of this evidence, mere speculation that the lack of RSL Plc board meetings caused Plaintiff's losses is insufficient. Accordingly, for the reasons stated above, Defendants' motion for summary judgment is granted, and Plaintiff's claims are dismissed.

D.  Plaintiff's Motion to Re-Open Discovery

On May 29, 2009, Plaintiff filed a motion pursuant to Rule 56(f) to re-open discovery. After fully briefing the cross-motions for summary judgment, participating in oral argument, and submitting a supplemental memorandum regarding causation, Plaintiff

now seeks to add to the record supplemental expert reports from R. Bruce Den Uyl and Steven R. Panagos. (*See* Decl. of John H. Bae in Support of Mot. of RSL Communications Plc to Supplement Discovery ("Bae 56(f) Decl.") ¶¶ 2, 3; *see also* Pl.'s 56(f) Mem. at 12-13.) For the reasons set forth below, the Court concludes that Plaintiff has failed to demonstrate that it is entitled to conduct additional discovery under rule 56(f). Accordingly, Plaintiff's motion is denied.

### 1. Applicable Law

Pursuant to Rule 56(f), "[i]f a party opposing [a motion for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . order a continuance to enable . . . other discovery to be undertaken . . . ." Fed. R. Civ. P. 56(f).

In order to defeat a summary judgment motion on the grounds that more discovery is needed, the party opposing the motion must submit an affidavit showing: (1) what facts are sought to resist the motion and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what effort affiant has made to obtain them[;] and (4) why the affiant was unsuccessful in those efforts.

*Behzadi & Brenjian Carpet v. David & Son Oriental Antique Rugs Corp.*, No. 07 Civ. 7073 (BSJ) (DFE), 2009 WL 773312, at *2 (S.D.N.Y. Mar. 19, 2009) (citing *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003)).

This provision "provides a mechanism whereby a party may avoid summary judgment if the party can make a showing that it is entitled to a continuance to permit further discovery." *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 02 Civ. 2561 (KMW) (GWG), 2006 WL 335357, at *7 (S.D.N.Y. Feb. 15, 2006) (citing Fed. R. Civ. P. 56(f)). However, "the rule 'applies to summary judgment motions made before discovery is concluded.'" *Id.* (quoting *McAllister v. New York City Police Dep't*, 49 F. Supp. 2d 688, 696 n.5 (S.D.N.Y. 1999)); *see also Hellstrom v. United States Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ("[S]ummary judgment should only be granted if *after discovery*, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which it has the burden of proof.'" (quotations omitted) (emphasis in original)); *Chimarev v. TD Waterhouse Investor Servs., Inc.*, 280 F. Supp. 2d 208, 229 n.1 (S.D.N.Y. 2003).

### 2. Analysis

The express terms of Rule 56(f) limit the Court's ability to re-open discovery to instances in which the "party opposing the motion shows by affidavit that . . . it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(f). Plaintiff has not taken that position. Rather, after repeatedly arguing that it has met its burden on the causation element of its claims (*see, e.g.*, Pl.'s Supp. Mem. at 2), Plaintiff seeks to reopen discovery as an alternative argument to avoid summary judgment in favor of Defendants. However, Rule 56(f) "is not a shield against all summary judgment motions." *Petitt v. Celebrity Cruises, Inc.*, 153 F. Supp. 2d 240, 261 (S.D.N.Y.

2001); *see also Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 23 (1st Cir. 1999) ("[A] party may not attempt to meet a summary judgment challenge head-on but fall back on Rule 56(f) if its first effort is unsuccessful." (internal quotation omitted)). Nor is this procedure a measure of last resort to be invoked when the non-movant wishes to proceed "out of an abundance of caution." (Pl.'s May 11, 2009 Pre-Motion Ltr. at 2 n.1.) Therefore, for the reasons stated below, Plaintiff's motion is denied.

First, Plaintiff has not explained to the Court's satisfaction why it did not seek to develop the proposed supplemental expert opinions during discovery, and it cannot be said that Plaintiff has been "railroaded" by a premature summary judgment motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). In fact, on January 20, 2006, at the oral argument regarding Defendants' motion to dismiss pursuant to Rule 12(b)(6), Judge Karas called into question Plaintiff's theory of causation and suggested that it would be one of the central issues in the case if summary judgment motions were filed. (Amirfar Opp'n Decl. Ex. F, Tr. of Jan. 20, 2006 Oral Argument at 45:11-14, 48:16-18.) Following the denial of Defendants' motion to dismiss, the parties conducted discovery for over one year (*see* Doc. Nos. 38, 54), and there are reports in the record from three expert witnesses engaged by Plaintiff. (*See, e.g.*, Amirfar Decl. Exs. 111-13, 116-17 (excerpts from export reports by Steven G. Panagos, Seymour Preston, Jr., and R. Bruce Den Uyl).) In short, Plaintiff was afforded every opportunity to develop evidence in support of its case.

Second, Plaintiff's contention that it "did not conduct discovery to establish 'but for'

and proximate causation" (Pl.'s 56(f) Mem. at 6), is belied by the record. (*See* Decl. of Benjamin Sirota in Opp'n to Plaintiff's Mot. to Reopen Discovery Ex. A.) For example, in its July 2, 2007 Contention Interrogatories, Plaintiff asked Defendant Lauder if he "contends that [his] acts or omissions are not the proximate cause of any damage to the Plaintiff, *as stated as an affirmative defense in the Answer . . . .*" (*Id.* (emphasis added).) Additionally, in both its First Request for Production of Documents and its Requests for Admission, Plaintiff propounded additional discovery requests relating to "proximate cause." (*See id.*) Therefore, Plaintiff did attempt to develop evidence relating to proximate causation during discovery, and its arguments to the contrary appear to be disingenuous.

Third, the controlling authority upon which the Court has relied in articulating the causation standards discussed in this decision pre-dates Defendants' motion to dismiss and the MTD Decision. Rather than addressing Defendants' reliance on this authority in any of the briefing relating to the parties' motions for summary judgment, Plaintiff chose to argue that the cases were distinguishable. (*See* Pl.'s Mem. at 29-33; Pl.'s Opp'n at 67-71.) In doing so, Plaintiff took the risk that this approach would not persuade the Court of the ultimate merits of its claims. "It is neither the role of this Court, nor the burden of defendant . . . , to relieve [the plaintiff] from the adverse consequences of its failed litigation strategies." *Allstate Ins. Co. v. Administratia Asigurarilor De Stat*, 948 F. Supp. 285, 296 (S.D.N.Y. 1996); *see also Liberty Mut. Ins. Co. v. Bankers Trust Co.*, No. 88 Civ. 3421 (RPP), 1993 WL 118520, at *6 (S.D.N.Y. Apr. 14, 1993) (denying motion to re-open discovery where the "failure to

pursue the requested discovery at an earlier time resulted not from 'excusable neglect' but from a deliberate, tactical choice of litigation strategy").  The Court is not persuaded that discovery should be re-opened based on Plaintiff's explanations regarding the previous efforts it made to obtain this evidence and why it was unsuccessful in doing so.

Finally, Plaintiff has not demonstrated that its two proposed expert reports would create a genuine issue of material fact as to the element of factual causation.  *See Miller*, 321 F.3d at 303.  Both supplemental reports seek to quantify the value of the actions that these experts have previously suggested Defendants "could have," or "might have," taken to preserve the value of RSL Plc.  (*See* Pl.'s 56(f) Mem. at 2; Pl.'s Opp'n at 72-73; Bae 56(f) Decl. ¶¶ 2-3.)  Plaintiff's counsel asserts that these opinions will "either demonstrate or raise a genuine issue of material fact that" it was within Defendants' power to "preserve[] approximately $1 billion in value for RSL Plc and its creditors."  (Bae 56(f) Decl. ¶ 4.)

Specifically, in Steven Panagos's proposed Supplemental Report, Plaintiff's expert stated that he had previously "proposed actions . . . that the RSL Plc Board should have taken to preserve value for RSL Plc's creditors," and that the purpose of the supplemental report was to "quantify the estimated cash impact" of those actions.  (Bae 56(f) Decl. Ex. C at 1 (citing Panagos Expert Report at 27).)  However, Panagos mischaracterized his July 2007 Export Report.  In his initial Report, Panagos opined that reasonable directors would have "held regular board meetings" and "considered the overall state of" RSL Plc.  (Panagos Expert Report at

29.)  Actions that reasonable directors "would" have taken are essentially, in Panagos's view, the actions that Defendants "should" have taken in order to fulfill their fiduciary obligations.  At no point in his Expert Report did Panagos opine that reasonable directors of RSL Plc would have — or that Defendants, as required by their fiduciary duties, should have — stopped "funding RSL subsidiaries that had an inability to pay the amounts back to RSL Plc" or sold RSL Plc's operating subsidiaries.  (Bae 56(f) Decl. Ex. C at 1.)  Rather, he opined that Defendants "could have" done so.  (Panagos Expert Report at 27.)  Of course, all manner of things *could have* occurred, in hindsight, but such speculation from Plaintiff and its expert does not suffice to meet its burden in a motion for summary judgment.  Nor is this mischaracterization of Panagos's July 27, 2007 Expert Report sufficient to justify re-opening discovery in order "to quantify the estimated cash impact" of what might have been.  (*Id.*)

The principal flaw in Plaintiff's theory of factual causation is not its failure to quantify either the value that would have been obtained if RSL Plc had liquidated its subsidiaries (*see id.* Ex. B at 2), or the "cash savings" that might have resulted from additional restrictions on expenditures by the RSL Plc Board (*id.* Ex. C at 2).  Rather, Plaintiff has failed to establish factual causation because it relied solely on the conclusory assertion that Defendants' inaction "*necessarily must have been* a substantial factor in causing the damages suffered by RSL Plc and its creditors."  (Pl.'s Mem. at 28 (emphasis added).))  As discussed above, *see supra* Part III.C.2, the defect in the argument is Plaintiff's reliance on the term "necessarily," as opposed to Plaintiff's

evidence of the precise dollar value of the "damages suffered." The proposed supplemental expert reports would not remedy this flaw. Accordingly, for all of these reasons, Plaintiff's motion to re-open discovery is denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is denied, Defendants' motion for summary judgment is granted, and Plaintiff's motion to re-open discovery is denied. The Court therefore denies as moot the parties' motions *in limine*, as well as Defendant Fisher's separate motion for summary judgment on Plaintiff's claims against him. However, remaining to be resolved in this litigation is Defendant Fisher's motion for summary judgment on his pending counterclaim against Plaintiff. Accordingly, Plaintiff and Defendant Fisher shall appear before the Court for additional oral argument regarding this motion on September 24, 2009 at 2:30 p.m.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

\*\*\*

Dated: August 10, 2009
        New York, New York

Plaintiff is represented in this action by Ingrid Mara Bagby, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281; John Hyok Bae, Greenberg Traurig, 200 Park Avenue, New York, New York 10166; and Dan K. Webb, Julie A. Bauer, and Robert L. Michels, Winstron & Strawn, LLP, 35 West Wacker Drive, Chicago, Illinois 60601. Defendants are represented by Catherine M. Amirfar, Emily O'Neill Slater, and John S. Kiernan, Debevoise & Plimpton, LLP, 919 Third Avenue, 31st Floor, New York, New York 10022. Defendant Fisher is also represented by Keara A. Bergin, Dewey, Pegno & Kramarsky, LLP, 220 East 42nd Street, 33rd Floor, New York, New York 10017.

42